**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WG WOODMERE LLC; SG BARICK LLC; and LH BARICK LLC, | )<br>)<br>)     Civil Action No.: 1:20-cv-3903 |
| Plaintiffs, | ) |
| vs. | )<br>) |
| | )<br>)     **COMPLAINT AND**<br>)     <u>**DEMAND FOR JURY TRIAL**</u> |
| TOWN OF HEMPSTEAD; THE INCORPORATED VILLAGE OF WOODSBURGH; and THE INCOPORATED VILLAGE OF LAWRENCE, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Plaintiffs WG Woodmere LLC, SG Barick LLC and LH Barick LLC (collectively "Plaintiffs") for their Complaint against defendants the Town of Hempstead ("Hempstead" or the "Town"), the Incorporated Village of Woodsburgh ("Woodsburgh"), and the Incorporated Village of Lawrence ("Lawrence" and together with Woodsburgh, the "Villages" and, the Villages, collectively, with Hempstead, "Defendants" or the "Municipalities") allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.     This action arises from Defendants' coordinated and unlawful attempt to cloak the wolf of eminent domain in the sheep's clothing of "zoning" and through that scheme to take Plaintiffs' property (the "Property") through a jointly-adopted new "zoning" ordinance titled "Coastal Conservation District - Woodmere Club" in violation of the United States Constitution, the New York State Constitution and other provisions of Federal and New York State Law.

1

2.      The new restrictive "zoning" ordinance applies solely to Plaintiffs' Property, which is known as the "Woodmere Club," a private golf club located on approximately 118 acres of land situated partially within each of the three Municipalities.

3.      Defendants' ploy to target only Plaintiffs and their Property – and no other similarly situated property – is starkly apparent by the name of the new zone: the "Coastal Conservation District – Woodmere Club."

4.      Under the zoning that was in effect for more than sixty years until Defendants enacted their new "zoning," Plaintiffs were permitted to develop 284 lots for single family homes on the Property as-of-right.  However, on June 29, 2020 and July 1, 2020, as the last step in their concerted machinations, the Town of Hempstead, the Village of Woodsburgh, and the Village of Lawrence each voted to enact the "Coastal Conservation District – Woodmere Club" zone.

5.      The newly enacted "zoning" dramatically reduced the permitted density on the Property from the previously permitted 284 single family residential lots to just 59, a loss of approximately 80%, or 255 lots.  In addition, it also correspondingly takes away Plaintiffs' ability to develop 80% of the acreage that Plaintiffs formerly had the right to develop.  Defendants further designated 95% of that reduction to be set aside as "parkland" on which all building and other viable economic uses of any kind are prohibited, effectively exacting a conservation easement on Plaintiffs' Property.

6.      As for the few token lots Defendants purposely permitted Plaintiffs to develop under the new zone as a fig leaf to cover their naked land grab – a tiny fraction of what Plaintiffs had the right to do before – that gesture is wholly illusory.  Defendants intentionally included onerous and burdensome conditions and restrictions in their new zone that will triple the cost to

develop these few lots (thus threating their economic viability and rendering any supposed "value" left for Plaintiffs illusory).

7.      Defendants hurriedly enacted their new "Coastal Conservation District – Woodmere Club" zone as a last ditch effort to pull the rug out from under Plaintiffs, who were two years into the subdivision approval process, under which Plaintiffs seek permission to subdivide the Property into 284 zoning-complaint building lots.

8.      Notably, Defendants enacted their new "Coastal Conservation District – Woodmere Club" only after they tried, unsuccessfully, for years, other gambits to severely limit or completely bar any development on the Property.

9.      Defendants' first tactic to stymie any development on the Property was to institute moratoria preventing development.  Hempstead did so first followed by Woodsburgh. These moratoria specifically targeted preservation of community character, with no mention of environmental, traffic or other concerns to which the Municipalities now point to as justification for their latest actions. This highlights the Municipalities' true motives behind their actions; *i.e.,* to find any way possible to prohibit as much development as possible and prevent Plaintiffs from adding any lots for single family homes to the area despite soaring demand, and without any legitimate legislative public purpose.

10.      Plaintiffs were forced to sue in State Court to invalidate the moratoria. In an action against Hempstead, the Court invalidated the Moratorium, finding that it was unconstitutional, illegal, and enacted for no valid purpose. As a result, shortly thereafter, Woodsburgh settled Plaintiffs' suit about Woodsburgh's "copy-cat" moratorium.

11.      Defendants followed the moratoria by proposing a new "down-zoning" plan in 2018 ("Proposed 2018 Golf Course Zone"), which would have reduced the as-of-right density of

the Property's then applicable zoning by 60%; from 284 to only 125 lots. The same engineering firm that prepared the study to support the "Coastal Conservation District – Woodmere Club" zone at issue here, prepared the study upon which the Town relied to support its Proposed 2018 Golf Course Zone.

12.     However, the 5 Towns Civic Association ("5TCA"), a citizens' organization whose sole raison d'être is to block all development on the Property, insisted that Defendants must act to prevent even a single home from being built on the Property and were loudly opposed to any development whatsoever.

13.     Faced with pressure from the 5TCA, extensive public criticism and an outpouring of negative comments on the Proposed 2018 Golf Course Zone from other local residents, the Municipalities' politicians ultimately withdrew the Proposed 2018 Golf Course Zone, proving that the intention of the entire rezoning proposal was just meant to pacify the public and was not steeped in sound environmental, traffic and engineering analysis.

14.     The Proposed 2018 Golf Course Zone, while dramatically reducing the number of lots permitted as-of-right under the then existing zoning, still would have allowed more than twice as many lots that the Defendants' ultimately permitted.

15.     After Defendants' failed attempt to adopt the Proposed 2018 Golf Course Zone, local officials and politicians further succumbed to public pressure by attempting to make the entire golf course a local private park for residents by taking it through their eminent domain powers. The politicians polled local residents, via survey, to discover if the taxpayers would agree to pay the increased property taxes necessary to fund a plan to buy Plaintiffs' Property for parkland. The residents overwhelmingly rejected the notion of paying higher taxes to purchase the Property for their own private park.

16.     Only after the local politicians failed to convince taxpayers to agree to purchase the Property and create a park through eminent domain did the Defendants adopt the newly zoned "Coastal Conservation District – Woodmere Club" with its designation of approximately 71% of the Property as parkland.  By doing so, Defendants have simply repackaged their eminent domain parkland idea, called it "rezoning," and then used that transparent ruse as an end-around the Constitutional requirement to pay compensation for the Property.  Neither the law, nor logic, nor sound public policy, permit such a charade.

17.     While all of that was taking place, Plaintiffs proceeded with the review of their proposed 284-lot subdivision plan before the Nassau County Planning Commission ("NCPC"), which included a review under New York State's Environmental Quality Review Act ("SEQRA").

18.     By the time Defendants enacted their "Coastal Conservation District – Woodmere Club" zone Plaintiffs had already completed a substantial part of the SEQRA review process, having spent almost two years and nearly $2 million dollars on fees, plans and studies, including the completion of a full draft environmental impact statement ("DEIS") that analyzed the environmental consequences of each and every component of the project pursuant to the mandates of SEQRA. The NCPC deemed the DEIS complete on May 14, 2020 and, at that time, published the DEIS for review by Defendants as involved agencies and for comment by the public.

19.     Instead of participating in the process the law provides for the review of Plaintiffs' subdivision application, Defendants hurriedly voted, in late June and early July 2020, to enact their new "Coastal Conservation District – Woodmere Club" zone.

20.     Remarkably, as stated above, this new "Coastal Conservation District – Woodmere Club" zone was formulated for the municipalities by the same engineering firm that created the Proposed 2018 Golf Course Zone, which would have permitted 125 lots for single family homes

on the Property.  But, unlike the Proposed 2018 Golf Course Zone, which was already extremely restrictive, the "Coastal Conservation District – Woodmere Club" zone included significant additional restrictions, including: a parkland requirement; setting aside significant property for supposed public flooding mitigation; and designating a specific subdistrict in which Plaintiffs were restricted to using the land solely for an existing clubhouse, or an identical structure in size and footprint.

21.     Indeed, only after needing to manufacture and offer a purportedly legitimate purpose for taking Plaintiffs' private land through zoning did the Defendants' engineering firm "discover" that the Defendants supposedly needed to protect their voters by enacting a "conservation district" that would effectively create a park specifically for the local residents (not even the general public) on more than 80 acres of Plaintiffs' private property.

22.     Thus, through the "Coastal Conservation District – Woodmere Club" zone, the Municipalities have enacted an improper regulatory land grab to accomplish indirectly the same ends they were unable to accomplish lawfully, *i.e.* by using their eminent domain powers and paying constitutionally compelled just compensation to Plaintiffs.

**The New Zoning Is an Unconstitutional Taking of Property Without Compensation**

23.     Defendants' newly adopted "Coastal Conservation District – Woodmere Club," has left Plaintiffs with not a single lot to develop in the Village of Lawrence – compared to the zoning in place when Plaintiffs purchased the Property which allowed 12 buildable lots; a 100% "categorical," *per se* taking of Plaintiffs' Property within that village per the United States Supreme Court's decision in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992), or, in the alternative, a taking under the United States Supreme Court's seminal decision in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).

24.     In Hempstead, the new ordinance reduces the number of lots that Plaintiffs can develop to 41 – compared to the zoning in place when Plaintiffs purchased the Property which allowed 248 buildable lots; a reduction of more than 83%, or 207 lots.  Such a significant taking is unconstitutional under *Penn Central*.

25.     In Woodsburgh, the new ordinance reduces the number of lots that Plaintiff can develop to 18 – compared to the zoning in place when Plaintiffs purchased the Property which allowed 24 buildable lots; a reduction of 25%.   Woodsburgh's ordinance constitutes an unconstitutional taking under *Penn Central.*

**The New Zone Places Unconstitutional Conditions on Plaintiffs' Property**

26.     Through the "Coastal Conservation District – Woodmere Club" zone the Municipalities have taken away Plaintiffs' ability to develop 80% of the acreage that Plaintiffs formerly had the right to develop.  Defendants further designated 95% of that reduction to be set aside as "parkland" which Plaintiffs must leave as open space.  Under the new zone, Plaintiffs are also required to install costly drainage and flood mitigation improvements – not for the Plaintiffs' benefit, but rather, for the benefit of the surrounding neighbors – solely at Plaintiffs' cost and expense.

27.     In addition, Plaintiffs will have to expend vast quantities of money annually to maintain approximately 80 acres of parkland, drainage and flood mitigation for the benefit of the surrounding neighbors, for an indefinite period.

28.     This exaction of an easement on the Plaintiffs' Property solely for the neighbors, along with putting the financial responsibility for maintaining it solely on Plaintiffs, constitutes an unconstitutional exaction under the seminal decisions *Nollan v. California Coastal Commission*,

483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 420 (2013).

**The New Zoning Violates Plaintiffs Equal Protections Rights**

29.     The rezoning, as is evident from its name: the "Coastal Conservation District – Woodmere Club," improperly singles out Plaintiffs' Property (and Plaintiffs) alone, among all other similarly situated properties in the Municipalities, for onerous, burdensome, harsh, and restrictive treatment.

30.     Not only are there at least five other golf courses near Plaintiffs' Property that also are located within flood zones, there are approximately 42,000 parcels (14,000 acres) of land that sit within flood zones in the Municipalities.  However, the "Coastal Conservation – Woodmere Club" zone only applies to the 12 parcels (approximately 118 acres) that sit exclusively on Plaintiffs' Property.  Attached hereto as **Exhibit A**, is a true and correct copy of a map evidencing the flood plain and coastal boundaries within the Municipalities.

31.     Further, although the Municipalities have advanced the new argument that flood mitigation purportedly mandates the new zone at issue in this case, the Municipalities have not changed zoning ordinances (aside from the new zone targeting solely Plaintiffs' Property) for the remaining 99% of the 14,000 acres in flood zones for flood mitigation purposes.  *See* Exhibit A.

32.      Further, contrary to its supposed concerns about building in flood zones, the Village of Lawrence owns another parcel in a flood zone and near an evacuation route. Lawrence is actively working to rezone this property to allow for future residential development (with a density more than 10 times that of the Plaintiffs' proposed development on Plaintiffs' Property). Lawrence also owns a golf course less than a mile away from the Property which is also in a flood zone.  That property, however, is not subject to flood mitigation.  To the contrary, Lawrence is

currently considering permitting further development on its own golf course property by allowing the installation of a building that would house an eight million dollar indoor pool and swimming facility.

33.     At the very same time the Town of Hempstead was trying to thwart development of Plaintiffs' Property, it was also pushing through rezoning of an area near the Property that will permit significantly greater density and traffic issues, including by allowing 19,500 square feet of commercial development and a new 336-unit residential apartment building.   This new development district is already in an area much more concentrated and congested than the area surrounding Plaintiffs' proposed subdivision, which consists solely of single-family residences. Although the Defendants point to the supposed traffic and other issues that would preclude the density of the previously as-of-right development of the Property, somehow these same concerns and issues are not applied to their own projects (for which they did not even commission a traffic study).

34.     In addition, in the "Coastal Conservation District – Woodmere Club" zone, the Defendants have mandated certain restrictive building requirements (such as the use of permeable pavers) and stormwater retention regulations, that apply only to the 59 lots that the Municipalities will allow Plaintiffs to build on the Property.   Yet, more than 99% of the approximately 42,000 land parcels (approximately 14,000 acres) within the Municipalities that also sit within the same flood zone are not required to employ the same supposedly critical – and expensive – construction methods and flood mitigation techniques for construction on their properties.

35.     Moreover, and shamefully, Defendants have given their official imprimatur – linking on their webpages to letters containing ugly sentiments that unlawfully single out Plaintiffs for unfair treatment through the adoption of the new zone based on abhorrent anti-Semitic

stereotyping and that target Plaintiffs' principals as "money grubbing," "greedy" out-of-state interlopers, demonstrating that Defendants have improperly singled out Plaintiffs for disparate treatment for illegal purposes.

**Under Well Settled New York Law the Defendants**
**Lack the Power to Have Adopted the New Zoning**

36.     In addition to also being unconstitutional under New York State's Constitutional provisions that correspond to the United States' Constitutional provisions noted above, in adopting their new zoning ordinance, the Municipalities have also violated New York law in improperly purporting to use their zoning power (the right to establish criteria for an area consisting of several properties, consistent with a plan) to accomplish planning objectives (the right to consider how a single property is to be developed).  As promulgated by the State Legislature, under the Nassau County Charter, the NCPC has primary jurisdiction for subdivision review.

37.     The rezoning therefore must also be invalidated, *inter alia*, under well settled New York law as an improper and *ultra vires* use of the zoning power by Defendants to enact measures that are soundly and exclusively within the sole ambit of the NCPC.

38.     Indeed, Hempstead is a persistent repeat offender of the improper use of zoning power and is well aware that its actions in this instance are illegitimate.  The Town has already tried to enact this sort of planning through the improper use of the zoning power directed to a single property and property owner, an effort that New York's Appellate Division, Second Department invalidated for this precise reason in *BLF Assocs., LLC v. Town of Hempstead*, 59 A.D.3d 51, 870 N.Y.S.2d 422 (N.Y. App. Div. 2008).

*         *         *

39.     Plaintiffs are in the business of developing real property, not of litigation.  However by colluding with each other for years to deprive Plaintiffs of their rights, Defendants have forced

Plaintiffs to endure years of litigation to enforce their rights, first in the New York State Courts and now in this action.   Defendants have always had the option of acting in a lawful manner but have repeatedly refused to do so.

40.     Defendants' conduct has damaged, and continues to damage Plaintiffs, who are bringing this action to invalidate the ordinance as an unconstitutional taking, an unconstitutional condition, for inverse condemnation compensation and compensation resulting from their inability to use and enjoy their Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), as well as their attorneys' fees and costs pursuant to 42 U.S.C. §1988.

41.     Plaintiffs' economic loss, just from the lost lots that were previously available to them as-of right, as a result of the adoption of the "Coastal Conservation District – Woodmere Club" zone, and for which each of the Municipalities is jointly and severally liable, amounts to at least $205 million dollars resulting from the loss of value in each of the Municipalities as follows:

      a.  at least $25 million dollars in the Village of Lawrence;

      b.  at least $40 million dollars in the Village of Woodsburgh; and

      c.  at least $140 million dollars in Town of Hempstead.

## JURISDICTION AND VENUE

42.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States and presents a federal question, and pursuant to 28 U.S.C. § 1343(a)(4) in that it seeks to secure equitable, monetary, and other relief under an Act of Congress, specifically 42 U.S.C. § 1983.

43.     This Court has supplemental jurisdiction over Plaintiffs' New York State law claims pursuant to 28 U.S.C. § 1367.

44.     This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

45.     Venue is proper within this judicial district, pursuant to 28 U.S.C. § 1391(b), because the relevant events giving rise to Plaintiffs' claims have occurred in this judicial district.

## PARTIES

46.     Plaintiff WG Woodmere LLC is a limited liability company with its principal place of business located at 41 Bayard Street, New Brunswick, New Jersey 08901.

47.     Plaintiff SG Barick LLC is a limited liability company with its principal place of business located at 1450 Broadway, 40th Floor, New York, New York 10018.

48.     Plaintiff LH Barick LLC is a domestic limited liability company with its principal place of business located 1450 Broadway, 40th Floor, New York, New York 10018.

49.     Defendant Hempstead is a municipality organized under the laws of the State of New York, located within Nassau County, New York.  The Town is governed by a Supervisor and Town Board.

50.     Defendant Woodsburgh ("Woodsburgh") is a municipality organized under the laws of the State of New York, and located within Nassau County, New York.  Woodsburgh is governed by a Mayor and Board of Trustees.

51.     Defendant Lawrence ("Lawrence") is a municipality organized under the laws of the State of New York, and located within Nassau County, New York. Lawrence is governed by a Mayor and Board of Trustees.

## RELEVANT NON-PARTIES

**The Nassau County Planning Commission**

52.     The NCPC is an independent board established pursuant to Article XVI of the Nassau County Charter.  The Nassau County Charter was adopted and enacted by the State Legislature and has the force of state law.

53.      The NCPC has jurisdiction to hear and approve applications for the subdivision of land that lies within the unincorporated areas of Nassau County and, in certain instances, land that lies within the bounds of an incorporated village or city.

54.     In Nassau County, the towns do not hold the planning power over subdivisions. Such authority is vested solely with the NCPC.

55.     Section 1610(b)(1) of the Nassau County Charter vests the planning power over areas outside of incorporated villages and cities (*i.e.* under the municipal jurisdiction of a town) exclusively in the NCPC.

56.     Where, as here, an applicant seeks to subdivide property into more than four lots and to lay out new roadways within the subdivision, the application is deemed an application for a "major subdivision" pursuant to County Charter §1610 and Real Property Law §334-a(1).

57.     In this case, because the Property is mostly situated within the jurisdiction of Hempstead, and because certain parts of the Property are within 300 feet of the borders of incorporated Villages, the primary jurisdiction for the purposes of subdivision review is vested with the NCPC.

58.     In New York, any proposed discretionary zoning or planning matter must undergo a review pursuant to SEQRA.  The NCPC is the lead agency in the ongoing SEQRA review of Plaintiffs' subdivision application.

59.     By the time Defendants adopted the new "Coastal Conservation District – Woodmere Club" zone, Plaintiffs had been engaged in the subdivision review process for approximately two-years and had incurred filing and professional fees (engineering, legal, *etcetera*) fees and costs of almost $2 million dollars in connection with the review process.

60.     Defendants are, and have always been, well aware of the significant cost to Plaintiffs in connection with the subdivision review process.

**The Hempstead Town Board and Councilmembers Blakeman and D'Esposito**

61.     The Town Board of the Town of Hempstead ("Town Board") is the body within the Town that is vested with the power and authority to, among other things, adopt and amend zoning laws and regulations for the Town.

62.     The Town Board does not have any planning or subdivision review authority.

63.     Councilmember Bruce Blakeman represents the Town's Third Councilmanic District.  He was appointed to the Town Board in 2015 and has been subsequently re-elected to his position.  Part of Plaintiffs' Property lies within his Town Board district.

64.     Councilmember Anthony P. D'Esposito, represents the Town's Fourth Councilmanic District, appointed to the Town Board in 2016 and has been subsequently re-elected.  Part of Plaintiffs' Property lies within his Town Board district.

65.     Councilmembers D'Esposito and Blakeman are the most publicly vocal Town officials opposed to Plaintiffs' proposed subdivision and development.

66.     Councilmembers D'Esposito and Blakeman are the primary driving forces behind the creation and adoption of the "Coastal Conservation District – Woodmere Club" zone.

**The Woodsburgh Board of Trustees and Mayor Israel**

67.     The Board of Trustees of the Incorporated Village of Woodsburgh ("Woodsburgh Board of Trustees") is the governing body of the Village of Woodsburgh.

68.     Lee Israel ("Israel") is the present Mayor of the Village of Woodsburgh, elected in 2013.

69.     Mayor Israel is a former president of the Old Woodmere Club[1] and was on the club's board when the club and its membership voted to sell the Property to Plaintiffs in April 2017.

70.      As a result of the sale to Plaintiffs, Mayor Israel has known of Plaintiffs' development plans for the Property for years.

71.     As explained in detail below, in addition to adopting the new zone, Mayor Israel has also taken a special interest in singling out Plaintiffs for disparate treatment and unequal enforcement of Woodsburgh's various local ordinances, rules and regulations relating to conditions at the Property.

**The Lawrence Board of Trustees and Mayor Edelman**

72.     The Board of Trustees of the Incorporated Village of Lawrence ("Lawrence Board of Trustees") is the governing body of the Village of Lawrence.

73.     Alex H. Edelman ("Edelman") is the present Mayor of the Village of Lawrence, elected in 2014.

---

[1]     For ease of reference the term "Old Woodmere Club" refers to the Property's private country club and golf course operations during the period *prior to* Plaintiffs' ownership and management. The term "Woodmere Club" refers to the private country club as presently owned and operated by Plaintiffs. Plaintiffs have been forced to discontinue golf operations at the Woodmere Club with the 2020 season as a result of the unlawful and unequal enforcement of various local ordinances, rules and regulations by the Villages, as alleged below.

74. Mayor Edelman has publicly announced his opposition to Plaintiffs' development plans of the Property.

75. Like his counterpart in Woodsburgh, Mayor Edelman has directed Lawrence officials to single out Plaintiffs for disparate treatment and unequal enforcement of Lawrence's various local ordinances and rules relating to conditions at the Property.

76. As explained in detail below, Mayor Edelman, together with Mayor Israel, and Councilmembers D'Esposito and Blakeman, acting under color of law and in their official capacities, have conspired amongst themselves to deprive Plaintiffs of their rights secured under the United States Constitution, 42 U.S.C. §1983, and the New York State Constitution and other New York State Laws.

**Cameron Engineering & Associates, LLP**

77. Cameron Engineering & Associates, LLP ("Cameron Engineering"), of Woodbury, Long Island, is the engineering firm that the Town retained to study and propose new zoning regulations to govern the potential residential redevelopment of golf course properties.

78. In June 2018, Cameron Engineering issued a lengthy report to support the Town's initial down-zoning plan, the Proposed 2018 Golf Course Zone, which reduced the permitted development at the Property to 125 lots for single family homes (as opposed to the 59 allowed under the zoning now at issue).

79. Less than two years later, in May 2020, Cameron Engineering issued a land use and environmental report which Defendants claim to rely on to support their adoption of the "Coastal Conservation District – Woodmere Club" zone. The report points to, and claims to rely upon, a myriad of purported new concerns, which Cameron Engineering never raised in crafting the earlier

rezoning scheme, to support its findings that Defendants should scale back the development potential from 284 to 59 lots and should create parkland on more than 80 acres of the Property.

80.     Under the Proposed 2018 Golf Course Zone, development would have been permitted in areas that Cameron Engineering now deems unsuitable and dangerous for development.

81.     The differing findings from the same engineering firm only serve to confirm that these reports and studies are shams directed to the justification of preordained political ends.

**The Five Towns Civic Association**

82.      The 5TCA is a civic association formed by community members in 2016.

83.     According to its website, 5TCA is dedicated to stopping the development of Plaintiffs' Property in order to preserve open green space for their local community.

84.     The 5TCA claims that it "was born out of necessity, because the quality of life in our neighborhood is about to change for the worse through overdevelopment; loss of our defining green spaces and property values, while unquestionably increasing traffic, flooding and probably taxes."

## FACTUAL BACKGROUND

### I.     THE PROPERTY

85.     Plaintiffs own the Property, a 118 acre parcel of land, located at 99 Meadow Drive, Woodmere, New York, which is known as the Woodmere Club.

86.     The Property consists of the following lots identified on the Nassau County Land and Tax Map: Section 41, Block F, Lots 37, 40, 48, 123, 310, 3028, 3029, 3030, 3032; Section 41, Block D, Lots 53, 55; Section 41, Block 72, Lot 1.

87. Plaintiffs acquired the Property on April 27, 2017. For decades a private golf and country club offering golf, tennis, swimming, catering and related amenities operated on the Property.

88. Plaintiffs discontinued the Woodmere Club's golf operations for the 2020 season, when the Villages' harassment and unlawful campaign of targeting Plaintiffs for unequal enforcement of various local ordinances, rules and regulations, set forth below, made continuing such operations impossible.

89. The Property is located partially in Hempstead (approximately 55 acres), and in the adjacent contiguous villages of Woodsburgh (approximately 40.5 acres) and Lawrence (approximately 22.9 acres). The Property is also within 300 feet of the border of the Village of Cedarhurst.

90. Because it is situated in three municipalities the Property is subject to the local zoning controls of each municipality, as well as the subdivision authority vested in the NCPC, pursuant to Section 1610(b)(1) of the County Charter.

91. The map attached hereto as **Exhibit B**, illustrates which portions of the Property fell within each of the zoning districts in each Municipality before Defendants changed the zoning to the "Coastal Conservation District – Woodmere Club" zone.

92. Due to a steady decline in golf membership, as well as a shift in demographics in the area, the Old Woodmere Club experienced a steep decline in membership over the past years.

93. As a result of the declining membership, several years ago the Old Woodmere Club determined that its continued operation as a private membership golf and country club was not economically sustainable, and it resolved to sell its property i.e., the Property that underlies this action.

94.     Defendants have always acknowledged that the continued operation of the Woodmere Club as a golf course and country club is economically unfeasible.

95.     At the time Plaintiffs acquired the Property, the Old Woodmere Club's ownership was accruing operating losses of over $1 million dollars per year, and had already amassed nearly $12 million dollars in debt.

96.     Under their contract for the purchase of the Property, in addition to an approximate $12 million dollar purchase price, Plaintiffs also agreed to pay off the Old Woodmere Club's debt and to continue to operate the Property as a golf course and country club for a period of time. Plaintiffs agreed to this arrangement knowing that it would result in losses ranging from $1.4 million to $2 million for each year Plaintiffs operated the Property as a country club and golf course.

97.     Therefore, it was always Plaintiffs' expectation -- well known to the Old Woodmere Club members and Defendants -- to discontinue the golf course and country club use and to subdivide the Property into a residential development in accordance with the applicable zoning and in a manner consistent with the character of the residential neighborhoods that surround the Property.

## II.     PLAINTIFFS CONDUCTED EXTENSIVE DUE DILIGENCE BEFORE SPENDING MILLIONS OF DOLLARS TO ACQUIRE THE PROPERTY AND HAD A REASONABLE, INVESTMENT-BACKED EXPECTATION THAT THEY COULD SUBDIVIDE THE PROPERTY AND DEVELOP 284 SINGLE FAMILY LOTS, CONSISTENT WITH BOTH THE APPLICABLE ZONING AND THE RESIDENCES IN THE SURROUNDING AREA

98.     Before purchasing the Property, at significant expense, Plaintiffs conducted extensive due diligence regarding their potential acquisition to understand the Property's subdivision and development potential.

99.     Among other things, Plaintiffs engaged land use counsel, and commissioned an engineering and planning firm to present an inventory and analysis of the zoning, land use and community character of the Property and its surrounding area.

100.     The outcome of this analysis confirmed that, prior to the rezoning at issue in this action, a 284 single-family subdivision plan, identified in the chart below, had the right to be created in complete conformity with the existing zoning regulations, without the need to obtain any zoning variances, and could be designed in a manner consistent with the community character of the surrounding area. This yield analysis was the seminal component of Plaintiffs' investment decision to purchase the Old Woodmere Club.

Table 1     Minimum Lot Size Requirements by Zoning District

| Municipality | Zoning District | Minimum Required Lot Area (Square Feet) | Number of Proposed Lots |
|---|---|---|---|
| Town of Hempstead | B Residence | 6,000 | 248 |
| Village of Lawrence | Residence AA | 40,000 | 12 |
| Village of Woodsburgh | Residence 1A | 43,560 | 23 |
| Village of Woodsburgh | Residence 2A | 87,120 | 1 |

## III.    DEFENDANTS HAVE, FOR YEARS, IMPROPERLY OBSTRUCTED PLAINTIFFS FROM UNDERTAKING ANY LAWFUL DEVELOPMENT ON THE PROPERTY, WITHOUT ANY LEGITIMATE PUBLIC PURPOSE

### A.  Hempstead Passed A Moratorium that it Unlawfully Extended Indefinitely Solely for Purposes of Stymieing Development

101.     The Municipalities' first attempt to stymie development on the Property was to institute supposedly "temporary" moratoria on development.

102.     On November 15, 2016, the Hempstead Town Board adopted Resolution No. 1541-2016, and enacted Section 302(R) to Article XXXI of the Town's Building Zone Ordinance, which imposed a "Temporary Moratorium" that was supposed to last for 180 days, subject to 90-day extensions, on all residential development of golf course properties in the Town that were located within 500 feet of an incorporated village (the "Moratorium").

103.     The stated purpose for enacting the Moratorium was to "ensure that any residential redevelopment of golf course properties covered by the moratorium will be fully in accordance with existing area character and layout in the surrounding vicinities, including but not limited to the existing character and layout of properties in adjacent or nearby incorporated villages."

104.     In enacting the Moratorium, the Town purported to have concerns about the impact of the possible development of three different golf courses located in disparate parts of the Town, although there was no indication that any golf course other than the Property was slated for a planned development.

105.     The text of the Moratorium specifically cited the need to review zoning regulations governing minimum lot size and other "area requirements applicable to the construction of single family dwellings."

106.     During the pendency of the Moratorium, the Town Board claimed that Cameron Engineering would assist the Town in studying the residential redevelopment of golf courses and that the Town would propose new zoning regulations governing the residential redevelopment of selected golf course properties based upon Cameron Engineering's recommendations.

107.     The Town's stated "neutral" purpose in connection with the Moratorium resolution was a ploy.

108.     From the outset Defendants were solely targeting the Property and Plaintiffs, which was the only golf course property in the Town that was likely to be redeveloped in the foreseeable future.

109.     Plaintiffs' Property, like the vast majority of residential parcels within Hempstead, was at the time subject to the zoning regulations set forth in the Town's Residence "B" District. The Residence "B" District permits single family homes on lots of no less than 6,000 square feet.

110.    The area in the Town surrounding the Property was, and still is, zoned within the Residence "B" District and is mostly developed with single-family dwellings on 6,000 square foot lots.

111.    Plaintiffs' subdivision proposal for the area of the Property within Hempstead called for the same—single family homes on 6,000 square foot lots, compliant with all zoning requirements.

112.    The Town's Moratorium received public support and praise from politicians in the Villages, including Lawrence Mayor Edelman, who on July 13, 2017 sent an open letter to the Town, advising: "we [Lawrence] reiterate our support and commitment to the Town's moratorium prohibiting development approval, and look forward to hearing from you and working with you." (emphasis in original).

113.    All in all, the Town Board "administratively" extended the Moratorium, which was originally set to expire in May 2017, six separate times, on: May 9, 2017 (Resolution No. 726-2017), August 8, 2017 (Resolution No. 116-2017), November 14, 2017 (Resolution No. 1649-2917), February 6, 2018 (Resolution No. 198-2018), May 8, 2018 (Resolution 642-2018), and August 7, 2018 (Resolution No. 198-2018).

114.    The repeated extensions of the Moratorium were political measures designed to project the Town's sympathies with those members of the public who wished to stop any sort of development of the Property.

115.    The extensions also were enacted simply to continue to grind any development on the Property to a halt, and not for the stated purpose of allowing the Town time to study issues relating to the potential redevelopment of certain golf courses.

116.    Having long been aware of Plaintiffs' development plans and aware that the Moratorium could not be indefinitely extended, on October 29, 2018, Woodsburgh, under Israel, passed its own copy-cat moratorium ("Village Moratorium") specifically targeting the Property so that Plaintiffs' plan would still be blocked if and when Hempstead's Moratorium finally went away.

117.    The Village Moratorium's stated purpose "was to suspend temporarily the processing or approvals of any subdivision […] to provide the Village with the time and opportunity to consider potential changes to its zoning and land use regulations while preserving the status quo."

118.    Yet, notwithstanding the stated intent, as with Hempstead's Moratorium, the Village version was enacted solely to target Plaintiffs and to delay and ultimately block Plaintiffs' subdivision plan for the Property, as Plaintiffs' Property was the only property within Woodsburgh with subdivision potential.

119.    As with the Hempstead Moratorium, Woodsburgh's moratorium specifically targeted only area character, with no mention of environmental, traffic or other concerns, highlighting Woodsburgh's motive when it was instituted.

120.    Ultimately Plaintiffs were forced to commence costly litigation against the Town in New York State Supreme Court, captioned *WG Woodmere LLC, SG Barick LLC and LH Barick LLC v. Town of Hempstead and Town of Hempstead Town Board*, Index. No. 606719/2018, to challenge the Town's repeated and unlawful extension of the Moratorium.

121.    Plaintiffs were also forced to commence another State Court action to challenge the constitutionality of Woodsburgh's moratorium, captioned *WG Woodmere LLC, SG Barick LLC and LH Barick LLC vs. Incorporated Village of Woodsburgh, et. al*., Index. No. 61690/2018.

122.     On December 26, 2018, the New York Supreme Court issued a Decision and Order finding Hempstead's repeatedly extended Moratorium unconstitutional as a matter of law:

> At some point, however, a 'moratorium' can amount to an unconstitutional taking or violation of a property owner's due process rights […]

> Over two full years have passed since the moratorium was first instituted. Although this court may question why it took nearly a year and a half for Cameron to write its report, it is undisputed that the Town had the analyses it sought and new zoning regulations to vote on in May of this year. That vote was scheduled to take place in May [2018], and then in June [2018]. Instead, the vote was indefinitely postponed, and the Board chose instead to extend the moratorium three more times.

> In its opposition to the motion, the defendants do not proffer *any* reason for these latest extension […]

> Plaintiffs have established as a matter of law that the moratorium is unconstitutional because it currently serves no proper purpose and it has now been extended beyond a reasonable time.

*See id.* at Dkt. No. 65 (emphasis in original).

123.     Shortly thereafter, the Village of Woodsburgh and its the Board of Trustees settled the case that Plaintiffs commenced against the Woodsburgh moratorium, and agreed not to extend the Village Moratorium (which was set to expire imminently) or to institute any new moratoria after the Village Moratorium's expiration.

**B.  After Defendants' Moratorium Gambit Failed, the Town Attempted to Adopt New Zoning for the Property Through a Proposed "Down-Zoning" Plan that Would Have Decreased Permitted Density on the Property and Reduced the Number of Plaintiffs' Lots By 60%; the Town Ultimately Abandoned That Plan In the Face of Public Demands for Zero Development on the Property**

124.     Hempstead followed its moratorium by introducing a new proposed zone in April 2018, the "Proposed 2018 Golf Course Zone," which they titled "GC Golf Course Coastal Residence District (GC).

125.     The Proposed 2018 Golf Course Zone was a classic attempt at "down zoning" to reduce density.

126.    It was supported by a lengthy land use study prepared by Cameron Engineering. *See* https://hempsteadny.gov/files/pdfs/FEAF_EEA_JUNE_2018_PART_1.pdf

127.    The Proposed 2018 Golf Course Zone, by its terms, was applicable to certain golf courses in the Town and would have required a minimum lot size for residential development of 15,000 square feet (as opposed to the lot area requirement of 6,000 square feet of the long-existing Residence "B" zoning).

128.    This would have almost tripled the required minimum lot size, and cut the number of development lots by a commensurate amount. It also would have created a brand new residential zone with lot sizes larger than those in any other residential zone in the Town.

129.    As discussed in detail below, the lengthy Cameron Engineering study which the Town claimed to rely on for its Proposed 2018 Golf Course Zone purportedly reviewed significant adverse environmental impacts on the Property (including but not limited to, tidal wetland degradation, and storm-water runoff from an increase in impervious cover) and community impact on taxes, traffic increase, school congestion and police and fire capabilities.

130.    Nonetheless, the Proposed 2018 Golf Course Zone would have allowed development in areas of the Property that Cameron Engineering now claims in its 2020 study will supposedly result in environmental disaster.

131.    Although the Proposed 2018 Golf Course Zone mentions two other privately-owned golf courses (Inwood Country Club and the Golf Club at Middle Bay Golf Course) which, in addition to Plaintiffs' Property, are located directly on the water and within the New York State Coastal Boundary Area, in reality, the proposed ordinance was intended solely to target Plaintiffs' Property.

132.    For Plaintiffs, the 2018 Proposed Golf Course Zone would have had the effect of reducing the number of housing lots by approximately 60%, from 284 to 125.

133.    Plaintiffs' principals attempted to dialogue with the Town and requested that, in lieu of adopting the 2018 Proposed Golf Course Zone the Town Board should engage in cooperative discussions. These requests were ignored.

134.    Instead, the Town Board indicated that it was necessary to hold a public hearing and vote on the Proposed 2018 Golf Course Zone on May 8, 2018, because the Moratorium was set to expire.

135.    Although the Proposed 2018 Golf Course Zone dramatically reduced the lots in any new subdivision on the Property, because it allowed for some degree of development it quickly triggered opposition from the 5TCA and residents.

136.    As a result of the public outcry, and with the Town Board scheduled to formally introduce the Proposed 2018 Golf Course Zone the next day, some members of the Town Board, including Councilmembers Blakeman and D'Esposito, held a public information meeting on May 7, 2018, with Cameron Engineering also in attendance to explain the proposal to the local community and answer questions.

137.    The May 7, 2018 meeting was not an "official" public meeting of the Town Board, and there is thus no official transcript of the proceedings.

138.     In sum and substance, at this "unofficial" meeting, Councilmember Blakeman repeatedly said that the Town Board needed to take immediate action to prevent development of Plaintiffs' Property, whether by adopting the Proposed 2018 Golf Course Zone or by some other means, because the Town could not just continue to extend the Moratorium indefinitely.

139.    According to Councilmember Blakeman:

> "We have to do something that is thoughtful. In my opinion, what we have done is very aggressive, but I think it is completely legal and justifiable, but the fact is, we cannot tell the builder they can do nothing- because they will run into court and get the 300 building lots. If we don't do something, they are going to get exactly what you do not want them to get."

140.    Councilmember Blakeman thus admitted that the entire purpose behind the Town's actions was to restrict development as much as possible and that all of the other justifications which the Town pointed in support of its actions were solely after-the-fact attempts to cover what the Town was actually trying to do so it could avoid liability.

141.    Councilmember Blakeman also noted at this "unofficial" meeting that further extensions of the Moratorium could be found unreasonable by a court because the Town Board had already (at that time) extended the Moratorium four (4) times since its enactment.

142.    The following additional statements, among others, were made by the Town's representatives at the meeting:

    a.   The Town Board had charged Cameron Engineering to be "aggressive" and propose the "most restrictive" development of golf course properties possible;

    b.   The Town Board recognized that the Moratorium was prejudicial to Plaintiffs' constitutional property right and, therefore, the Town Board was required to move ahead on the new proposed zoning and had sped up the process in the days shortly preceding the vote of the Proposed Golf Course Zone ; and

    c.   Cameron Engineering had purposefully kept its "study" in draft so that it could incorporate "community response" to the 2018 Proposed Golf Course Zone ordinance.

143.    By the conclusion of the meeting, it was clear that the approximately 350 residents in attendance not only opposed the Proposed 2018 Golf Course Zone, but actually opposed any and all development on the Property.

144.    To appease the assembled throng, Councilmember Blakeman said that the Town Board would postpone the public hearing scheduled for the next day, not vote on the 2018 Proposed Golf Course Zone ordinance, and extend the Moratorium yet again.

145.    Thus, on May 8, 2018 the Town board once again extended the Moratorium for another period of ninety (90) days), and announced that it would adjourn the formal introduction of the 2018 Proposed Golf Course Zone ordinance until June 19, 2018.

146.    At its public meeting on June 19, 2018, the Town Board formally introduced the Proposed 2018 Golf Course Zone, but following a series of negative public comments, the Town Board indefinitely postponed any future public hearings on the new zone. *See*, https://hempsteadny.gov/files/tbdocuments/20180619-verbatim.pdf?v1

147.    Also at the June 19, 2018 meeting, the Councilmember Blakeman remarked that the Town needed to take action to prevent development of Plaintiffs' Property specifically because it could not legally keep extending the Moratorium:

> Councilmember Blakeman: [O]ne thing that is known is that it could be catastrophic to the community if two hundred and seventy-seven homes went up there […] There are a lot of issues and what we need to do is we need to draw this to a conclusion at some point because we can't go ad infinitum. The developer has already sued us saying that our moratorium is illegal and that our moratorium has gone on too long. So, we have to bring this to a conclusion sooner rather than later.

*See* https://hempsteadny.gov/files/tbdocuments/20180619-verbatim.pdf?v1 at 16:21-17:11.

148.    The Town ultimately abandoned the Proposed 2018 Golf Course Zone in the face of public opposition.

**C. After their Efforts to Block Plaintiffs Through Moratoria and Down-Zoning Failed, Defendants Explored Taking the Entire Property for Parkland Via Eminent Domain, But that Plan Failed When Residents Made Clear that They are Not Willing to Pay Higher Taxes to Pay for the Property**

149.　After abandoning their 2018 "down zoning" plan, local officials succumbed to public pressures and began to consider the possibility of taking the entire Property by eminent domain for either: (i) a possible park district, which would be open only to residents within half-a-mile from the Property (approximately 770,367 residents), but exclude other residents elsewhere in the Town or on Long Island,  or (ii) a municipal park, open to the public at large.

150.　At a July 3, 2018 public meeting, the Town confirmed it would hire planning consultants Fredrick P. Clark Associates (the "Clark Firm"), to analyze the valuation and economic viability of the creation of a park district or municipal park. *See,* https://hempsteadny.gov/files/tbdocuments/20180703-verbatim.pdf?v1.

151.　According to a July 2, 2018 proposal from the Clark Firm to the Town, its scope of services included examining three alternatives for the Property: (i) use of the Property as a Town-owned park, containing an 18 hole golf course; (ii) use of the Property as a Town-owned park, containing a nine-hole golf course, with the remaining land to be redeveloped with active recreational facilities; and (iii) use of the entire Property as a Town-owned park, containing active recreational facilities, as well as the preservation of certain amount of passive open space with walking trails.

152.　According to the proposal, the Clark Firm was to provide the results of their analysis to the Town in the form of a written report.

153.　Even though there are three other private golf courses within the Town, the Woodmere Club was the only property the Town directed the Clark Firm to study for the potential park district.

29

154.    On May 17, 2019, Councilmembers D'Esposito and Blakeman announced that an "Official Woodmere Golf Course Survey" had been mailed to all households within approximately a half mile of the Property.

155.    The Survey described any proposed development on the Property as "unacceptable to the Town" for reasons of "congestion, overcrowding, traffic impact, environmental concerns, and of course preservation of surrounding residences."

156.    The survey asked residents for their opinion about creating a new special park district encompassing the entire Property solely for residents within the special district, which would come with increased average annual property taxes to those residents of between $2,000 to $4,000 annually for at least the next 20 years to support the acquisition and maintenance of the proposed park.

157.    On June 21, 2019, the *LI Herald* posted a letter to the editor written by then-Town Supervisor Gillen, who said that the "Official Woodmere Golf Course Survey" that Councilmembers Blakeman and D'Esposito touted was "created and sent without my input or support."

158.    Supervisor Gillen's letter further indicated that the entire process was, and always had been, a sham designed to block all development at the Property, and that the Survey was circulated simply to provide cover for a process that already had a predetermined outcome.

159.    According to Supervisor Gillen, "[t]he members of the Town of Hempstead council who represent the area decided to break away from working with the supervisor's office, and as a result have caused more harm than good.  While the council members have claimed the survey was simply to solicit residents' feedback […] the lack of information on how they came up with the limited options offered was panic inducing…"

160.    In addition, making clear that the Town had commissioned the so-called "study" with the outcome already determined, Supervisor Gillen wrote, "[t]he special park district study is still not complete.  Neither is the proposed zoning study.  These documents need to be completed, contemplated and shared with residents before the community can make an informed decision… Taxpayers deserve more than a premature 'survey'."

161.    In a June 2019 Facebook post, Councilman Blakeman virtually admitted that his survey was a sham, and conceded that taking the Property by eminent domain was not feasible: "If the County could afford to buy it, which they can't, then you would rather have a Regional Park open 7 days a week?... The Town and County simply don't have the resources to buy it and the neighbors aren't going to pay for a Park District."

162.    Ultimately, on May 5, 2020, in response to Plaintiffs' formal demands that the Town produce relevant documents under New York State's Freedom of Information Law – (demands that the Town had stonewalled until a New York State Supreme Court justice ordered the Town to respond in an action Plaintiffs were forced to commence against the Town) the Town's counsel admitted that no land review reports prepared by the Clark Firm existed.

163.    After receiving the survey responses, the Town determined that the cost of creating a park district was prohibitive because the residents refused to pay the taxes necessary to fund the compensation to which Plaintiffs would have been entitled by law, had the Town taken the Property under its eminent domain power.

164.    Further, the overall cost of acquisition, development, and debt service necessary to create a municipal park was a significant expense for the Municipalities that they could not afford, because a park would not produce any tax revenues.

165.    Focused again on avoiding opposition, Defendants ultimately dropped the idea of using eminent domain and decided to simply take the Property without paying for it; to call what was obviously a taking, in both intent and effect, "zoning," and adopted the "Coastal Conservation District – Woodmere Club."

IV.    **WHILE DEFENDANTS WERE TRYING EVERYTHING POSSIBLE TO STOP PLAINTIFFS FROM DEVELOPING ANYTHING AT ALL, PLAINTIFFS FILED THEIR SUBDIVISION APPLICATION WITH THE NCPC TO OBTAIN SUBDIVISION APPROVAL UNDER THE AS-OF-RIGHT ZONING AND THE NCPC COMMENCED SEQRA REVIEW OF PLAINTIFFS' APPLICATION**

166.    While Defendants were taking the steps outlined above to block Plaintiffs' development plans for the Property, and even while Plaintiffs were offering to meet with public officials in an effort to find a mutually acceptable alternative that would obviate the perceived need for any rezoning as well as for litigation, Plaintiffs filed their application for subdivision approval pursuant to the mandates of New York State law.

167.    On December 7, 2018 Plaintiffs filed an application with the NCPC for subdivision approval to create a new "filed map" to be known as "Willow View Estates" (the "Subdivision").

168.    In their application, Plaintiffs sought to subdivide the Property into 284 single family residential lots that fully complied with the then-effective zoning regulations in each jurisdiction.  A true and correct copy of the proposed Willow View Estates subdivision map is attached hereto as **Exhibit C**.

169.    To comply with the subdivision review regulations of the NCPC, Plaintiffs' application contained detailed and substantial amounts of environmental and engineering data, including a fully-engineered subdivision plan for the entire Property.

170.    Plaintiffs paid an initial filing fee of $342,000 to the NCPC to commence the process.

171.     Upon receipt and initial review of the application, the NCPC commenced the mandated review of the matter under SEQRA, an exhaustive review process that must be completed before the NCPC can make final determination on the subdivision application.

172.     In early 2019, the NCPC officially declared itself "Lead Agency" for the purposes of the SEQRA review process and issued a "Positive Declaration," a determination that triggers the most detailed and extensive form of environmental review provided by law.

173.     None of Defendants objected to the Lead Agency status for NCPC.

174.     To study and address any potential adverse environmental impacts that could result from Plaintiffs' application, the NCPC then ordered Plaintiffs to prepare and submit a full DEIS.

175.     The DEIS is the essential tool for the planning process, as it analyzes a vast array of possible environmental impacts that might occur based upon a proposed development and proposes ways in which to mitigate against the most significant of those impacts.

176.     As the first step in the SEQRA process, the NCPC engaged in "scoping" review, a process that determines the "table of contents" for the DEIS, which then lists the issues that the DEIS must study.

177.     The scoping process involved multiple iterations of the "table of contents" for the DEIS and, as involved agencies, Defendants were made aware of the proposed scope and were given the right to comment thereon.

178.     None of Defendants submitted substantive comments on the proposed scope or took part in the scoping process.

179.     Following a public hearing on June 26, 2019, the NCPC adopted a final scope to Plaintiffs' DEIS.

180.     Thereafter, Plaintiffs and their engineers spent the next several months preparing the DEIS in a manner consistent with the final scope set by the NCPC.

181.     Ultimately, on May 14, 2020, over a year-and-a-half after Plaintiffs' filed the subdivision application, and after having expended approximately $2 million dollars in the process, the NCPC declared Plaintiffs' DEIS "complete" and accepted it for review. At the same time, the NCPC opened the required period for public comment on the DEIS.

182.     The topics covered in Plaintiffs' DEIS included:

- Physical Alteration of Land (including, subsurface and environmental conditions, soils, geotechnical investigation, topography);
- Water Resources and Floodplains (including among other topics: surface waters, floodplains, Superstorm Sandy, Nassau County Back Bays Coastal Storm Risk Management Study, Stormwater, Five Towns NY Rising Community Reconstruction Plan, Groundwater Resources, Coastal Resources);
- Ecology and Wetlands;
- Aesthetic Resources;
- Historic and Archaeological Resources;
- Recreational Opportunities and Open Space;
- Transportation;
- Energy;
- Zoning, Land Use and Community Character;
- Noise, Odors and Lighting;
- Climate Change (including sea-level rise, greenhouse gas emissions);
- Construction Impacts;
- Alternatives (Required No action Alternative, Cluster Plan, Reduced Density Plan with 9-Hole Golf Course); and
- Growth-Inducing Impacts.

183.     Plaintiffs' DEIS also included, among other things, a Traffic Impact Study, environmental site assessment, and a topographic survey, all conducted in accordance with New York law.

184.     Instead of participating in the NCPC review of Plaintiffs' Subdivision through the SEQRA process (which addresses all the environmental concerns the new zoning at issue purports to address), the Municipalities instead elected to adopt the new "Coastal Conservation District –

Woodmere Club" zone in an effort to circumvent SEQRA and the subdivision process, and to impose their own new plan for a development scheme upon the Property.

185.    All of Defendants supposed environmental concerns noted in the "Coastal Conservation District – Woodmere Club" zone and the corresponding Cameron Engineering study have been addressed in Plaintiffs' DEIS through the SEQRA review.

186.    To date, Plaintiffs have paid approximately $700,000 dollars in fees to Nassau County in connection with the NCPC's subdivision review process.

187.    To date, Plaintiffs have paid approximately $1,500,000 dollars to their consultants, architects, engineers, legal counsel and other professionals in connection with their Subdivision application.

V.    **HAVING FAILED IN ALL THEIR PREVIOUS EFFORTS, AND WITH THE NCPC MOVING THE SEQRA PROCESS FORWARD, DEFENDANTS HURRIEDLY VOTED TO ENACT THE NEW "COASTAL CONSERVATION DISTRICT – WOODMERE CLUB" ZONE, A NEW ZONING DISTRICT THAT APPLIES ONLY TO PLAINTIFFS' PROPERTY**

A.    **Defendants Entered Into An Unprecedented Inter-Municipal Agreement to Permit Hempstead To Shield the Villages from the Full Consequences of Their Illegal Conduct, which They Could Never Afford to Bear On Their Own**

188.    With the expiration of the moratoria, the abandonment of the 2018 Proposed Golf Course Zone, the collapse of the eminent domain parkland plan, and the NCPC moving the SEQRA process forward on the Subdivision, Defendants formally joined forces and colluded with each other to block Plaintiffs' development plan with an illegal zoning scheme.

189.    In the months of November and December 2019 and January 2020 Defendants entered into an Intermunicipal Cooperation Agreement ("IMA") to coordinate their attack on Plaintiffs' property rights.

190.     Under the IMA, Defendants agreed to work together to draft, and adopt, "mirror image" zoning ordinances that would impose a single zoning scheme on the Property. *See,* https://hempsteadny.gov/files/pdfs/IMA.pdf

191.     Defendants justified the adoption of the IMA due to the Property's location within three different jurisdictions and the supposed need to jointly address "environmental concerns" presented by the development of the Property for residential and commercial use.

192.     In addition, knowing that the enactment of the proposed "Coastal Conservation District – Woodmere Club" would effect a taking without providing any compensation to Plaintiffs, and that their actions were unlawful for that reason alone as well as for others, and fully expecting Plaintiffs to sue, each Municipality adopted by resolution a fee sharing agreement (the "Fee Sharing Agreement").

193.     Under the Fee Sharing Agreement, even though each Defendant has differing abilities to pay legal fees and any judgment that may ultimately be rendered against it, Defendants nevertheless agreed that "Hempstead would pay 70% for such incurred legal services and costs" in association with any action the Plaintiffs may commence to challenge the enactment of the "Coastal Conservation District – Woodmere Club," "with the Villages responsible for the remainder" of such costs and fees.

194.     In addition, the Municipalities agreed to retain jointly the services of a single law firm, to be selected by Hempstead.

195.     Under the Fee Sharing Agreement, even though Hempstead's portion of the Property encompasses only about 50% of the total Property, Hempstead nonetheless will pay 70% of legal costs and take the lead in any litigation.

196.     The Fee Sharing Agreement also improperly and illegally induced the Villages to support their respective versions of the "Coastal Conservation District – Woodmere Club" zone by requiring that the Villages remain parties to the IMA and prohibiting them from amending or repealing aspects of the new zone under their jurisdictions.

197.     If the Villages withdraw for the IMA or enact "unapproved" changes to the zoning regulations governing the Property, under the Fee Sharing Agreement, they would be obligated to pay 100% of their own legal fees and retain their own lawyers.

**B.  The Municipalities Introduce and Adopt the "Coastal Conservation District – Woodmere Club" Zone**

198.     Mere days after the NCPC declared Plaintiffs' DEIS complete and ready for review, each Defendant formally introduced its version of the "Coastal Conservation District – Woodmere Club" zone on May 18, 2020, May 19, 2020, and May 21, 2020, respectively.

199.     On June 23, 2020, Defendants held an unprecedented joint public hearing regarding the "Coastal Conservation District – Woodmere Club."

200.     At the hearing, Plaintiffs' land use counsel objected to the "Coastal Conservation District – Woodmere Club" as an illegal enactment that should be voted down. Counsel once more urged dialogue between all parties instead of strife and litigation. A copy of the statement is attached hereto as **Exhibit D**.

201.     The Municipalities ignored the objection and concluded the public hearing.

202.     On June 29, 2020 and July 1, 2020, Defendants formally adopted the "Coastal Conservation District – Woodmere Club" zone. A copy of Hempstead's resolution adopting the new zone is attached as **Exhibit E**; a copy of Woodsburgh's resolution adopting the new zone is attached as **Exhibit F**; and a copy of Lawrence's resolution adopting the new zone is attached hereto as **Exhibit G**.

203.     The Defendants' stated purpose for enacting the "Coastal Conservation District – Woodmere Club" is: "to regulate development in the environmentally sensitive coastal areas that span the municipal boundaries of the Town and the contiguous Villages of Lawrence and Woodsburgh, including the area occupied by the former Woodmere Club – allowing for the enhanced preservation and protection of the Town's and neighboring Villages' environmental, coastal, open space and cultural resources and the preservation of the residential neighborhoods."

204.     In addition, the stated purpose recites as its principal rationale the need to manage "current and future physical climate risk changes due to sea level rise, storm surge and flooding."

205.     There is no comprehensive environmental, or other, study that supports the adoption of the "Coastal Conservation District – Woodmere Club" zone.

206.     The "study" that accompanied the "Coastal Conservation District – Woodmere Club" zone was prepared by Cameron Engineering in the form of an "Expanded Environmental Assessment" ("EEA").   *See* https://hempsteadny.gov/files/pdfs/Expanded-EA.pdf

207.     The EEA is not the product of years of analysis of the environmental problems it references. Rather, it was prepared entirely as a fig leaf to cover the naked land grab that is the "Coastal Conservation District – Woodmere Club" zone.

### C.   The "Coastal Conservation District – Woodmere Club" Dramatically Curtails Development and Takes Away Plaintiffs' Valuable Property Rights

208.     The newly created "Coastal Conservation District – Woodmere Club" zone replaces the zoning districts listed in Table 1, Paragraph 100 above, with a new zoning scheme that set forth three new "subdistricts": (i) the "Open Space/Recreation Sub-District;" (ii) the "Single-Family Residential Subdistrict;" and (iii) the "Clubhouse/Hospitality Subdistrict." A true and correct copy of the "Coastal Conservation District – Woodmere Club" subdivision map yield is attached hereto as **Exhibit H**.

209.     Under the prior zoning, Plaintiffs had the right to develop 12 building lots for single family homes within Lawrence.

210.     Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions Plaintiffs are not permitted to place any lots for single family homes within Lawrence's jurisdiction, a reduction of 100%.

211.     Under the prior zoning, Plaintiffs had the right to develop 248 building lots for single family homes within the Town of Hempstead.

212.     Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions, Plaintiffs are only permitted to develop 41 building lots for single family homes within Hempstead's jurisdiction, a reduction of 84%.

213.     Under the prior zoning, Plaintiffs had the right to develop 24 building lots for single family homes within Woodsburgh.

214.     Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions, Plaintiffs are only permitted to develop 18 building lots for single family homes within Woodsburgh's jurisdiction, a reduction of 25%.

215.     Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions Plaintiffs' are thus only permitted to develop a maximum of 59 building lots for single family homes on the Property, a reduction of approximately 80% overall.  As stated above, Defendants have further designed 95% of that reduction to be set aside as "parkland" on which all building and other viable economic uses are prohibited.

216.     Defendants have thus deprived Plaintiffs of 100% of the value of their Property in Lawrence, and at least 84% of the value in Hempstead and 25% of the value in Woodsburgh through the rezoning.

     i.    *The "Coastal Conservation District – Woodmere Club" Enacts A Conservation Easement on More Than 70% of the Property Set Aside Exclusively for "Parkland" Under its Terms.*

217.    For the stated purpose of purportedly addressing severe storms and coastal storm surges, the "Coastal Conservation District – Woodmere Club" imposes an "Open Space/Recreation Sub-District" (the "Open Space Subdistrict") that applies to approximately 83.3 acres of the total Property, of which 35.7 acres lie within the 55-acre portion of the Property subject to Hempstead's jurisdiction. *See, e.g.* Exhibit E, at §76.18(A); EEA (https://hempsteadny.gov/files/pdfs/Expanded-EA.pdf) at pg. 19.

218.    Even though the Municipalities admit in the "Coastal Conservation District – Woodmere Club" zone ordinance itself that golf courses are closing as a result of declining golf participation and memberships at golf clubs (and therefore are not economically feasible), this subdistrict limits "permitted uses" to "open space parkland [which has no economic value at all], passive parkland  [which has no economic value at all] , or a nine-hole golf course [the only use with seemingly any value]." *See e.g.* Exhibit E, at § 76.26(A); § 76.18(B).

219.    None of the Defendants have ever studied whether a nine-hole golf course is an economically viable use of the Property.  It's not.

220.    The inclusion of the golf course use within the Open Space Subdistrict is thus illusory; it is an attempt to disguise the fact that the Open Space Subdistrict creates the equivalent of a park out of privately owned land.

221.    Thus, the zoning scheme set forth in the "Coastal Conservation District – Woodmere Club" would make it physically impossible to design and run a golf course of any kind. The "Coastal Conservation District – Woodmere Club" places the area for lots for single family homes (an area in which no golf course is permitted) in the middle of the Property and makes no

provision for parking or any form of attendant commercial use within the Open Space Subdistrict.

222.    Consequently, by designating more than 80 acres of Plaintiffs' Property as passive "parkland," Defendants imposed a permanent conservation easement upon Plaintiffs' Property without providing any compensation for it, all for the benefit of neighboring properties and all at Plaintiffs' sole expense.

223.    Although Plaintiffs are precluded from making any viable economic use of any portion of the Property located within the Open Space District, the "Coastal Conservation District – Woodmere Club" zone nonetheless mandates that Plaintiffs maintain such land and even install new, costly drainage infrastructure to service it.

224.    For example, this sub-district purports to require Plaintiffs to install, at their own expense, active flood management equipment on the Property.  That equipment is of no use to Plaintiffs but is solely designed to provide flood control for neighboring properties.

225.    In addition, Plaintiffs are still subject to continuing obligations under various local ordinances to maintain the Property at a cost in excess of $3 million dollars annually, or risk fines for failing to do so, and also must maintain property insurance.

226.    In addition, Plaintiffs will still be obligated to pay taxes to the Municipalities for all the areas on the Property designated as "parkland."

227.    Thus, not only have Plaintiffs been compelled to give up any economic benefit from over 80 acres of their property, they are saddled with all of the burdens, but none of the benefits of ownership, amounting to carrying costs of more than $3 million dollars annually.

228.    In sum and substance the "Open Space/Recreation Sub-District" simply piles up economic losses to Plaintiffs. Plaintiffs are forced to keep paying property taxes to the Municipalities on the open space, are forced to incur costs for maintenance and upkeep for the

Property, and are forced to expend exorbitant costs on new equipment that the new zoning compels them to install on and under the open space, just to be able to develop the few lots remaining to them under the new zoning.

229.    Further, with respect to those few lots Plaintiffs can develop under the new zoning, Defendants' new conditions and restrictions in the new "Coastal Conservation – Woodmere Club" zone have almost tripled the hard construction costs allotted to each lot (as compared to the prior zoning), and thus have eliminated the economic viability of each buildable lot.

230.    By saddling the few remaining lots available for development with almost triple the costs to develop, Defendants have intentionally made it economically unfeasible for Plaintiffs to develop the Property.

> ii.    *The "Coastal Conservation District – Woodmere Club" Enacts A Residential Subdistrict that Restricts Plaintiffs' Ability to Develop 80% of the Acreage that Plaintiffs Formerly had the Right to Develop, and Is Inconsistent with its Stated Purpose of Preventing Flooding Because it Allows for Development in Flood Zones while Restricting Development Outside the Flood Zone.*

231.    The second subdistrict, the "Single-Family Residential Subdistrict" (the "Single Family District") covers approximately 29.4 acres of the Property, 19.3 of which are located in the Town and the remaining 10.1 acres of which are located within the Villages.

232.    The Single Family District regulates approximately 25% of the Property.

233.    Only a tiny sliver of the Single Family District is within Lawrence, and it therefore does not allow for the development of any single family lots in that village.

234.    In Hempstead, the Single Family District applies to 35.1 % of the overall Property.

235.    In Woodsburgh, the Single Family District applies to 20.5 % of the overall Property.

236.     While the Defendants' principal justification for the "Coastal Conservation District – Woodmere Club" zone is allegedly the need to limit development within sensitive flood zones, the Single Family District allows residential development almost exclusively in areas of the Property that lie within a flood zone.

237.     Conversely, the Open Space District prohibits development in parts of the Property that are not within a flood zone.

238.     This illogical regulatory scheme demonstrates the sham nature of the justification for the "Coastal Conservation District – Woodmere Club" zone.

239.     The design of the subdistricts has nothing to do with flooding; the design is simply intended to mandate the maintenance of a huge buffer around the outer areas of the Property.  *See* EEA (https://hempsteadny.gov/files/pdfs/Expanded-EA.pdf) at pp. 7, 9, 18, 21, 23.

240.     Although approximately 42,000 parcels (or 14,000 acres) of land within the Municipalities sit within a flood zone (which is about 18% of all parcels within the Town, 40% of all parcels within Lawrence, and 50% of all parcels within Woodsburgh) the "Coastal Conservation – District Woodmere Club" zone rezones only 12 parcels (118 acres) on account of purported flood issues, and applies only to Plaintiffs' Property.  *See* Exhibit A.

241.     In addition, the Proposed 2018 Golf Course Zone contained a **50-foot** greenbelt around the entire Property.  The "Coastal Conservation District – Woodmere Club" expands on that concept by creating an **80-acre** buffer between any allowed development and the neighboring properties.  That fact and that the "Coastal Conservation – District Woodmere Club" only allows approximately ten lots located <u>outside</u> of the flood zone demonstrates that Defendants' intent was not actually to protect from flooding, but to create a buffer for the neighbors.

242.    Indeed, the less than miniscule effect on flood zone properties in the Municipalities as a result of the "Coastal Conservation District – Woodmere Club" dramatically demonstrates that the Defendants' "flood zone" claims are bogus.

243.    18% of Hempstead is located within a flood zone, but the "Coastal Conservation District – Woodmere Club" only affects 0.03% of that 18%;

244.    40% of Lawrence is located within a flood zone, but the "Coastal Conservation District – Woodmere Club" only affects 0.37% of that 40%;

245.    50% of Woodsburgh is located within a flood zone, but the "Coastal Conservation District – Woodmere Club" only affects 6.35% of that 50%.

>    iii.    *The "Coastal Conservation District – Woodmere Club" Designates A Specific Clubhouse/Hospitality Sub-District to Ensure the Use Will Always and Forever Remain a Clubhouse*

246.    The third subdistrict lies completely within the jurisdiction of Woodsburgh and is known as the "Clubhouse/Hospitality Sub-District" (the "Clubhouse District").

247.    The Clubhouse District "is limited to approximately 5.7 acres within the Village of Woodsburgh portion of the Property" and encompasses the existing clubhouse facility for the former golf course and the amenities associated with it, including its athletic courts, swimming pool and parking lot. *See e.g.* Exhibit F, at §150-110(C).

248.    The stated intent of the Clubhouse District is "to preserve and enhance the existing clubhouse of the Woodmere Club ..." which the ordinance calls a "prominent community asset" of "historic character." *See e.g. id.* at §150-102; §150-110(C).

249.    Thus, Woodsburgh has admitted it used zoning regulations to preserve the use that already exists within the Clubhouse District, and to preserve the "historic" structure located in that district.

250.     In an unprecedented use of a zoning regulation, the minimum lot size required in the Clubhouse District is the entirety of the land governed by the Clubhouse District—5.7 acres. Thus, the Clubhouse District allows for just one building lot.

251.     The permitted building area, lot coverage and height requirements in the Clubhouse District are all precisely pegged to the existing Clubhouse Building's footprint, square footage, lot coverage and height.  *See id*. at §§150-128-130.  Meaning, although Plaintiffs could theoretically demolish the Clubhouse it would make no sense for them to do so as they are limited to replacing it loosely with a facsimile of it.

252.     The Clubhouse District is not in reality a zoning district, rather, it attempts to use zoning to effectively landmark both a building and the uses of land, such that the subject 5.7 acres remains always and forever limited to a clubhouse with tennis courts and a pool.

253.     Once again, the burden the "Coastal Conservation District – Woodmere Club" zone puts the operation and maintenance of the old clubhouse and its facilities solely upon Plaintiffs, who can have no choice but to run the facility in some way, since doing so is the only use permitted to them in this sub-district.

254.     Thus, at Plaintiffs' expense, Woodsburgh will forever enjoy the benefits of the clubhouse, the place in which Mayor Israel spent so much time as a member of the old club's board before Plaintiffs' purchased the Property.

255.     The maintenance and operation of the Clubhouse and amenities costs Plaintiffs hundreds of thousands of dollars a year.

256.     Yet the Clubhouse District would restrict Plaintiffs to use only the already existing Clubhouse, or to construct a new building on its exact footprint having the exact same dimensions,

that Plaintiffs could use solely for hospitality; *i.e.,* catering and overnight stays, or religious or educational uses. All of these permitted uses operate at a loss.

257.     There has been no analysis by the Municipalities of whether the proposed limited uses of the Clubhouse District are economically feasible.

258.     To the contrary, Plaintiffs would be forced to continue to pile up losses every year with owning the Property in this sub-district, on top of the loss of the economic value to the Property as a result of the rezoning into this sub-district.

259.     Plaintiffs have thus been deprived of all viable economic uses of the portion of the Property within the Clubhouse District.

> **D.  Defendants Claimed to Rely on The Same Engineers Who Said in 2018 that Limiting Development at the Property to 125 Lots for Single Family Homes was Appropriate But Now Claim that Only 59 Housing Lots There Should be Allowed**

260.     Cameron Engineering's EEA does not even attempt to square its purported conclusion in 2020 with those in its 2018 report, in which Cameron Engineering concluded, just two years earlier, that a 125-single-family-residence-development within the Property was fine.

261.     The Proposed 2018 Golf Course Zone, and the 2018 Cameron Engineering Report, set forth an entirely different set of regulations from those now enacted by the "Coastal Conservation District – Woodmere Club" and would have permitted development in areas of the Property that the EEA now claims would result in environmental disaster.

262.     In 2018 – evidently, before residents outraged at the possibility of any development nearly rioted at Councilmembers Blakeman and D'Esposito's "unofficial" public meeting about the Proposed 2018 Golf Course Zone – redevelopment in those very same areas was just fine.

263.     For example, the proposed mitigation measures discussed in Cameron Engineering's 2018 report include increased lot sizes to 40,000 and 20,000 square foot lots,

implementing limits on impervious surfaces and requiring storm water to be addressed on each building lot, with the stated purpose of aligning the development parameters with State regulations that apply to development adjacent to wetlands.

264. Yet the 2018 report makes no mention of precluding development in any specific area of the site other than providing for perimeter buffers.

265. By contrast, Cameron Engineering's EEA recommends that no development should take place within the 80 acre Open Space District, which largely could have been developed subject to the 2018 plan.

266. In addition, the Proposed 2018 Golf Course Zone did not include: any parkland; any land set aside for public flooding mitigation; or any designation of a specific clubhouse district.

> i. *Cameron Engineering's EEA in support of the "Coastal Conservation District – Woodmere Club" is flawed and consists solely of conclusory allegations with little to no technical analysis to support its conclusions, and is obviously a result-driven exercise created solely to cover-up Defendants' unlawful conduct*

267. Cameron Engineering's EEA attempts to tie the proposed "Coastal Conservation District – Woodmere Club" zone to a need for a drastic reduction in the residential yield of the Property to provide additional area in which to accommodate stormwater infiltration.  However the EEA contains zero inventory analysis to provide technical substantiations that would support its assertion.

268. Unsurprisingly, the EEA makes only a passing mention of the DEIS that was prepared for Plaintiffs' proposed Subdivision, which has undergone critical technical review and acceptance by the NCPC.

269.     Indeed, the comprehensive information and analysis from Plaintiffs' DEIS, which Cameron Engineering ignored, is evidence that the Subdivision as proposed would not result in significant environmental impacts.

270.     The EEA itself expressly admits its deficiencies, as compared to the comprehensive DEIS Plaintiffs submitted as part of the Subdivision approval process under SEQRA, noting that "…any future development of the golf course would require further, site-specific ecological investigations to determine if there would be development constraints associated with these habitats and potential rare plants and/or animals. Therefore, the impact of these potential issues on the development of the subject property is unknown at this time."

**E.  The New Zone Improperly Singles Out Plaintiffs' Property -- and Plaintiffs -- For Illegal, Disparate Treatment**

*i.     The New Zone's Draconian Restrictions Do Not Apply to Any Other Similarly Situated Property in the Municipalities*

271.     Cameron Engineering's EEA identifies supposed significant environmental issues that broadly affect "coastal communities" and concedes that the existing zoning regulations, regulations that govern thousands of parcels that lie within the Municipalities' coastal areas, are inadequate to address these critical problems.  Yet the EEA calls for a novel regulatory regime solely applicable to the Property and not to any other property in the Municipalities.

272.     Further, the EEA maps out the flood zones only on the Property. It does not identify the surrounding properties that are also in federally designated flood zones or explain why special zoning requirements shouldn't extend to those similarly-situated parcels.

273.     Indeed, aside from the "Coastal Conservation District – Woodmere Club," no zoning district within the Municipalities' respective jurisdictions compels the maintenance of "passive recreation" areas on private property.

274. For example, the new zone does not apply to other large tracts of land in the 100 and/or 500 year flood zones, including any of the other golf courses in the Municipalities, such as the Rockaway Hunting Club, Inwood Country Club, Seawane Golf and Country Club, the Golf Club at Middle Bay, and the Lawrence Yacht & Country Club.

275. As evidenced from the image maps attached hereto as **Exhibit I**, all of those golf courses, one of which, the Rockaway Hunting Club, borders Plaintiffs' Property, are located in flood zones.

276. Nonetheless, the Municipalities have kept all of these golf courses in residential zones just like the zones previously applicable to Plaintiffs' Property.

> ii. *The Defendants Have Improperly Singled Out and Targeted Plaintiffs Based on Ugly Stereotypes*

277. On February 19, 2020, Woodsburgh posted on its official website a letter written to the editor of the *Five Town's Jewish Times* by the 5TCA, which Mayor Israel called "very well written." The letter referred to Plaintiffs and their principals as "greedy" interlopers from out of state, who did not care about the community, simultaneously demonstrating animus against the Plaintiffs based on classic anti-Semitic tropes and noting that Plaintiffs do not reside in New York, all of which are impermissible, illegal bases for the Defendants' actions.

278. For example, the letter, posted on Woodsburgh's website, stated:

- "if you live in New Jersey, you probably don't really care about the traffic problems and gridlock that the residents of the Five Towns have to put up with on a daily basis."
- "According to public record, they paid a little over 9 million dollars and assumed 15 million in debt for the entire 114 acre piece of property. They are poised to make an excellent return on their investment. As one resident so eloquently stated at the last public meeting '**I look at this map and all I see is greed**'"

(Emphasis in original).

279.     In addition, the letter confirmed the consensus that the community (and municipal officials) would compromise at nothing: "[w]e maintain that 283 homes in any configuration (apartments or homes) is still way too much […] once green space is gone, it's gone forever."

280.     In an open letter posted to Woodsburgh's website, the Village's Board of Trustee's echoed the 5TCA sentiments, alleging that Plaintiffs care nothing for the welfare of the community: "They have denigrated politicians and others who seek to protect the quality of life for residents of the Village of Woodsburgh and surrounding areas."

281.     In another open letter to the community, Mayor Israel wrote "[b]e assured that the Village of Woodsburgh is actively and proactively working to maintain the charm and character for which we are known."

> iii.     The Villages Selectively Enforced Village Codes and Rules Against the Woodmere Club

282.     In addition to the many efforts to destroy Plaintiffs' property rights since Plaintiffs acquired the Property, both Woodsburgh and Lawrence officials have taken countless retaliatory measures to impose arbitrary and discriminatory burdens, selectively enforcing various village ordinances that the Villages never tried to enforce before, and/or that they never seek to enforce against other similarly situated property owners.

283.     Between 2018 and 2019, under Mayor Israel's leadership, Woodsburgh issued six appearance tickets to Plaintiffs for conditions that were long-standing and that existed before Plaintiffs acquired the Property, including conditions that existed when Mayor Israel himself was a Woodmere Club board member.

284.     For example, one ticket cited the Woodmere Club for failure to restrict excessive noise for certain A/C equipment, which had been in place for more than 15 years which predates Plaintiffs' ownership.

285.    In 2013, when Mayor Israel was on the Old Woodmere Club's board, the Club entered into an agreement with a contracting company that allowed the company to park and maintain some of its earth moving vehicles and equipment on the Property overnight in a remote location, far removed from the residences that border the Property.

286.    In 2015, again while Mayor Israel was on the Old Woodmere Club's board, the Club's management expanded the agreement, allowing the construction company to operate a dirt sifting operation in the area on the Property used for parking. In exchange, the company provided the Old Woodmere Club with dirt that the Club used in its golf course operations.

287.    This agreement violated Woodsburgh's vehicle and traffic ordinance, Chapter 140, Article III, § 140-26.1(B), an ordinance that prohibits the parking or storing outdoors of any commercial vehicle in residential areas between the hours of 9:00 PM and 8:00 AM, and Chapter 150, Article II, § 150-6(F), a zoning regulation that prohibits the use of residential properties for commercial use.

288.    Despite these long-standing, technical violations of Woodsburgh's codes, there was never any objection from Village officials until 2017, after Plaintiffs purchased the Property and Mayor Israel was threatened with the loss of his personal golf course through Plaintiffs' development plans.

289.    Following Plaintiffs' purchase of the Property, Woodsburgh's Code Enforcement Officer began citing Plaintiffs for violations occasioned by the long-standing agreement with the commercial operator.

290.    Upon information and belief, Woodsburgh never issued citations to the Old Woodmere Club.

291.    Moreover, no other property owner similarly situated to Plaintiffs had previously received tickets for similar conduct.

292.    Woodsburgh's Code Enforcement Officer and Buildings Inspector told the Woodmere Club's general manager that the directive to issue citations came from unnamed "higher-ups."

293.    Upon information and belief, those "higher ups" include, first and foremost, Mayor Israel, who used his power to harass Plaintiffs based on his own personal animus arising out of anger over the future loss of his golf club, as well as because Plaintiffs have tried lawfully to exercise their development rights.

294.    Most recently, in July of 2020, Woodsburgh's Code Enforcement Officer and Buildings Inspector informed the Woodmere Club that he was instructed to ticket the club for violations of certain property maintenance ordinances, claiming that areas of brown grass caused by a heat-wave allegedly violated Woodsburgh's ordinance against "dying" vegetation.

295.    No other Property owner received tickets for brown grass during the heat wave.

296.    Lawrence has also singled out Plaintiffs for selective enforcement actions and unequal and adverse treatment.  In 2019, Plaintiffs received violations on multiple occasions for allegedly violating Lawrence Village Code §144-5B, alleging that Plaintiffs allowed mowing of the golf course and made excessive noise in connection with golf course maintenance before 8:00 AM on weekdays and 9:00 AM on the weekends.

297.    The Old Woodmere Club had engaged in the same practices for years routinely, but was never cited by Lawrence for alleged code violations.

298.     The Village-owned Lawrence Yacht and County Club regularly mows its lawn and performs golf course maintenance at the same times, which would also violate Village Code §144-5B.

299.     Despite such conduct, the Lawrence Yacht and Country Club has never been cited by the village for its violations of Village Code §144-5B.

300.     Lawrence consistently provided favorable treatment to the Lawrence Yacht and Country Club, and selectively enforced its Village Code solely against Plaintiffs and the Woodmere Club.

**VI.   DEFENDANTS' CLAIMS THAT THEY SUPPOSEDLY HAD TO ADOPT THE NEW ZONING TO DEAL WITH PURPORTED ENVIRONMENTAL CONCERNS ARE BOGUS – DEFENDANTS ARE NOT CONCERNED WITH WHAT THEY CLAIM IS AT ISSUE, ONLY WITH PLAINTIFFS DEVELOPING PLAINTIFFS' PROPERTY**

> **A.   At the Same Time that Hempstead Claimed That Defendants Had to Enact the New Zoning to Counter Traffic Congestion From the Density of Plaintiffs' Proposed Subdivision Plan, It was Pushing Through a Sweeping "Transit-Oriented" Rezoning That Would Dramatically Increase Density and Traffic Congestion Far Beyond that Under Plaintiffs' Plan**

301.     Although the Town, led by Councilmember Blakeman, now claims that it supposedly needed to adopt the new "Coastal Conservation District – Woodmere Club" zone to address, among other things, the Town's supposed lack of infrastructure and traffic congestion issues caused by the increase in housing units under Plaintiffs' planned Subdivision, in 2019 Councilmember Blakeman spearheaded the rapid approval of a major rezoning initiative adjacent to the Inwood and Lawrence train stations.

302.     The train station rezoning, developed and recommended to the Town by the same Cameron Engineering that is behind the 2018 Proposed Golf Course Zone and the new "Coastal Conservation District – Woodmere Club" zone, encouraged a "mix of housing and commercial

uses […] to meet the demand for a housing prototype for residents" and allowed for 336 new residential units and 19,500 square feet of retail and commercial space to be developed. The rezoning ordinance was unanimously approved by the Town board on May 7, 2019.

303.    The new rezoning ordinance would cause an increase of approximately 1,000 additional vehicles per day in the most congested area in the Town, as compared to the Subdivision development proposal which placed traffic congestion at just an approximate 500 vehicles per day.

> **B.  Lawrence Officials, Who Claimed to Need the New Zoning to Prevent Development in a Floodplain Were Simultaneously Seeking to Develop a Former Sewer Treatment Plant that Sits on Village-Owned Property in the Very Same Floodplain, and on a Flood Evacuation Route**

304.    Moreover, as with Hempstead's rezoning ordinance, Lawrence also applied the rationale it offered in support of "the Coastal Conservation District – Woodmere Club" zone solely to Plaintiffs' Property and not to others similarly situated.

305.    For example, contrary to its supposed concerns about building in flood zones (the Lawrence version of the "Coastal Conservation District – Woodmere Club" zone cites to drainage issues in the floodplain to support the new ordinance) Lawrence is considering rezoning for outside development a former 4-acre sewer plant facility it owns. Lawrence is planning to allow outside developers to build a "Midrise Structure," to include a 150+ unit apartment complex on the site.

306.    Not only will this proposed development result in a density of more than ten times that of the then existing as-of-right zoning of Plaintiffs' Property, the former sewer plant facility lies within the same floodplain as Plaintiff's Property, and is also near a coastal evacuation route.

307.    Yet, at no time has Lawrence's Board even mentioned that the former sewer plant lies in a floodplain. Indeed, that supposedly critical issue has never entered into the Lawrence's Board's considerations.

**FIRST CAUSE OF ACTION**

**DENIAL OF EQUAL PROTECTION**
*U.S. Const. Amend. XIV; 42 U.S.C. § 1983; N.Y. Const. Art. I, §11*

308.   Plaintiffs repeat and re-allege paragraphs 1-307 as if fully set forth herein.

309.   The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that all persons subjected to legislation shall be treated alike, under like circumstances and conditions, both in privileges conferred and in liabilities imposed.

310.   The Equal Protection Clause of Article I, § 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

311.   The purpose of the Equal Protection Clause under both the United States and New York Constitutions is to secure the right of every person within the State's jurisdiction to be free of intentional and arbitrary discrimination, whether occasioned by the express terms of a statue or by its improper execution through duly constituted agents of government.

312.   A claim for a violation of Equal Protection under 42 U.S.C. § 1983 is stated where similarly situated property owners are not subject to such treatment and that defendants lacked a rational basis for their disparate treatment.

313.   Through their adoption of the "Coastal Conservation District – Woodmere Club," (as apparent from its name) the Defendants, conspiring with each other and acting under the color of law, singled out Plaintiffs, who wished to develop and subdivide their private Property under the then existing as-of-right zoning, in conformity with community character, for unfair and illegal treatment.

314.   Defendants' scheme violates the rights guaranteed to Plaintiffs by the United States and New York Constitutions, in that the "Coastal Conservation District – Woodmere Club" zone is arbitrary, oppressive and capricious and unreasonably requires Plaintiffs to submit to controls not imposed on other similarly situated properties.

315.   The "Coastal Conservation District – Woodmere Club"  zone must therefore be declared by this Court as a violation of the Equal Protection Clause of the United States and New York Constitutions, and null, void, and unenforceable..

316.   In the alternative, Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory damages in an amount to be determined at trial as a result of Defendants' conspiring together to deprive Plaintiffs of their Constitutional rights.

317.   As a result of Defendants' conduct in violation of §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE TAKINGS CLAUSE
### *U.S. Const. Amend. V and XIV; 42 U.S.C. § 1983; N.Y. Const. Art. I, §7*

318.   Plaintiffs repeat and re-allege paragraphs 317 as if fully set forth herein.

319.   The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to Defendants by the Fourteenth Amendment of the United States Constitution, provides that "[n]or  shall Private property be taken for public use without just compensation."

320.   The Takings Clause of the New York State Constitution provides that "Private property shall not be taken for public use without just compensation."

321.   In New York, the term public use broadly encompasses any use which contributes to the health, safety and general welfare of the public.

322.     The "Coastal Conservation District – Woodmere Club" interferes with and destroys legitimate investment-backed expectations of Plaintiffs by preventing them from subdividing and developing the Property, and takes away Plaintiffs' ability to develop 80% of the acreage on the Property that Plaintiffs formerly had the right to develop.  Defendants further designated 95% of that reduction to be set aside as "parkland" on which all building and other viable economic uses of any kind are prohibited.

323.     As a result of the adoption of the "Coastal Conservation District – Woodmere Club" zone, not only have the Defendants reduced the available lots to develop from 284 to 59, Defendants have almost tripled the hard construction costs allocable to each lot as compared to the prior zoning, and thus substantially reduced the value of each buildable lot under the new zone.

324.     By saddling the 59 lots that remain available for development with almost triple the costs to develop, the Defendants have intentionally made it economically unfeasible for Plaintiffs to develop the Property, and thus taken away viable economic uses of it.

325.     The Hempstead and Woodsburgh versions of the "Coastal Conservation District – Woodmere Club" effect a taking of Plaintiffs' Property under the standard set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

326.     The Hempstead and Woodsburgh versions of the "Coastal Conservation District – Woodmere Club" are an unconstitutional taking of Plaintiffs' Property without compensation.  The "Coastal Conservation District –  Woodmere Club" zone must therefore be declared by this Court as invalid under the Takings Clause of the Fifth Amendment of the United States Constitution and the New York State Constitution.

327.     In the alternative, as a direct and proximate consequence of Hempstead's taking under the "Coastal Conservation District – Woodmere Club," Plaintiffs are entitled to just

compensation in an amount to be established at trial based on the difference between the pre and post regulation prior to the taking, currently estimated to be at least $140 million dollars.

328.    In the alternative, as a direct and proximate consequence of Woodsburgh's taking under the "Coastal Conservation District – Woodmere Club," Plaintiffs are entitled to just compensation in an amount to be established at trial based on the difference between the pre and post regulation, prior to the taking, currently estimated to be at least $40 million dollars.

329.    The "Coastal Conservation District – Woodmere Club" zoning has eliminated all building lots situated within Lawrence.   As such, the Lawrence version of the "Coastal Conservation District – Woodmere Club" effects a taking of Plaintiffs' Property under the standard set forth in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992).

330.    In the alternative, the Lawrence version of the "Coastal Conservation District – Woodmere Club" effects a taking of Plaintiffs' Property under the standard set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

331.    The Lawrence version of the "Coastal Conservation District –  Woodmere Club" must therefore be declared by this Court as invalid under the Takings Clause of the Fifth Amendment of the United States Constitution and the New York State Constitution.

332.    In the alternative, as a direct and proximate consequence of the Lawrence's taking under the "Coastal Conservation District – Woodmere Club," Plaintiffs are entitled to just compensation in an amount to be established at trial based on the difference between pre-and post-regulation value of the Property, currently estimated to be at least $25 million dollars .

333.    In addition, in the event the "Coastal Conservation District – Woodmere Club" is deemed invalid, Plaintiffs are still entitled to recover damages from Defendants, jointly and severally, as a result of Defendants' temporary taking of Plaintiffs' Property as set forth in *First

*English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), in an amount to be determined at trial.

334.   As a result of Defendants' conduct in violation of 42 U.S.C §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## THIRD CAUSE OF ACTION

### UNCONSTITUTIONAL CONDITIONS / EXACTION
*U.S. Const. Amend. V and XIV; 42 U.S.C. § 1983*

335.   Plaintiffs repeat and re-allege paragraphs 1-334 as if fully set forth herein.

336.   Through the "Coastal Conservation District – Woodmere Club" zone Defendants have taken 83 acres of Plaintiffs' Property for "parkland" through a conservation easement, which is tantamount to a direct appropriation or ouster under *Lingle v. Chevron,* 544 U.S. 528, 537-38 (2005).

337.   Under the terms of the "Coastal Conservation District – Woodmere Club" zone Plaintiffs are required to expend approximately $3 million dollars to install flood mitigation improvements and thereafter annually expend substantial funds to maintain over 70% of the Property that falls within the Open Space District, solely for the benefit of the residents living within the vicinity of Plaintiffs' Property and not for themselves.

338.   By restricting Plaintiffs to using that portion of the Property solely for open space, the "Coastal Conservation District – Woodmere Club" zone is forcing Plaintiffs to maintain over 70% of the Property to achieve conservation purposes for the public at Plaintiffs' sole cost.

339.   Moreover, Plaintiffs are foreclosed from developing any of the other approximate 30% of the Property unless they spend that money solely for the public.

340.    These conditions, which apply to no other property within the Municipalities have prevented Plaintiffs from exercising their fundamental rights as property owners.

341.    Plaintiffs have suffered significant economic harm as a result of conditions the "Coastal Conservation District – Woodmere Club" zone places on their Property, and will continue to do so each and every day that these unconstitutional conditions exacted from them by the Defendants remain in effect.

342.    This uncompensated effective exacting of an easement on the Plaintiffs' Property solely for the benefit of the public as a condition on developing the Property, while placing the financial and other burdens of ownership solely upon Plaintiffs, constitutes an unconstitutional exaction under *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 420 (2013).

343.    As a result of Defendants imposition of unconstitutional conditions under the "Coastal Conservation District – Woodmere Club"  the ordinance must therefore be deemed by this Court invalid under the Fifth Amendment of the United States Constitution.

344.    In the alternative, as a direct and proximate consequence of Hempstead's imposition of unconstitutional conditions under the "Coastal Conservation District – Woodmere Club," Plaintiffs are entitled to just compensation in an amount to be established at trial, but at least $140 million dollars.

345.    In the alternative, as a direct and proximate consequence of Woodsburgh's imposition of unconstitutional conditions under the "Coastal Conservation District – Woodmere Club", Plaintiffs are entitled to just compensation in an amount to be established at trial, but at least $40 million dollars.

346. In the alternative, as a direct and proximate consequence of Lawrence's imposition of unconstitutional conditions under the "Coastal Conservation District – Woodmere Club", Plaintiffs are entitled to just compensation in an amount to be established at trial, but at least $25 million dollars.

347. In addition, in the event the "Coastal Conservation District – Woodmere Club" is deemed invalid, Plaintiffs are still entitled to recover damages from Defendants, jointly and severally, as a result of Defendants' placement of temporary unconstitutional conditions on Plaintiffs' Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), in an amount to be determined at trial.

348. As a result of Defendants' conduct in violation of 42 U.S.C. §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE DUE PROCESS CLAUSE
*U.S. Const. Amend. V and XIV; 42 U.S.C. § 1983; N.Y. Const. Art. I, §6*

349. Plaintiffs repeat and re-allege paragraphs 348 as if fully set forth herein.

350. The due process protections guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section Six to the New York State Constitution guaranty that no citizen can be deprived of property without due process of law.

351. Plaintiffs have a constitutionally protected cognizable property right under New York law in the property they own.

352. By engaging in the scheme set forth above, including without limitation, circumventing the NCPC's Subdivision review after allowing Plaintiffs to spend approximately $2 million dollars pursuing the process, adopting the "Coastal Conservation District – Woodmere

Club" zone, and at all times providing an empty, meaningless process, with a pre-determined outcome, *i.e.* to thwart the Subdivision approval – Defendants impermissibly deprived Plaintiffs of their property interest without due process of law.

353.    As set forth above, while the principal justification for the "Coastal Conservation District – Woodmere Club" zone is allegedly the need to limit development within sensitive flood zones, the Single Family District allows residential development almost exclusively in areas of the Property that lie within a flood zone.

354.    Conversely, the Open Space District prohibits development in parts of the Property that are not within a flood zone.

355.    The design of the subdistricts has nothing to do with flooding or any other justification to which Defendants point merely as pretext; the design is simply intended to mandate the maintenance of a huge buffer around the outer areas of the Property, in which, for no legitimate purpose and without any rational basis, Plaintiffs are prohibited from developing the Property.

356.    Defendants have violated Plaintiffs' substantive due process rights and conspired amongst themselves to do so, taking numerous steps in furtherance of their conspiracy.

357.    Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983.

358.    The "Coastal Conservation District – Woodmere Club" zone must therefore be declared by this Court as a violation of the Due Process Clause of the United States and New York Constitutions and therefore invalid.

359.    In the alternative, Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory damages in an amount to be determined at trial as a result of Defendants' conspiring together to deprive Plaintiffs of their Constitutional rights.

360.    As a result of Defendants' conduct in violation of  42 U.S.C. §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## FIFTH CAUSE OF ACTION

### UNLAWFUL AND *ULTRA VIRES* EXERCISE OF ZONING POWER

361.    Plaintiffs repeat and re-allege paragraphs 360 as if fully set forth herein.

362.    In New York, the zoning power is a power granted to local municipalities by the State Legislature and is governed by statute.

363.    A local municipality may not exercise the zoning power unless that exercise conforms to the scope, nature and purpose ascribed to the zoning power.

364.    A municipality may only adopt zoning enactments when such enactments are part of, and consonant with, a well-considered land use plan.

365.    In New York, the planning power is a separate power, distinct from the zoning power, devolved upon local municipalities by statute.

366.    In Nassau County, the planning power over subdivision applications is vested solely in the NCPC and in village planning boards. Towns within Nassau County do not have subdivision review authority.

367.    New York's Court of Appeals in *Golden v. Planning Bd. of Town of Ramapo*, 30 N.Y.2d 359, 372 (N.Y. 1972) describes the zoning power as "characteristically ineffective" for addressing the sound development of a single parcel and emphasizes the distinct purposes and independent ambits of the zoning and planning powers.

368.    In enacting the "Coastal Conservation District–Woodmere Club" ordinance, Defendants have engaged in illegal, *ultra vires* actions that exceed the proper limits of the zoning

power. They have adopted zoning regulations that are not part of, or related to, a well-considered comprehensive plan and they have improperly adopted and implemented planning power through a zoning ordinance.

369. As a result, the "Coastal Conservation District – Woodmere Club" must be invalidated in its entirety.

370. Plaintiffs are entitled to a declaratory judgment that the "Coastal Conservation District – Woodmere Club" is an *ultra vires* act, and thus null, void and unenforceable.

## SIXTH CAUSE OF ACTION

### UNLAWFUL AND *ULTRA VIRES ULTRA VIRES* ACTION IN CONNECTION WITH "CLUBHOUSE SUB-DISTRICT"

371. Plaintiffs repeat and re-allege paragraphs 370 as if fully set forth herein.

372. The creation and enforcement of the "Clubhouse-Hospitality Sub-District" under Woodsburgh's version of the "Coastal Conservation District – Woodmere Club," is not, in reality, a zoning district, but is an attempt to use zoning effectively to bestow landmark status upon a perceived historic building.

373. Defendants may not use zoning power to preserve favored structures or uses of land.

374. Further, there is no New York law that authorizes a municipality to use zoning power to enact landmarking legislation.

375. The Clubhouse-Hospitality Sub-District, which purports to commit Plaintiffs to preserving the "historic" clubhouse, is an improper effort to enact landmarking legislation through the guise of zoning and thus *ultra vires*, improper and invalid.

376. Section 150-109 of Woodsburgh's version of the "Coastal Conservation District – Woodmere Club" zone provides that: "[i]f §150-110 [Subdistricts Established] or §150-111

[Permitted Uses] of this Article shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall invalidate the remainder of this Article."

377.    Section 76.24 of Hempstead's version of the "Coastal Conservation District – Woodmere Club" zone provides that: "[i]f § 76.25 [Subdistricts Established] or § 76.26 [Permitted Uses] of this Article shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall invalidate the remainder of this Article."

378.    Section 212-13.1.9 of Lawrence's version of the "Coastal Conservation District – Woodmere Club" zone provides that: "[i]f § 7212-13.1.10 [Subdistricts Established] or § 212-13.1.11 [Permitted Uses] of this Article shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall invalidate the remainder of this Article."

379.    The "Coastal Conservation District – Woodmere Club" zone must be invalidated in its entirety because the unlawful Clubhouse-Hospitality Sub-District established under the new zone is not severable and each Defendant's respective version of the ordinance expressly provides that its entire ordinance must be declared invalid if any of the "sub-districts" or "permitted uses" are declared invalid.

380.    Plaintiffs are entitled to a declaratory judgment that the "Coastal Conservation District – Woodmere Club" is an *ultra vires* act, and thus null, void and unenforceable in its entirety.

**<u>SEVENTH CAUSE OF ACTION</u>**

**<u>ADOPTION OF LOCAL LAWS INCONSISTENT WITH SEQRA</u>**

381.    Plaintiffs repeat and re-allege paragraphs 380 as if fully set forth herein.

382.     Under New York law, all determinations relating to environmental issues in connection with determinations by agencies in the State of New York must be made solely through the SEQRA process.

383.     Once the SEQRA process was underway in connection with Plaintiffs' Subdivision application, Defendants were required to address any and all of their purported environmental concerns solely through the SEQRA process.

384.     By purporting to adopt new zoning to address environmental concerns and pulling the rug out from under the NCPC on the very eve of the closing of public comment on Plaintiffs' DEIS, Defendants have unlawfully preempted the SEQRA process and their new zoning, ostensibly enacted to address these environmental issues, is thus invalid.

385.     In adoption the "Coastal Conservation District – Woodmere Club" zone Defendants have exceeded their authority and as a result the new zone must be invalidated in its entirety.

386.     Plaintiffs are entitled to a declaratory judgment that the "Coastal Conservation District – Woodmere Club" is an *ultra vires* act, and thus null, void and unenforceable in its entirety.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs requests judgment against Defendants as follows:

A.   On the <u>First Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable, or in the alternative awarding Plaintiffs compensatory damages against Defendants, in an amount to be determined at trial, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

B. On the <u>Second Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable in its entirety, and awarding Plaintiffs compensation resulting from their inability to use and enjoy their Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), or in the alternative awarding Plaintiffs just compensation against Defendants, jointly and severally, in an amount to be determined at trial, but at least $205 million dollars, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

C. On the <u>Third Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable in its entirety, and awarding compensation resulting from their inability to use and enjoy their Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), or in the alternative awarding Plaintiffs just compensation against Defendants, jointly and severally, in an amount to be determined at trial, but at least $205 million dollars, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

D. On the <u>Fourth Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable in its entirety, or in the alternative awarding Plaintiffs compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

E.  On the <u>Fifth Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety;

F.  On the <u>Sixth Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety; and

G.  On the <u>Seventh Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety.

In addition, awarding Plaintiffs prejudgment interest at the maximum rate allowable by law; and awarding Plaintiffs such other and further relief at law or in equity that the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all claims and issues so triable.

Dated: New York, New York
August 24, 2020

**MEISTER SEELIG & FEIN LLP**

By:    */s/ Jeffrey Schreiber*
Jeffrey Schreiber, Esq.
Thomas L. Friedman, Esq.
Sophie I. Myers, Esq.

125 Park Avenue, 7th Floor
New York, New York 10017
Tel: (212) 655-3500
Fax: (212) 655-3535
Email: js@msf-law.com
        tlf@msf-law.com
        sim@msf-law.com

*— and —*

**MANATT, PHELPS & PHILLIPS, LLP**
Michael M. Berger, Esq.
Edward G. Burg, Esq.
[*pro hac vice* admission forthcoming]

2049 Century Park East, Suite 1700
Los Angeles, California 90067
Tel: (310) 312-4000
Fax: (310) 312-4224
Email: mmberger@manatt.com
        eburg@manatt.com

*Counsel for Plaintiffs*