UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
WG WOODMERE LLC, SG BARICK LLC, and
LH BARICK, LLC,

                 Plaintiffs,          **REPORT AND**
                                      **RECOMMENDATION**
      -against-              CV 20-3903 (ARR)(AYS)

TOWN OF HEMPSTEAD, INCORPORATED
VILLAGE OF LAWRENCE, and
INCORPORATED VILLAGE OF WOODSBURGH,

                 Defendants.
-------------------------------------------------------------X
SHIELDS, Magistrate Judge:

      This is an action commenced by the Plaintiff entities ("Plaintiffs") alleging violations of

federal and state law in connection with the zoning of a parcel of land, located at 99 Meadow

Drive, Woodmere New York.[1]  That property, purchased by Plaintiffs in 2017 was formerly

home to a golf club. It has been known, and is referred to herein as the "Woodmere Club" or the

"Property". The Woodmere Club consists of 118 acres. It is located within Defendants Town of

Hempstead ("Hempstead" or the "Town"), Village of Lawrence ("Lawrence") and Village of

Woodsburgh ("Woodsburgh") (collectively "Defendants").

      Plaintiffs' complaint (the "Complaint") alleges seven separate causes of action. See

generally Complaint ("Compl."), Docket Entry ("DE") [1].  The four Federal claims set forth

therein seek redress for Constitutional violations pursuant to 28 U.S.C.  1983 ("Section 1983").

---

[1] Plaintiffs' papers repeatedly use the term zoning with quotation marks. Presumably this is to highlight their position that the enactment of the zoning ordinance at issue here is some sort of a sham concocted by Defendants to keep Plaintiffs from developing their property. This Court uses the term zoning without any such dramatic influence - which, in reading the voluminous papers submitted in connection with the present motion - the Court finds unhelpful. Similarly unhelpful to the Court is the profligate use of footnotes (despite the District Court's indulgence in allowing the submission of 100 page long memoranda of law). This Court will endeavor to keep the use of footnotes to a minimum.

The first such claim alleges denial of equal protection of the laws in violation of the Fifth and Fourteenth Amendments to the United States Constitution (the "Equal Protection Claim"). Compl. ¶¶ 308-17. Plaintiffs' second Federal claim alleges an unconstitutional taking in violation of the Fifth Amendment to the Constitution. Compl. ¶¶ 318-34 (the "Takings Claim"). Plaintiffs' third claim also alleges a Fifth Amendment violation. This claim, set forth in paragraphs 335-348 of the Complaint, alleges the "uncompensated exaction of an easement," on the Property. Compl. ¶ 342 (the "Exaction Claim"). Plaintiffs' final Federal claim alleges violation of both their procedural and substantive due process rights in violation of the Fifth and Fourteenth Amendments to the Constitution. Compl. ¶¶ 349-60. (the "Due Process Claims"). With the exception of the Exaction Claim, the aforementioned Federal Constitutional claims also allege parallel claims under the Constitution of the State of New York. See Compl. ¶ 310 (alleging violation of N.Y. Const. Art. 1 section 11); ¶ 320 (alleging violation of N.Y. Const. Art. 1 Section 7); ¶ 350 (alleging violation of N.Y., Const. Art. 1 Section 6).

In addition to their Federal and State Constitutional claims, Plaintiffs allege three claims under New York State law- the fifth through seventh causes of action. The fifth cause of action alleges broadly that Defendants have exceeded their authority under their zoning powers. Compl. ¶¶ 361-70. Plaintiffs' sixth cause of action alleges a more specific violation of Defendants' zoning power by using it to confer unauthorized landmark status on a particular building located on the Property. Compl. ¶¶ 371-80. Plaintiffs' final state law claim is in the nature of preemption. That claim states that Defendants have adopted local laws in violation of the New York State Environmental Quality Review Act ("SEQRA") which is alleged to be the sole vehicle for enacting environmental legislation under New York State law. Compl. ¶¶ 381-86.

Presently before this Court, upon referral of the Honorable Sandra J. Feuerstein,[2] is Defendants' joint motion to dismiss the Complaint. For the reasons set forth below, the Court respectfully recommends that Defendants' motions be granted in part and denied in part. The Court recommends that the motions to dismiss the SEQRA claims be granted but that the motions be denied with respect to all other claims, and that such claims be allowed to proceed to discovery.

BACKGROUND

I. Factual Background

In the context of this motion to dismiss Plaintiffs rely on the facts set forth in the Complaint. See generally Compl. Defendants, rather than setting forth facts in their memorandum of law (as is the case in nearly every set of papers submitted in connection with motions to dismiss) sought, and were granted leave, to submit a joint statement of facts. That joint statement ("Defendants' Statement") appears on the docket herein as entry number 35-43. This Court observes that allowing for a joint statement of facts did not necessarily serve judicial economy in that Defendants Hempstead and Woodsburgh filed an initial 45-page memorandum of law and Defendant Village of Lawrence filed its own 25-page memorandum. Plaintiffs, also given leave to exceed usual page limits, jointly respond to all motions with an 83-page memorandum of law.

In any event, the Court has reviewed the factual allegations in the Complaint as well as Defendants' Statement. To the extent that facts in Defendants' Statement mirror those set forth in the Complaint, the statement is considered. However, to the extent, as described variously below, Defendants' Statement sets forth their positions regarding their clients' intent or refers to

---

[2] Subsequent to the referral, on June 14, 2021 the case was transferred to the Honorable Allyne R. Ross.

documents outside of the Complaint, the statement is ignored as inappropriate to consider in the context of the present motion to dismiss. This is especially true in light of the fact that while Defendants' motion papers make passing reference to Rule 56 of the Federal Rules of Civil Procedure, it is clear that the present motion was never converted to motion for summary judgment. Therefore, the facts set forth below are drawn from the Complaint and documents annexed thereto. They are accepted as true and construed in favor of Plaintiffs - the non-moving parties.

On July 28, 2021, the Court held oral argument on the motion. The purpose of the argument was to hear counsels' legal argument as well as their positions with regard to Plaintiffs' claims. From time-to-time Plaintiffs' counsel was asked to explain the claims and argue as to whether they were factually supported by the pleading. See generally Transcript of July 28, 2021 Oral Argument ("Arg. Tr."), DE [48]. Defendants often countered that Plaintiffs' descriptions varied from the Complaint and lacked factual basis therein. See generally id. It is important to note that when determining whether Plaintiffs state a claim as to each particular cause of action, the Court is guided only by the factual allegations actually set forth in the Complaint and the reasonable inferences to be drawn therefrom.

A.    The Property

 Plaintiffs acquired the Property on April 27, 2017. Compl. ¶¶ 87, 85-86. Approximately 55 acres of the Property are located within Hempstead, 40.5 acres are within Woodsburgh, and 22.9 acres are within Lawrence.  Compl. ¶ 88. The Property's location makes it subject to the local zoning controls of each of the Defendant entities, as well as those of the County of Nassau. Compl. ¶ 90.  Prior to Plaintiffs' purchase it became clear to its former owners that it could not be operated profitably as a golf club. Therefore, the members of that club resolved to sell the

Property. Compl. ¶ 93. Plaintiffs purchased the Property for approximately $12 million. As part of the sale Plaintiffs assumed the prior owners' debt and agreed to continue operations as a golf club for a period of time. At the time of the purchase, however, it was Plaintiffs' intent to subdivide the land comprising the club for residential development in accord with local zoning, and consistent with the surrounding neighborhood. Compl. ¶ 97. In furtherance of this goal, and prior to the purchase, Plaintiffs engaged land use counsel as well as engineering and planning experts. It was the opinion of these experts that existing zoning allowed for the Property to be properly and legally developed to include 284 single family homes. Compl. ¶ 100. Specifically, Plaintiffs assumed that 248 lots could be developed in Hempstead, that 12 lots could be developed in Lawrence and that 24 lots could be developed in Woodsburgh. Id.

B.      The Building Moratoria

On November 15, 2016 -prior to Defendants' purchase of the Property - the Town of Hempstead adopted a resolution and accompanying zoning ordinance imposing a building moratorium halting all residential development of golf course properties within the Town. Compl. ¶ 102. Plaintiffs' purchase of the Property took place shortly before the moratorium was set to expire. However, the moratorium was extended by the Town six times, through August 7, 2018. Thus, although enacted prior to Plaintiffs' April 2017 acquisition of the Property, the life of the moratorium was extended during and after their purchase. See Compl. ¶ 113.

Like all land use decisions enacted by Defendants, Plaintiffs characterize enactment and extensions of the 2016 building moratorium as part of Defendants' ploy to target Plaintiffs and interfere with their right to develop the Property. Compl. ¶ 108. In particular, Plaintiffs state that the moratoria were "political measures designed to project the Town's sympathies with those members of the public who wished to stop any sort of development of the Property" . . . and

"were enacted simply to grind any development on the Property to a halt." Compl. ¶¶ 114-15. Defendants, on the other hand, state that when the initial moratorium was enacted Hempstead was faced with potential development of a high-density residential subdivision (if developed in accord with existing zoning) and with it "the potential irrevocable loss" of "invaluable open space" in an "environmentally sensitive coastal area." Defs.' Joint Statement of Facts ("Defs.' St.") at 5,[3] DE [35-43]. According to Defendants, development of the Woodmere Club in accord with zoning in existence at the time of the initial moratorium would have allowed for development that was inconsistent with the character of the surrounding community. Such development would further take place without consideration of the area's environmentally sensitive coastal ecosystem, rising sea levels, or the mitigation of traffic congestion on overburdened roads. Id.

Like Hempstead, Woodsburgh is alleged to have enacted a building moratorium that halted development of the Property. Unlike the Hempstead moratoria, the Woodsburgh moratorium was enacted after Plaintiffs' 2017 purchase, on October 29, 2018. According to Woodsburgh, the moratorium was enacted to "provide the Village with the time and opportunity to consider potential changes to its zoning and land use regulations while preserving the status quo." Compl. ¶ 117. Plaintiffs attack this stated intent as a sham, stating that the Woodsburgh moratorium, like that of Hempstead, was enacted to block Plaintiffs' development of the Property. Thus, the Complaint states that neither the Hempstead nor the Woodsburgh moratoria were enacted with any mention of environmental, traffic or other matters, but only with the concern of area character. Compl. ¶ 119. For its part, Woodsburgh notes that prior to enactment of its moratorium it had, since 2015, been considering whether development of its part of the

---

[3] For ease of reference, page numbers referenced herein are numbers assigned to pages on electronically filed documents, and not to the underlying documents themselves except for page numbers referenced in cases.

Property would have adverse effects on the environment, including preservation of ecological habitats, stormwater runoff, altered drainage patterns and increased flooding. Woodsburgh's concerns also extended (according to Defendants' Statement) to whether development would be in accord with the existing community character.

After enactment of the moratoria, Plaintiffs commenced separate state court litigations against the Town and the Village attacking both moratoria. Compl. ¶¶ 120-21; see WG Woodmere v. Hempstead, No. 606719/2018 and WG Woodmere v. Incorporated Village of Woodsburgh, No. 61690/2018. The litigation against Hempstead was resolved in Plaintiffs' favor when the state court held that the repeated extensions (which resulted in a 1.5 year moratorium) amounted, as a matter of law, to an unconstitutional taking. Compl. ¶ 122. Thereafter, Woodsburgh declined to extend their moratorium beyond the date provided in its initial enactment. Compl. ¶ 123. Defendants' Statement does not discuss the litigations regarding the moratoria. Instead, they discuss a proceeding commenced pursuant to Article 78 of the New York Civil Practice Law and Rules in which Woodsburgh prevailed. That proceeding was dismissed for failure to exhaust administrative remedies, rendering Plaintiffs' claims unripe under state law. Defs.' St. at 11.

C. 2018 Proposed Golf Course Zone

In April of 2018, while the Hempstead moratoria were still in effect, and prior to the state court's December 2018 decision holding the extensions thereof unconstitutional, Hempstead introduced a new zoning regulation for the Property. That zoning was entitled "GC Golf Course Coastal Residence District". It is referred to by Plaintiffs as the "Proposed 2018 Golf Course Zone," Compl. ¶ 124 (referred to herein as the "2018 Golf Course Zone" or the "2018 Golf Course Zoning"). Plaintiffs characterize the 2018 Golf Course Zone as an attempt at "down-

zoning" to reduce the density of building. Compl. ¶ 125. In support of this description, Plaintiffs' note (and Defendants do not deny) that adoption of the 2018 Golf Course Zone would have reduced the as-of-right density of the Property's then applicable zoning by 60% - from 284 to 125 permissible building lots. This decrease in density would be accomplished by changing the previously required 6,000 square foot building lot requirement to 15,000 square feet. Compl ¶¶ 11; 127-28; 132.

When considering the adoption of this 2018 zoning, Defendants were guided by the report of an engineering firm known as Cameron Engineering ("Cameron" or "Cameron Engineering"). In connection with that zoning, Cameron produced a study referred to herein as the 2018 Cameron Report. Plaintiffs attached significance to the fact that Cameron is also the firm that designed the zoning at issue in this litigation, described below.

The 2018 Cameron Report purports to have been based upon environmental impacts such as tidal wetlands degradation and storm water runoff. The 2018 Golf Course Zoning thus considered these environmental issues when allowing for the building of 125 houses. This environmentally-permissible density is interesting when compared with the current zoning's allowable building of only 59 houses. This disparity is alleged in support of Plaintiffs' claim that the current zoning (described below) is not driven by environmental concerns, but instead, designed to appease those who desire no development of the Property. See Compl. ¶ 130. Plaintiffs also note that the 2018 Golf Course Zone mentions two other privately-held golf courses which, like the Property, are located on the water and within the New York State Coastal Boundary Area. However, Plaintiffs state that "in reality" the 2018 Golf Course Zoning was "intended solely to target" the Property. Compl. ¶ 131.

The 2018 Golf Course Zoning was scheduled for a public hearing and vote before the Hempstead Town Board on May 8, 2018 - prior to the final extension of the Town moratorium. Compl. ¶ 134. It appears that Plaintiffs were in favor of this zoning and looking forward to its approval. The scheduled meeting for a vote on the 2018 Golf Course Zoning triggered public opposition to development of the Property. This opposition included outcry by the Five Towns Civic Association (the "TCA"), a local community group. According to Plaintiffs, the TCA exists solely to further the agenda of preventing "even a single home" from being built on the Property. Compl. ¶ 12.  In response to public opposition to development, and on the day before the scheduled May 8, 2018 hearing and vote, members of the Town Board held an informational meeting attended by Hempstead Town Board members Blakeman and D'Esposito. The meeting was attended by approximately 350 residents who made clear their opposition to any development of the Property. Compl. ¶ 143.

Cameron Engineering was present at the informational meeting in order to explain the 2018 Golf Zoning to the public. Compl. ¶¶ 135-36.  Since the May 7, 2018 meeting was unofficial, there is no transcript of the proceedings therein. Compl. ¶ 137. Nonetheless, Plaintiffs' describe those proceedings in their Complaint. At the meeting, Blakeman is stated to have announced that the Town Board needed to take immediate action to prevent development of the Property, whether by adoption of the 2018 Golf Course Zoning or by other means, because the moratorium could not be extended indefinitely. Compl. ¶ 138. Despite the lack of a transcript, Blakeman is quoted as expressing the opinion that everything that the Town had done to date was aggressive but "completely legal and justifiable," but also stating that the Town had to "do something" and that they could not tell the builders that they could do "nothing - because they will run onto court and get the 300 building lots," which was "exactly what you do not want

them to get." Compl. ¶ 139. Blakeman is stated to have "thus admitted" that all zoning actions taken by the Town were aimed at restricting development of the Property as much as possible, and that all justifications stated in support of the Town's actions were nothing more than "after-the-fact attempts to cover what the Town was actually trying to do, so it could avoid liability." Compl. ¶ 140.

In addition to Blakeman's May 7, 2018 statements, other Town representatives were stated to have expressed, in sum and substance, that Cameron Engineering was instructed to be "aggressive" and propose the "most restrictive" plan while also keeping its study in "draft" so that it could incorporate "community response". The Town is also alleged to have recognized at the meeting that the previously extended moratoria would likely be held unconstitutional. Compl. ¶ 142. After the May 7, 2018 meeting the Town postponed the public hearing and vote on the 2018 Golf Course Zoning which was scheduled for the next day, and again voted to extend the moratorium - this time until the next public hearing - which was scheduled for June 19, 2018. Compl. ¶ 145.

A meeting was held on June 19, 2018 during which the Town introduced the 2018 Golf Course Zone, but also indefinitely postponed any future public hearings as to that zoning proposal. Compl. ¶ 146. It appears that there was a transcript of the June 19, 2018 meeting wherein Blakeman is quoted as saying that it would be "catastrophic" to the community if 277 homes were developed on the Property. He also stated that while there were many issues to be discussed, the matter must be "drawn to a conclusion at some point because we can't go on ad infinitum." He noted that the Town was already in litigation with the developer who had taken the position that the moratoria "were illegal and had gone on too long." Compl. ¶ 147. Following the June 19, 2018 meeting, the Town abandoned the 2018 Golf Course Zoning. Compl. ¶ 148.

D.    Public Park Proposal

After withdrawal of the 2018 Golf Course Zone, Defendants floated the possibility of creating a public park on the Property, funded by taxpayer funds. At a meeting held on July 3, 2018, the Town announced that it would engage the planning consultant firm of Frederick P. Clark Associates ("Clark" or the "Clark Firm") to explore the creation of a public park.  Compl. ¶ 150. Despite the fact that the Town includes three other private golf courses, the Property was the only private club singled out for such consideration. Compl. ¶ 153.

On May 17, 2019, Blakeman and D'Esposito announced the mailing of the "Official Woodmere Golf Course Survey" (the "Survey") to all households within approximately one-half mile of the Property. Compl. ¶ 154. The Survey asked recipients their opinion regarding creation of a special park district solely for the use of residents within the district. Creation of such a district would involve annual property tax increases of between $2,000 and $4,000 for the next twenty years. Compl. ¶¶ 155-56. When faced with the possibility of paying increased taxes to support a public park, residents "overwhelmingly rejected" purchase of the Property for such use. Compl. ¶¶ 15; 149.

The Complaint details then-Town Supervisor Gillen's opposition to the Survey and creation of a special park district. It also notes her opinion that the entire process had always been a "sham designed to block all development at the Property, and that the Survey was circulated simply to provide cover for a process that already had a pre-determined outcome." Compl. ¶ 158. Gillen is also said to have stated that neither the park district study nor the zoning process was complete, and that members of the Hempstead Town Board broke away from working with her office, causing more harm than good. Compl. ¶¶ 158-60. After Plaintiffs prevailed in Freedom of Information Law litigation aimed at production of the Clark Firm's

documents, the Town admitted that no land review reports had actually been prepared in connection with creation of a public park on the Property. Compl. ¶ 162. Like the 2018 Golf Course Zoning, the idea of creating a special park district on the Property was ultimately abandoned. Compl. ¶165.

E.    Proceedings Before the Nassau County Planning Commission
      and SEQRA Review of the Proposed Development of the Property

The parties agree that in addition to obtaining approval from local zoning jurisdictions, development of the Property is subject to review and approval by the County of Nassau. On December 7, 2018, after the apparent abandonment of the 2018 Golf Course Zoning and prior to the mailing of the Survey, Plaintiffs moved forward to obtain Nassau County's approval for development of the Property. Thus, Plaintiffs presented a plan to the Nassau County Planning Commission (the "NCPC"), by filing an application in connection with a new "filed map" creating a new subdivision to be known as "Willow View Estates". Compl. ¶ 167. That application, which contained detailed environmental and engineering data, sought subdivision of the Property into 284 single family residential lots. This density of building lots was in compliance with Defendants' then-effective, and as yet unchanged, zoning laws (which, as noted, allowed for 6,000 square foot building lots). Compl. ¶ 168. The filing fee incurred in connection with this application amounted to over $300,000. Compl. ¶ 170.

Shortly after receipt of Plaintiff's subdivision application, NCPC issued a "positive" environmental declaration triggering an extensive environmental review under SEQRA, and declared itself the lead agency to undertake that review. Compl. ¶¶ 171-73. In accord with that review, Plaintiffs were directed to prepare a draft environmental impact statement (a "DEIS"). NCPC engaged in the SEQRA "scoping" process, determining the topics to be addressed in the DEIS. Compl. ¶¶ 176-77. The final scope of inquiry was adopted on June 26, 2019 - while

Plaintiffs were apparently still mulling the idea of creating a special park district. Following adoption of the DEIS scope of review, Plaintiffs engaged in a two and one half year project, spending approximately $2 million to prepare the DEIS.

On May 14, 2020, NCPC declared Plaintiffs' DEIS complete, and accepted the document for review. Compl. ¶ 181. The DEIS addressed an extensive list of environmental concerns, including, inter alia, water resources and floodplains, Superstorm Sandy, coastal storm risk management, stormwater runoff, zoning and community character, climate change, alternatives, a traffic impact study and an environmental site assessment. Compl. ¶ 182. On October 13, 2020, Defendants requested that the NCPC rescind its decision accepting the DEIS as complete, and to instead require Plaintiffs to file a Supplemental Environmental Impact Statement (a "SEIS") to consider the impact of the current zoning scheme. Defs.' St. at 13. This was apparently rejected by the NCPC which scheduled the DEIS for public review. Pursuant to that decision, a virtual public hearing on the DEIS was held on November 17, 2020. At that hearing it was made clear that the SEQRA process was ongoing. Importantly, the NCPC made clear that any development of the Property would not only have to comply with a final environmental review by the County as lead agency, but also with the local land use regulations of the municipalities where the Property is located.

In its latest action, the NCPC announced that it would accept comments on the DEIS until January 8, 2021. On January 7, 2021, Defendants, through Cameron Engineering, submitted its technical comments to the DEIS. While those comments are not directed toward compliance with the current zoning scheme, they are extensive and take particularized issue with the adequacy and analyses contained within the DEIS. See

https://www.nassaucountyny.gov/DocumentCenter/View/31838/Willow-View-Estates-DEIS-All-Comments?bidId.

In addition to the Cameron Engineering comments to the DEIS, the Village of Woodsburgh has submitted its own comments. As of the filing of this action, Plaintiffs have expended approximately $700,000 in fees to Nassau County and approximately $1.5 million for professionals engaged to comply with the County and State environmental review process. Compl. ¶¶ 186-87. To date, no final SEQRA determination with respect to the Property has been reached. Thus, the SEQRA review process is ongoing and is not yet complete.

F. The Current Zoning: the Coastal Conservation District- Woodmere Club

1. The Intermunicipal Cooperation Agreement

As noted, NCPC deemed the DEIS complete on May 14, 2020, and published the document for public review. Plaintiffs allege that all concerns Defendants allege to have been addressed in their next zoning decision have already been addressed in the DEIS. Compl. ¶ 185. Nonetheless, Defendants proceeded with their own zoning process review. According to Plaintiffs, between December of 2019 and June of 2020, while the SEQRA process was ongoing, Defendants joined forces, entering into an "Intermunicipal Cooperation Agreement (the "ICA") to "coordinate their attack on Plaintiffs' property rights." Compl. ¶ 189. Defendants characterize the ICA as nothing more than an agreement reached, consistent with New York State law, to undertake "mutually beneficial, shared and coordinated comprehensive planning and land use regulation for" the Property. Defs.' St. at 14. Whatever the motive, the ICA acknowledges that the Property lies within the three Defendant jurisdictions and provides for Defendants to work together to draft and adopt "mirror image" zoning that would impose a single zoning requirement on the Property. Compl. ¶ 190. Defendants also entered into a fee-sharing agreement pursuant to

14

which Hempstead would pay for 70% of all legal fees incurred in connection with the activities

of the ICA, with the villages being responsible for the remaining fees. Compl. ¶ 193. Defendants

also agreed to jointly retain the services of a single law firm, to be chosen by Hempstead. Compl.

¶ 194. Plaintiffs characterize the existence of the fee sharing agreement as evidence that

Defendants knew that their upcoming zoning action would be unlawful, and they would therefore

be subject to defending a lawsuit. Compl. ¶ 192. In this matter, Hempstead and Woodsburgh

appear to be acting in accord with the ICA. Thus, they are represented by the same counsel.

Lawrence, as is certainly its right, has retained separate counsel.

### 2. The CCD Zoning

On May 18, 19 and 21, 2020 each Defendant municipality introduced its version of the

Coastal Conservation District-Woodmere Club zoning for the Property (the "CCD Zone" or

"CCD Zoning"). On June 23, 2020 Defendants held what Plaintiffs refer to as an "unprecedented

joint public hearing" regarding the CCD Zoning. Compl. ¶ 199. Plaintiffs' land counsel appeared

at the hearing, objecting to the proposed zoning as an illegal enactment that should be voted

down. Compl. ¶ 200. On June 29, 2020 and July 1, 2020, Defendants formally adopted the CCD

Zoning. Each Defendants' resolution adopting the CCD Zone is annexed to the Complaint as

Exhibits E (Hempstead resolution), F (Woodburgh resolution) and G (Lawrence resolution). The

stated purpose for adoption of the CCD Zone is the same for each Defendant to, i.e., "regulate

development in the environmentally sensitive coastal areas that span the municipal boundaries of

[the Defendant municipalities] allowing for enhanced preservation and protection of the

residential neighborhoods." Compl. ¶ 203. Additionally, Defendants state as their joint purpose

the need to manage "current and future physical climate risk changes due to sea level rise, storm

surge and flooding." Compl. ¶ 204. The environmental study accompanying Defendants' zoning

decisions was prepared by Cameron Engineering in the form of an "Expanded Environmental Assessment". Compl. ¶ 206. This study is alleged by Plaintiffs to lack depth and constitutes nothing more than a "fig leaf to cover the naked land grab that is "the CCD Zone." Compl. ¶ 207. Defendants characterize Cameron Engineering as taking a hard look at the potential adverse environmental impacts of development including flood impacts and traffic. Defs.' St. at 15. Far from lacking depth, Defendants state that Cameron Engineering "pursued and completed a comprehensive study, review, and analysis of the potential adverse environmental impacts of residential development" of the Property and the positive environmental impact of the soon-to-be adopted CCD Zone. Id. at 15-16.

Defendants submit, for the Court's consideration, correspondence concerning approval of the CCD Zone by the NCPC. That correspondence is relied upon to show that the NCPC had no opposition to the CCD Zoning, and recommended that the Defendant entities take whatever actions they deemed appropriate to amend their land use regulations to enact such zoning. Defs.' St. at 18. Defendants state that the NCPC has never indicated how adoption of the CCD Zoning will affect Plaintiffs' pending SEQRA review. Id. at 18. As to their SEQRA reviews, each of the Defendants issued negative SEQRA declarations regarding the CCD Zone, thus triggering no further local environmental review thereof. Id. at 26.

The CCD Zone, which was enacted by joint action of Defendants, sets forth three new subdistricts: (1) the open space/recreation subdistrict; (2) the single-family residential subdistrict, and (3) the "Clubhouse/Hospitality subdistict". Compl. ¶ 208. The open space recreation district covers 83.3 acres of the Property. Compl. ¶ 217. In this subdistrict permitted uses are golf clubs, open space parkland or a nine-hole golf course. Compl. ¶ 218. Plaintiffs allege that the Defendants know full well that the first two options are economically without value, and that the

nine-hole golf course has never been studied for economic feasibility. Allowance of that golf course is argued to be an illusory attempt to show economic viability when, in fact, this subdistrict is merely a disguise for creating a park out of privately held land. Compl. ¶¶ 219-20. This is alleged to have created a permanent conservation easement on the Property without compensation for the benefit of surrounding properties, at Plaintiffs' expense. Compl. ¶ 221. In addition to prohibiting any real development of the Property, the CCD Zoning requires Plaintiffs to install, at their own expense, flood management equipment on the Property and to maintain the Property under various existing ordinances at an annual expense in excess of $3 million, to maintain insurance on all parcels and to pay taxes on such areas. Compl. ¶¶ 225-27.

As to residential development, the CCD Zone reduces the number of homes that may be developed in Lawrence from 12 to zero; in Hempstead from 248 to 41 and in Woodsburgh from 24 to 18 houses. This reduces the overall right to develop homes on the Property from 284 lots for single family homes to only 59 homes, taking away Plaintiffs' ability to develop 80% of the acreage that they previously had to right to develop. Compl. ¶¶ 4-5; 215.  Plaintiffs allege that the severely limited designation of areas for residential development is clear support for their position that the CCD Zone was not enacted to protect environmental concerns with regard to flooding, but to prevent all development. Specifically, Plaintiffs note that residential development is allowed under CCD Zoning almost exclusively in areas designated as flood zones, while the open space subdistrict prohibits development of areas that are not within a flood zone. Compl. ¶¶ 236-37. Plaintiffs support the claim that the Property is being singled out by noting that while 42,000 parcels of land within the Defendants' jurisdiction are located within flood zones, the CCD Zoning rezones only 12 such parcels on account of flood concerns. Compl. ¶ 240.

The Town of Hempstead's concerns regarding traffic congestion associated with density of development are stated by Plaintiffs to be demonstrably false. This allegation is supported by the fact that at the same time that Defendants were claiming that over-development of the Property would result in traffic congestion, Hempstead rapidly approved a major re-zoning initiative near to the Inwood and Lawrence train stations. These developments provided for 336 new residential units and 19,500 square feet of retail and commercial space. Compl. ¶¶ 301-02. Such re-zoning would, according to the Complaint, cause an increase of approximately 1,000 additional vehicles per day in the most congested areas of the Town, as compared to Plaintiffs' proposed development of the Property which would have no such impact. Compl. ¶ 303. Similarly, Lawrence is currently considering approval of development of a 4-acre sewer plant facility providing for building a mid-rise structure to include an apartment complex with over 150 units. Compl. ¶ 305. This proposed development, in the same floodplain as the Property, will result in a density of more than ten times that of the existing as-of-right zoning of the Property. However, the question of density is stated to be an issue that never entered into Lawrence's plans with respect to the sewer facility. Compl. ¶ 307.

In addition to claiming that the density and flooding concerns alleged to be addressed by the CCD Zoning are bogus, the current zoning is alleged to do nothing more than accomplish the public goal of creating a huge buffer around the outside areas of the property under the guise of environmental protection. Compl. ¶ 239. Support for the claim that the CCD Zoning is aimed only at creation of a buffer (and not due to environmental concerns) lies in the fact that under the 2018 Golf Course Zoning Cameron Engineering signed off on only a 50-foot greenbelt around the Property. In contrast, the current CCD Zone, also approved after a study by Cameron

Engineering, creates an 80-acre buffer between any allowed development and neighboring properties. Compl. ¶ 241.

The third subdistrict provided for in the CCD Zoning is the Clubhouse/Hospitality subdistrict (the "Clubhouse District"), which is located completely within the jurisdiction of Woodburgh. Development of that area is limited to approximately 5.7 acres within Woodsburgh only. Compl. ¶ 247. It encompasses the existing clubhouse facility for the now-closed golf course and its amenities including athletic courts, a swimming pool and parking lots. Id. Defendants' stated intent with respect to creation of this subdistrict is to "preserve and enhance the existing clubhouse of the Woodmere Club," which is referred to as a "prominent community asset." Compl. ¶ 249. Defendants' opposing statement refers to the clubhouse as "historically sensitive." Defs.' St. at 4. The minimum lot size requirement for development of the Clubhouse District is 5.7 acres - the entirety of the land currently occupied by the former golf course and amenities. Compl. ¶ 250. Thus, the CCD Zoning allows only for a single building lot - which is the same lot and height requirements as the existing clubhouse and amenities. Compl. ¶ 250. The future development of this area is thereby limited to replacement of the existing clubhouse or a facsimile thereof. Compl. ¶ 251. These facts are relied on in support of Plaintiffs' characterization of the Clubhouse subdistrict as an effective landmarking of the existing structure and amenities - such that the 5.7 acres of this subdistrict are forever limited to a clubhouse with tennis courts and a pool (or other "hospitality" uses which would operate as a loss). Compl. ¶¶ 252; 256. This zoning subdistrict thereby allows Woodsburgh, at Plaintiffs' expense (an annual unprofitable expenditure of hundreds of thousands of dollars) to forever continue to enjoy a clubhouse, tennis courts and pool - places where the mayor of Woodsburgh is noted to have spent so much time as a member of the board of the former golf club. Compl. ¶¶ 254-55. In

short, creation of the Clubhouse District, like creation of the other subdistricts within the Property, works to deprive Plaintiffs of all viable economic use of their land. See Compl. ¶ 259.

As briefly alluded to above, Cameron Engineering authored the 2018 Report - which stated its environmental supported for the 2018 Golf District. Cameron also authored the report lending environmental support to the CCD Zoning (the "2020 Cameron Report"). Plaintiffs note that 2020 Cameron Report makes no attempt to square its current conclusions with those set forth in the 2018 Cameron Report. Thus, it is unexplained why the 2020 Cameron Report cites environmental concerns that allow for only the scaled-down number of houses that were unstated in the 2018 Cameron Report. Specifically, Cameron made no effort in its 2020 report to explain why 125 houses were allowed in 2018, but only 59 are allowed in 2020. Compl. ¶¶ 260-62. Nor, despite a concern with stormwater runoff (an area addressed in the ongoing SEQRA review) does the 2020 Cameron Report make any mention of the technical review accepted with respect to this issue in the DEIS. Compl. ¶¶ 267-68. That report does, however, state that any future development of the Property would require further site-specific investigation to determine constraints associated with habitats of plants and animals and that "the impact of these potential issues on the development of the [Property] is unknown at this time." Compl. ¶ 270.

As discussed above, Plaintiffs allege that the Property has been singled out for selective treatment. This selective treatment is demonstrated by the fact that the Property is now subject to a novel regulatory scheme that does not apply to other federally designated flood zones within the Defendant jurisdictions. Compl. ¶¶ 271-72. Nor are any other areas subject to requirements that the owners maintain an "passive recreation" area on their private property. Compl. ¶ 273. In particular, Plaintiffs refer to five other golf courses located within the Defendant jurisdictions located within flood zones that are not subject to the restrictions set forth in the CCD Zoning.

Compl. ¶¶ 274-75. Plaintiffs allege that the unfair treatment of the Property can be traced at least in part to an anti-Semitic animus, evidenced by a posting of a letter on Woodsburgh's official website. That letter was written to the editor of a publication known as the Five Towns Jewish Times. It refers to Plaintiffs as unfair out-of-state interlopers who do not care about the community, and are motivated only by greed. Compl. ¶ 278. Other facts allege a more general community opposition to development. Postings on the Woodsburgh website confirm a community consensus that building of 283 homes in any configuration is too much development. Compl. ¶ 279. Similarly, in an open letter to the community Woodsburgh Mayor Israel wrote: "[be] assured that the Village of Woodsburgh is actively and proactively working to maintain the charm and character for which we are known." Compl. ¶ 281.

The Villages of Woodsburgh and Lawrence are specifically cited in support of Plaintiffs' allegations of selective treatment in the form of unfair enforcement of local law. Thus, between 2018 and 2019 Woodsburgh issued six appearance tickets for violations that existed on the Property (when Woodsburgh Mayor Israel was a member of the golf club) prior to Plaintiffs' acquisition of the Property. Comp. ¶ 283; see also Compl. ¶¶ 285-91. These code enforcements are alleged by Plaintiffs, upon information and belief, that to have been directed by Woodsburgh "higher-ups" including Mayor Israel "who used his power to harass Plaintiffs based upon his own personal animus arising out of anger over the future loss of his golf club, as well as because Plaintiffs have tried lawfully to exercise their development rights." Compl. ¶ 293. Like Woodsburgh, Lawrence is alleged to have newly and selectively enforced its Village Code against Plaintiffs, ticketing the Property for practices engaged in routinely when the former golf club was in operation, prior to Plaintiffs' purchase thereof. Compl. ¶¶ 296-97. Additionally, the Lawrence Village-owned yacht club is alleged to have received favorable treatment, and never to

have been cited for the same violations alleged to have been committed by Plaintiffs. Compl. ¶¶ 298-300.

To summarize, Plaintiffs allege that the current CCD zoning a part of a years-long scheme aimed at depriving Plaintiffs of their economic rights to develop their land. This scheme is alleged to have been directed only at Plaintiffs who have been singled out among even those who own golf clubs within the Defendant jurisdictions. The current zoning is stated to be nothing more than a "transparent ruse" and an end-around the Constitutional requirement that the Defendants pay Plaintiffs just compensation for their taking of the Property. Compl. ¶ 17.

II.    Plaintiffs' Claims

As stated above, the Complaint alleges seven separate causes of action. See Compl. The four Federal claims set forth therein seek redress for constitutional violations pursuant to Section 1983. The first such claim is the Equal Protection Claim. Compl. ¶¶ 308-17. Plaintiffs' second federal claim is the Takings Claim. Compl. ¶¶ 318-34 (the "Takings Claim"). Plaintiffs' third claim also is the Fifth Amendment Exaction Claim. Compl. ¶ 342. Plaintiffs' final federal claims are their Due Process Claims. Compl. ¶¶ 349-60. With the exception of the Exaction Claim, the aforementioned Federal Constitutional claims also allege parallel claims under the Constitution of the State of New York. See Compl. ¶ 310 (alleging violation of N.Y. Const.Art. 1 section 11); Compl. ¶ 320 (alleging violation of N.Y. Const. Art. 1 Section 7); Compl. ¶ 350 alleging violation of N.Y., Const. Art. 1 Section 6).

Plaintiffs' state law claims (that are not constitutionally-based) appear as their Fifth, Sixth and Seventh causes of action. The Fifth Cause of Action alleges an ultra vires exercise of the zoning power.  Plaintiffs' Sixth Cause of Action alleges a more specific allegedly ultra vires action in the form of creation of the clubhouse subdistrict. In particular, this claim alleges that

the CCD Zoning impermissibly grants landmark status to the former golf clubhouse and its

amenities, which are located only in Woodsburgh. Finally, the Seventh Cause of Action alleges

that Defendants have unlawfully adopted laws inconsistent with SEQRA.

DISCUSSION

I.   Legal Principles: Standards on Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft

v. Iqbal, 556 U.S. 662, 678-79 (2009) (quoting, Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

570 (2007)); see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 119–20 (2d Cir. 2010).

Facial plausibility is established by pleading factual content sufficient to allow a court to

reasonably infer the defendant's liability. Twombly, 550 U.S. at 556. "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at

555. Nor is a pleading that offers nothing more than "labels and conclusions" or "a formulaic

recitation of the elements of a cause of action," sufficient. Iqbal, 556 U.S. at 678 (2009) (quoting

Twombly, 550 U.S. at 555). As required in the context of this motion to dismiss the factual

allegations in the Complaint, though disputed by Defendants, are accepted to be true for purposes

of this motion, and all reasonable inferences are drawn therefrom in favor of the Plaintiff.

While facts to consider in the context of a Rule 12 motion to dismiss are generally limited to

those set forth in the pleadings, a court may consider matters outside of the pleadings under

certain circumstances. Specifically, in the context of a Rule 12(b)(6) motion, a court may

consider: (1) documents attached to the complaint as exhibits or incorporated by reference

therein; (2) matters of which judicial notice may be taken; or (3) documents upon the terms and

effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the

complaint. <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002); <u>see</u>

<u>International Audiotext Network, Inc. v. American Tel. and Tel. Co.</u>, 62 F.3d 69, 72 (2d Cir.

1995).

Here, the documents to be included in this Court's decision are the maps and zoning

ordinances attached to the Complaint. These documents, which are incorporated by reference

into the Complaint are properly considered. The Court considers Defendants' Statement to the

extent that it mirrors the Complaint, and not to the extent that it sets forth facts regarding intent

that are at odds with the factual allegations of the Complaint. With these facts, as set forth in

detail above in mind, the Court turns to the merits of Defendants' motion.

II.     <u>Standing and Ripeness</u>

Defendants argue that all Federal Constitutional claims, whether based upon any aspect

of the Fifth Amendment Takings Clause, Equal Protection or Due Process, must be dismissed

because Plaintiffs cannot show that their claims are ripe. <u>See</u> Memorandum of Law in Support of

Incorporated Village of Lawrence's Motion to Dismiss ("Lawrence Br."), at 9-11 and n. 2, DE

[38-1]. Central to this argument is the uncontroverted fact that, despite years of negotiation,

Plaintiffs have never actually applied to any of the Defendant municipalities for approval of any

plan to develop the Property. Nor, Defendants note without opposition, have Plaintiffs applied to

any of the Defendants for a variance to allow for any development outside of the parameters of

the present zoning.  <u>See id.</u> at 9. Moreover, to the extent that Plaintiffs have applied for approval

of any development, that application has been made only to the NCPC, which remains in the

SEQRA phase of the approval process.

Defendants additionally argue that Plaintiffs' claims fail because certain restrictions on

development were known to Plaintiffs when they purchased the Property, so they may not now

claim that they have been deprived of any right based upon their economic expectations. In support of this argument Defendants note that the initial Hempstead moratorium was enacted prior to Plaintiffs' purchase of the Property, and that Woodsburgh had also been considering alternatives to development prior to 2017.

Clear Supreme Court precedent as to these arguments defeat Defendants' arguments on both fronts.

First, it is without question (and Defendants do not really argue otherwise) that exhaustion of state/administrative remedies is not required prior to commencing a Section 1983 claim. See Knick v. Twp. of Scott, 588, U.S. ---, 139 S. Ct. 2162, 2177 (2019) (noting general rule that plaintiffs may bring claims under Section 1983 without bringing "any sort of state lawsuit"). Knowing this, Defendants couch their dismissal argument in terms of ripeness. This argument is based upon the alternative holding in Williamson County Regional Planning Comm'n v Hamilton Bank of Johnson City, 473 U.S. 172 (1985), a case that was, in the main, reversed by the Supreme Court in Knick. Despite this reversal, it remains the law that land use cases are not ripe for Constitutional review in the absence of action that makes the land use position of the government clear. Thus, Defendants are correct when they say, in general, that a land use claim is not ripe where the Federal Court does not yet know the extent of the local regulation that will be applied to the property at issue. However, this is not the same as requiring that a plaintiff exhaust remedies, or even that a plaintiff apply for a permit prior to commencing a Federal action.

Defendants' attempt to thread the needle of their argument between exhaustion (which is not required) and ripeness (which is) fails. That is because the ripeness issue is more properly couched as "clarity" and not "finality" when determining whether a case is prematurely

commenced. As recently made clear by the Court in <u>Pakdel v. City and County of San Francisco</u>, 594 U.S. ---,141 S. Ct. 2226 (June 28, 2021), the ripeness question is not properly answered by asking whether all (or any) state applications or variances have been made, but by determining whether the government position as to the plaintiff's property is clear. Submission of an application, or even a single variance may be required to reach such clarity; but it also may not. As described by the Court, the "finality requirement is relatively modest." <u>Pakdel</u>, 141 S. Ct. at 2230. "All a plaintiff must show is that "there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" <u>Id.</u>

Here, as in <u>Pakdel</u>, there is no question as to how the zoning at issue applies to the Property. This is true mainly because the CCD zoning applies only to Plaintiff's property. Thus, this is not a case where a general zoning requirement might be waived, or a variance granted as to the use of a particular parcel within a zoning scheme. Instead, the entire zoning scheme is comprised only of the Property. Defendants, acting together, have made clear as to how the zoning applies to the Property. The years of negotiation which culminated in the Town's refusal to even schedule a vote on prior zoning makes this even clearer. Because Defendants have made clear exactly the development that they will allow on the Property, no application need be submitted to answer the question of what will be allowed. Indeed, adoption of Defendants' position on this issue would amount to imposition of an exhaustion requirement, a procedural hoop that the Constitution does not allow. In sum, the case is ripe because, despite the lack of an application or variance, there is no question that clarity exists.

The fact that certain restrictions on development were known to Plaintiffs when they purchased the Property does not change the conclusion that this case is ripe for decision. Acceptance of a rule holding that any and all zoning restrictions in place at the time of purchase

automatically defeats a Fifth Amendment claim would allow governments "in effect, to put an expiration date on the Takings Clause . . . . Future generations, too, have a right to challenge unreasonable limitations on the use and value of land." <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 631, 121 S. Ct 2448, 2463 (2001).

In sum, neither the failure to apply for a variance, nor the fact that some regulation was known to be on the horizon when Plaintiffs purchased the Property, require dismissal. The first argument is barred by the Supreme Court's recent recognition of the "modest" finality required to show ripeness, and the latter by that Court's clear holding that Fifth Amendment rights cannot be zoned out of existence for all future property owners. This does not mean that Plaintiffs are entitled to the relief they seek; it means only that the Court must decide whether the Complaint states a claim on the merits as to the several causes of action alleged. It is to those issues that the Court now turns.

III.     <u>The Motion to Dismiss</u>

As noted above, Plaintiffs' Federal Constitutional claims are, in parallel fashion, also alleged to also arise under the Constitution of the State of New York. The parties' briefing of any State Constitutional claims ranges from sparse to non-existent. Defendant Lawrence advances a brief substantive argument taking the position that the State Constitutional claims are barred because Plaintiffs have a remedy under the Section 1983, <u>see</u> Lawrence Br. at 28-29. For their parts, Hempstead and Woodsburgh discuss the State Constitutional claims by way of a passing reference to the law that Federal equal protection claims are construed, in all material ways, in accord with Federal Constitutional claims. <u>See</u> Defendants', Town of Hempstead's and Incorporated Village of Woodsburgh's, Memorandum of Law in Support of Motion to Dismiss Complaint ("Defs.' Br."), DE [35-44]. Apart from these two references (which Plaintiffs do not

appear to contest) no party has devoted much of their substantial paper briefing to the issue of whether Plaintiffs state a claim under the New York State Constitution.

At oral argument it became clear that no party urges any distinction between the standards that apply under the Federal Constitution, and those that apply under the Constitution of the State of New York. All agreed that it was not necessary therefore to go into a lengthy discussion about the two constitutions only to conclude that the Federal standards apply. Nonetheless, the Court will address the legal argument briefed by Lawrence regarding whether a private right of action exists under the New York State Constitution. As to this legal argument, Lawrence relies on <u>Felmine v. City of New York</u>, 2012 WL 1999863, at *7 (E.D.N.Y. June 4, 2012) for the proposition that there is no State Constitutional private right of action where another cause of action, such as under Section 1983, exists. However, contrary to this case law, there is authority for the proposition that a State Constitutional claim may be stated even where the Plaintiff alleges claims under Section 1983. This is because Federal law does not provide for liability under a theory of <u>respondeat superior</u> – which is available under State law. <u>See</u> <u>Azurdia v. City of New York</u>, 2019 WL 1406647, *15 (E.D.N.Y. March 28, 2019); <u>Alwan v. City of New York</u>, 311 F. Supp. 3d 570, 587 (E.D.N.Y. 2018). Here, however, no individuals are named, so the <u>respondeat superior</u> distinction has no application. Thus, the Court holds that where, as here, a plaintiff has a remedy under Section 1983, and there is no claim against any individual defendant, there is no implied right of action for violation of the New York State Constitution. <u>See</u> <u>Bertuzzi v. Copiague Union Free Sch. Dist.</u>, 2020 WL 5899949, at * 28 (E.D.N.Y. March 9, 2020), Report and Recommendation <u>adopted as modified</u>, 2020 WL 3989493 (E.D.N.Y. July 15, 2020). Accordingly, the Court recommends holding that the State Constitutional claims are barred by the availability of the Federal remedy. To the extent they are not, they are, however,

governed by the same legal standards as the Federal Constitutional claims. Therefore, like the parties, the Court proceeds to discuss the Federal Constitutional claims, with the assumption that the standards under the State Constitution are the same. Such claims are brought pursuant to Section 1983. Section 1983 does not itself create substantive rights; it offers "a method for vindicating federal rights elsewhere conferred." Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under § 1983, a plaintiff must allege: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983; see also Snider v. Dylag, 188 F.3d 51, 53 (2d Cir.1999).

A.     Equal Protection Claims (First Cause of Action)

1.     Legal Principles

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985). An equal protection claim can be stated in terms of treatment different from others who are similarly situated or as "class of one" selective enforcement. To state a claim under the Equal Protection Clause for selective enforcement of the law, Plaintiffs must plead that they were (1) treated differently from other similarly situated entities and (2) that such treatment "was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure . . . ." Sausa v. Village of West Hampton Dunes, 2019 WL 7598667, at * 8 (E.D.N.Y. June 10, 2019) (citations omitted). To establish that they were subject to selective treatment, a plaintiff must plead that he was similarly situated to other persons but was nevertheless treated differently. Gagliardi v.

Village of Pawling, 18 F.3d 188, 193 (S.D.N.Y. 1994). "A 'class of one' claim succeeds where the plaintiff can show intentional treatment different than those similarly situated, and a lack of rational basis for that treatment." Raus v. Town of Suthampton, 2015 WL 2378974, at *7 (citing Sacher v. Village of Old Brookville, 967 F. Supp. 2d 663, 670 (E.D.N.Y. 2013)) (additional citation omitted). Whatever Plaintiffs' theory it is clear that they must "sufficiently plead the existence of 'similarly situated' others." Segreto v. Town of Islip, No. 12-CV-1961, 2014 WL 737531, at *6 (E.D.N.Y. Feb. 24, 2014); see Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 61 (2d Cir.1985) (it is essential that the plaintiffs allege that "the defendants intentionally treated their application differently from other similar applications").

After determining whether Plaintiffs properly allege similarity, the court considers whether there is a plausible pleading of lack of rational basis. This requires plausibly pleading that legislation fails to be "rationally related to a legitimate state interest." City of Cleburne, Tex. v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). A municipal regulation classification subject to rational basis review "'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Connolly v. McCall, 254 F.3d 36, 42 (2d Cir.2001) (quoting Heller v. Doe, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993)).

The Second Circuit has recognized three types of equal protection violations that may be alleged when challenging particular legislation. Thus, in Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona, NY, 945 F.3d 83 (2d Cir. 2019), the court referred to three possible distinct types of equal protection violations: "(1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect . . . ; and (3) a facially neutral law that is enforced in a discriminatory

manner." <u>Tartikov</u>, 945 F.3d at 110-111. The factually sensitive nature of the discrimination inquiry is demonstrated in <u>Tartikov</u> where the Second Circuit noted that the issue of determining whether "invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." <u>Id.</u> at 111. Such evidence was noted to "include 'the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decision-making process departed from established norms, statements made by the decision making body and community members, reports issued by the decision making body and community members, reports issued by the decision making body whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available.'" <u>Tartikov</u>, 945 F.3d at 111.

> 2.     <u>Plaintiffs State Plausible Equal Protection Claims</u>

Plaintiffs' complaint alleges a violation of their equal protection rights in the form of selective enforcement of certain laws, and well as the broader argument that the CCD Zoning in itself violates their Equal Protection rights. Plaintiffs discussed the nature of their Equal Protection claims at length at oral argument and in their briefing.

As to pleading similarity, Plaintiffs point not only to the presence of other golf courses located in environmentally sensitive areas, but also, in general, to environmentally sensitive areas that are not golf clubs. While these properties are, like the Property, alleged to lie within federally designated flood zones, they are not subject to the CCD Zoning which applies only to Plaintiffs' property. Compl. ¶¶ 271-72; 274-75. Plaintiffs allege that passing and application of the CCD Zoning only to their property, while not subjecting other similarly situated golf courses and areas to the same CCD Zoning, lacks a rational basis, and therefore violates Plaintiffs' equal

protection rights. In essence, Plaintiffs allege that the CCD Zoning irrationally applies to the Property, which has been singled out for treatment different from other similar areas.

Additionally, Plaintiffs allege a violation of the Equal Protection clause in the form of selective enforcement of certain codes. This claim relies on pleading referred to above with respect to the lax enforcement of rules when the Property was under previous ownership (and when Mayor Israel was the president of the golf club). Compl. ¶ 283; see also Compl. ¶¶ 285-291; 293; 296-300. It also refers to the fact that other similarly situated golf clubs are not subject to enforcement of similar laws. As to pleading of lack of rational basis, Plaintiffs state that there is no reason for singling out their Property for such restrictive zoning. In particular, they allege that the CCD Zoning "is arbitrary, capricious and unreasonably requires Plaintiffs to submit to controls not imposed on similarly situated properties." Compl. ¶ 314.

The Court holds that the allegations as to unfair selective treatment, particularly those setting forth different treatment of particular golf clubs located within flood zones, coupled with the factual pleading animating those claims are sufficient to state a claim for the violation of the Equal Protection clause. Plaintiffs' equal protection claims fall within the latter two types of violations referred by the Second Circuit in Tartikov. That is because the CCD Zoning, on its face, is not a facially discriminatory law. As pointed out by defense counsel at oral argument, the law, on its face, is environmental legislation that limits development in an area within a flood zone. However, Plaintiffs plausibly plead that the CCD Zoning was adopted, applied and enforced in a discriminatory manner. Tartikov, 945 F.3d at 110-111.

To be sure, Defendants may be able to show that it is rational to pass environmentally sensitive zoning to parcels of land without similarly zoning all areas. A jury may ultimately find that Defendants acted without discriminatory intent when passing that zoning. Moreover, there

may be rational reasons for the code enforcement decisions made by Defendants. The Constitutional bar required to pass muster under the rational basis standard is indeed low. Plaintiffs likely have a difficult road ahead when attempting to develop facts to meet their ultimate burdens. However, findings as to whether that bar is met here, at the pleadings stage, cannot be made. Therefore, in light of the fact that Plaintiffs have pleaded plausible facts in support of their Equal Protection claims it is recommended that the motion to dismiss Plaintiffs' First Cause of Action be denied.

      B.      <u>Fifth Amendment Takings Claims (Second and Third Causes of Action)</u>

Plaintiffs assert two separate Fifth Amendment claims, which they characterize as a takings claim (the Second Cause of Action) and an exaction claim (the Third Cause of Action). The Court discusses these claims together.

      1.      <u>Legal Principles</u>

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides that private property may not be "taken for public use, without just compensation." <u>Cedar Point Nursery v. Hassid</u>, 141 S. Ct. 2063, 2071 (2021). Physical appropriations of property, such as the exercise of the power of eminent domain to condemn, is a clear form of taking that triggers the right to compensation. <u>Id</u>.  The right to physically invade property can also constitute a <u>per</u> <u>se</u> taking by way of an easement, such as when government conditions a permit on the grant of some type of an easement. In such a case, "even though no particular individual is permitted to station himself permanently upon the premises," <u>Nollan v. California Coastal Commission</u>, 483 U.S. 825, 832, 107 S. Ct. 3141, 3146, 97 L. Ed. 2d 677 (1987), a <u>per</u> <u>se</u> taking may be found. A taking might also occur when government creates a public park out of private property, and in so doing forces "some people alone to bear public

burdens which, in all fairness and justice, should be borne by the public as a whole." <u>Palazzolo</u>, 533 U.S. at 2458, quoting, <u>Armstrong v. United States</u>, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960). In sum, as succinctly stated by the Supreme Court, a <u>per</u> <u>se</u> taking can be found where government "appropriates for the enjoyment of third parties the owner's right to exclude." <u>Cedar Point</u>, 141 S. Ct at 2072.

In addition to the creation of easements and parks without compensation, a Constitutional taking occurs when the government imposes regulation on the use of property that "goes too far." <u>Cedar Point</u>, 141 S. Ct. at 2071, quoting, <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922). To determine whether challenged zoning does, in fact, go too far, Courts apply the flexible test developed in <u>Penn Central Transp. Co. v. New York City</u>, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). This requires the court to consider factually specific issues such as "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." <u>Penn Central</u>, 438 U.S. at 124, 98 S. Ct. 2646. Where these factors evidence regulations that go too far, a Fifth Amendment taking has occurred, triggering the right to compensation.

    2.    <u>Plaintiffs State Plausible Fifth Amendment Claims</u>

Whether styled as a <u>per</u> <u>se</u> taking by way of easement or creation of a public park, or a taking subject to the balancing analysis set forth in <u>Penn Central</u>, there is no doubt that the motions to dismiss Plaintiffs' Fifth Amendment claims must be denied. As to a <u>per</u> <u>se</u> taking, Plaintiffs have plausibly alleged that a portion of the Property has been taken for public use without compensation. As to the claim that the CCD Zoning constitutes an unconstitutional exaction, Plaintiffs state a plausible claim by pleading that the zoning requires that an undue portion of their land be set aside for public purpose. Such allegations are clear when Plaintiff

state as a fact – assumed to be true at this stage of the proceedings - that 70% of the Property must now be maintained and preserved for public use. See Compl. ¶¶ 337-42.

A Penn Central taking is similarly sufficiently alleged in the Complaint wherein Plaintiffs allege that the limited number of lots available for development, along with onerous building requirements, make it economically unfeasible to develop their land. See, e.g. Compl. ¶¶ 324-25; 330. Indeed, the Complaint pleads specifically that due to the requirements of the CCD Zoning "Defendants have deprived Plaintiffs' of 100% of the value" of the Property in Lawrence, "and at least 84% of the value in Hempstead and 25% of the value in Woodsburgh". Compl. ¶ 216. In sum, there is no question that Plaintiffs allege sufficiently that the zoning interferes with their investment-back expectations. The mere fact that the first moratorium was in place at the time of purchase does not defeat the plausible claim that Plaintiffs' investment expectations were completely defeated by the current zoning. Indeed, the years-long negotiations with Defendants informs the issue of those expectations, and is a matter to be developed during discovery. While the exact contours of investment expectations cannot be decided at the pleadings stage, it is clear that Defendants cannot, consistent with the Fifth Amendment, simply zone-out Plaintiffs' expectations – even when the zoning at the time of purchase is somewhat unclear. The Supreme Court has made clear that this is not the case. The requirements of the CCD Zoning may well work to deprive Plaintiffs of the economic expectations to which they, as owners of private property, are due.

Plaintiffs also plausibly assert that Defendants' zoning accomplishes that which the public wanted – but was unwilling to pay for – the creation of a public park. The carving out of areas where development is not allowed as well as creation of the subdistrict that preserves the former golf club and amenities works to create such a public place at Plaintiffs' expense. See

Compl. ¶ 220. With respect to this claim, Plaintiffs plausibly allege that Defendants are forcing Plaintiffs to "alone to bear public burdens" referred to by the Supreme Court in <u>Palazzolo</u>.

Further, Plaintiffs' plausible allegations call for discovery regarding the character of government action. The Complaint raises questions as to the veracity of the asserted reasons for blocking development in allegedly environmentally sensitive areas. This is because Plaintiffs properly plead, <u>inter</u> <u>alia</u>, that earlier zoning developed in 2018, and approved by Cameron Engineering (the same engineering firm that expressed different and allegedly inconsistent environmental concerns) allowed for greater land development consistent with the then-expressed environmental concerns.

It is important to note that allowing this case to proceed beyond the pleading stage does not conflict with the notion that Defendants may enact appropriate land use regulations that are consistent with the Fifth Amendment. Those regulations, however, must not go too far, <u>i.e.</u>, they must substantially advance "legitimate state interests" while also not denying Plaintiffs the "economically viable use" of their land to which they are entitled. <u>Nollan</u>, 483 U.S. at 834. Moreover, Defendants may not create public parkland at Plaintiffs' expense. Whether or not Plaintiffs' allegations result in ultimate findings to support a holding that Defendants have violated the takings clause of the Fifth Amendment in the many ways alleged are matters that can only be determined after discovery, and indeed likely after trial. In the face of Plaintiffs' detailed and plausible pleadings these are matters that cannot be decided in the context of a motion to dismiss. Thus, while the Court reaches no conclusions in connection with a <u>Penn Central</u> or any other unconstitutional takings analysis, Plaintiffs have raised plausible takings claims. Accordingly, it is recommended that the motion to dismiss all Fifth Amendment claims be denied.

C.     Due Process Claim (Fourth Cause of Action)

Plaintiffs bring two claims pursuant to 42 U.S.C. § 1983: (1) a substantive due process claim under the Fourteenth Amendment; and (2) a procedural due process claim under the Fourteenth Amendment.

1.     Substantive Due Process

Substantive due process is a means of "protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). "In order to establish a violation of a right to substantive due process, [after plaintiff demonstrates that it was denied a valid property interest,] a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998)). To satisfy this standard, a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." Rosa R. v. Connelly, 889 F.2d 435, 439 (2d Cir. 1989).

a.     Valid Property Interest

To meet the first prong of the test for substantive due process violations, plaintiffs must show they have a "valid property interest." Cine SK8 v. Town of Henrietta, 507 F.3d 778, 784 (2d Cir. 2007) (citing Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 503 (2d Cir. 2001)); see also Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("To formulate a claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest.").

In land use regulation cases, including zoning cases, the Second Circuit applies a strict "entitlement test" when determining whether an alleged property right is sufficient to support a substantive due process claim. See RRI Realty v. Inc. Vill. of Southampton, 870 F.2d 911, 918 (2d Cir.1989); Brady v. Town of Colchester, 863 F.2d 205, 213–14 (2d Cir.1988). This test, first articulated in Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 58 (2d Cir.1985), applies not only to a property interest in what is sought, but also to a property interest in what is owned. See Zahra v. Town of Southold, 48 F.3d 674, 680 (2d Cir.1995) (dicta); RRI Realty, 870 F.2d at 915. In either case, the inquiry is derived from the Supreme Court's analysis in Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972), and seeks to determine whether there is a "legitimate claim of entitlement" to the benefit in question. Zahra, 48 F.3d at 680 (quoting RRI Realty, 870 F.2d at 915).

Courts look to "existing rules or understandings that stem from an independent source such as state law" to determine whether a claimed property right rises to the level of a right entitled to protection under the substantive due process doctrine. Brady, 863 F.2d at 212 (quoting Roth, 408 U.S. at 577, 92 S. Ct. 2701). Accordingly, the Court looks to New York State law.

Under New York law, a property owner has no right to the existing zoning status of their land unless the right has become "vested." See, e.g., In the Matter of Ellington Constr. Corp. v. Zoning Bd. of Appeals of the Inc. Vill. of New Hempstead, 77 N.Y.2d 114, 122, 566 N.E.2d 128, 132, 564 N.Y.S.2d 1001, 1005 (1990). In order for a right in a particular zoning status to vest, a property owner must have undertaken substantial construction and must have made substantial expenditures prior to the enactment of the more restrictive zoning ordinance. Id. "Where ... there has been no construction or other change to the land itself," a

property owner has no right to complete a project permitted under an earlier zoning classification. In the Matter of Pete Drown Inc. v. Town Bd. of the Town of Ellenburg, 229 A.D.2d 877, 879, 646 N.Y.S.2d 205, 206 (3d Dep't 1996). In instances in which construction has been improperly delayed by local officials in an attempt to prevent vesting, the right to an existing zoning status may also vest by equitable estoppel. See In the Matter of Lawrence Sch. Corp. v. Morris, 167 A.D.2d 467, 468, 562 N.Y.S.2d 707, 708 (2d Dep't 1990); In the Matter of Faymor Dev. Co. v. Bd. of Standards & Appeals of City of New York, 45 N.Y.2d 560, 566, 383 N.E.2d 100, 103, 410 N.Y.S.2d 798, 801 (1978); Soundview Associates v. Town of Riverhead, 725 F. Supp. 2d 320, 336, (E.D.N.Y. 2010). Dilatory tactics aimed at cutting off an owner's right to develop their property may result in a finding that the right to existing zoning has vested. Such vesting was held by the New York Court of Appeals in Pokoik v. Silsdorf, 40 N.Y.2d 769, 390 N.Y.S.2d 49, 358 N.E.2d 874, 876 (1976). There, the court held that "dilatory tactics" which included refusal to act on an application, and thereafter passing an amendment to existing law amounted to "administrative procrastination" which was "calculated to deny [the] property owner his right to use [his] land in a currently lawful manner." Such tactics were held to be "supportable neither by law nor by sound and ethical practice." Pokoik, 40 N.Y.2d at 772. Accordingly, the court held that plaintiff's property right to develop land in the manner zoned upon acquisition was vested.

Here, Plaintiffs allege that they cannot begin construction until their subdivision application, which is pending before the NCPC, is approved. They state that they have spent over two years and $2 million dollars on their subdivision application process, yet are still awaiting a final decision. Compl. ¶¶ 167-183. Plaintiffs contend that the money and efforts expended on their subdivision application process thus far is sufficient to allow the right to develop their

property in accord with existing zoning to have vested. They therefore aver that their pleading is sufficient to plausibly have their situation fall within the special exception described above. The Court agrees.

Plaintiffs have alleged facts sufficient to support a plausible claim that the special facts exception to vesting may apply here. Specifically, they have alleged that Defendants acted in bad faith by changing the very zoning laws that the Plaintiffs were seeking to satisfy with the $2 million spent on the subdivision application to the NCPC, thus effectively alleging that Plaintiffs' pending application can never be finally ruled upon because the zoning laws for which it was submitted no longer exist. Plaintiffs allege that the $2 million spent on the application satisfies the special facts exception to the "substantial construction" element. Construing the facts alleged in favor of Plaintiffs, as required at this stage in the proceedings, the Court holds that Plaintiffs allege facts sufficient to satisfy the "property interest" requirement of a substantive due process claim.

### b. Arbitrary or Irrational Infringement on Property Interest

In order to meet the second prong of a substantive due process claim, a plaintiff must show "that defendants infringed on [its] property right in an arbitrary or irrational manner." Cine SK8, 507 F.3d at 784. In particular, plaintiff must show that the government's infringement was "'arbitrary,' 'conscience shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" Ferran v. Town of Nassau, 471 F.3d 363, 369–70 (2d Cir. 2006); see also Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 505 (2d Cir. 2001) ("As we have held numerous times, substantive due process 'does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit.... [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross

abuse of governmental authority.'" (quoting Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999))); Crowley v. Courville, 76 F.3d 47, 52 (2d Cir. 1996) (explaining that plaintiff meets second prong of substantive due process test "only when government acts with no legitimate reason for its decision" (citation and quotation marks omitted)).

Specifically, "[i]n the zoning context, a government decision regulating a landowner's use of his property offends substantive due process if the government action is arbitrary or irrational. Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision." Southview Assoc., Ltd. v. Bongartz, 980 F.2d 84, 102 (2d Cir. 1992) (citations and quotation marks omitted); see also Merry Charters, LLC v. Town of Stonington, 342 F. Supp. 2d 69, 78 (D. Conn. 2004) (explaining that "denial by a local zoning authority violates substantive due process standards only if the denial 'is so outrageously arbitrary as to constitute a gross abuse of governmental authority'" (quoting Natale, 170 F.3d at 263)). For instance, in the context of a substantive due process claim against the Town of Colchester where zoning was at issue, the Second Circuit reversed a grant of summary judgment to the Town where, inter alia, it "had no authority under state law" to take certain actions with respect to plaintiffs' "protected property interest in the use of their property." Brady v. Town of Colchester, 863 F.2d 205, 215–16 (2d Cir. 1988). The Second Circuit explained that under these circumstances, a "trier of fact could conclude that there was no rational basis for the [Town's zoning board's] actions, and that, as a result, the [zoning board] violated appellants' rights to substantive due process." Id. at 216 (citation and quotation marks omitted).

Defendants argue that Plaintiffs have failed to allege conduct that "shocks the conscience." However, Plaintiffs allege that they were deprived of their property interests

arbitrarily, irrationally, and unlawfully. Specifically, Plaintiffs allege Defendants have engaged in arbitrary, and conscience shocking conduct in the form of the following acts:

> - Defendants refused to even vote on the Proposed 2018 Golf Course Zone, under which Plaintiffs would have been restricted from developing their 284 as-of-right lots down to 125 lots;
>
> - Defendants' claim that they enacted and extended the moratoria for a legitimate purpose, which the New York State Court held was not the case;
>
> - When enacting the current zoning, Defendants relied upon environmental concerns raised by Cameron Engineering, even though those concerns were not raised a year earlier when the very same engineering firm recommended passage of the 2018 Proposed Golf Course.

Compl. ¶¶ 59, 70-77, 78-86, 96-97, 101-184.

The Court need not go through each and every allegation upon which a rotational jury could rely in ultimately finding that Defendants engaged in arbitrary and irrational conduct with respect to Plaintiffs' attempts to develop their property. It is clear that accepting all of Plaintiffs' factual allegations as true and, again, construing them most favorably to Plaintiffs, that Plaintiffs have adequately stated a claim for denial of their substantive due process rights based upon alleged conduct that was "'arbitrary,' 'conscience shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" Ferran, 471 F.3d at 369–70. The Court notes that as the litigation progresses it may become clear that there was a proper basis for Defendants' actions here. However, at this early stage in the litigation, without the benefit of more detailed information that will revealed in the process of discovery, the Court may not conclude that the Plaintiffs' claim must fail as a matter of law. The Complaint plausibly alleges that decisions with respect to the Property were made in an absence of discretion and in an arbitrary, irrational, and conscience-shocking manner. In short, Plaintiffs' allegations—namely, that the Defendants' actions were arbitrary, conscience shocking, or oppressive in the constitutional sense—are

sufficient to withstand a motion to dismiss. <u>See</u> Ferran, 471 F.3d at 369–70. Accordingly, Plaintiffs have alleged a plausible substantive due process claim, and Defendants' motion to dismiss this claim for failure to state a claim is denied.

2. Procedural Due Process

In order to assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." <u>Local 342, Long Island Pub. Serv. Employees, UMD, ILA, AFL–CIO v. Town Bd. of Huntington</u>, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted). In order to establish a procedural due process violation, a plaintiff must prove that he or she was deprived of "'an opportunity ... granted at a meaningful time and in a meaningful manner' for [a] hearing appropriate to the nature of the case." <u>Boddie v. Connecticut</u>, 401 U.S. 371, 378, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971).

As discussed above, Plaintiffs have sufficiently alleged that they possess a protected property interest. This finding supports the first prong of both their substantive and procedural due process claims. As to the remaining element of their procedural due process claim, Plaintiffs allege a violation of their procedural rights under New York law regarding the application process to subdivide the Property. Specifically, New York law mandates the use of a specific procedure through which all stakeholders in connection with a proposed subdivision are given procedural protections. The first step in the procedure is the SEQRA review process, which is designed to address environmental concerns relating to the proposed subdivision plan of all stakeholders. This includes the concerns of property owners, and the County, as well as a local municipalities and landowners. Here, because there are multiple agencies with approval authority, the NCPC has taken the lead in reviewing the environmental impacts of development

under SEQRA, and engages in a "coordinated review" process. 6 NYCRR 617.6(b)(3). At the

end of the SEQRA process, all of the other municipalities can comment on the proposed

subdivision and issue their own findings with respect to its environmental impacts. 6 NYCRR

617.9(a)(3); 6 NYCRR 617.11(d).

Plaintiffs allege that Defendants disregarded the SEQRA process. In particular they argue

that rather than properly addressing their environmental concerns through the state mandated

procedure, Defendants waited until the very eve of the conclusion of the SEQRA review process

to take any action with respect to their alleged concerns about the environment. At that point,

instead of commenting and participating in the ongoing SEQRA process, Defendants changed

the zoning on the Property by adopting the CCD Zoning. This late adoption put an effective end

to the Initial SEQRA Proceedings, during which process Plaintiffs had already spent enormous

resources in pursuing. Defendants' conduct is alleged to have been in contravention of

established SEQRA processes aimed at furthering a collaborative approach to protecting the

environment during the land development process.

Plaintiffs' characterization of the collaborative process intended to be furthered by

established SEQRA principles finds support in New York law. Thus, in Merson v. McNally, 90

N.Y.2d 742, 753, 665 N.Y.S.2d 605, 688 N.E.2d 479 (1997) the court observed that "[t]he

environmental review process was not meant to be a bilateral negotiation between a developer

and lead agency but, rather, an open process that also involves other interested agencies and the

public." 90 N.Y.2d 742, 753, 665 N.Y.S.2d 605, 688 N.E.2d 479 (1997). As noted

in Merson, SEQRA's procedures, principally the compilation of the EIS, provide "a means for

agencies, project sponsors and the public to systematically consider significant adverse

environmental impacts, alternatives and mitigation." Id. at 751 n. 3, 665 N.Y.S.2d 605, 688

N.E.2d 479 (quoting 6 NYCRR 617.2[n]). Plaintiffs allege that they were deprived from receiving a determination from the NCPC due to Defendants' abrupt change of zoning and adoption of the CCD Zoning. This, according to Plaintiffs, deprived them of their Constitutionally protected right to due process. The Court agrees that this is a plausible pleading of deprivation of a protected right. Accordingly, at this early juncture, Plaintiffs have alleged a plausible procedural due process claim, and Defendants' motion to dismiss this claim on that ground is denied.

D. State Law Claims

1. *Ultra Vires* Exercise of Zoning Power by Planning (5th Cause of Action)

i. Legal Principles

The New York Court of Appeals, the Supreme Court and trial level courts have long made clear the broad discretion afforded to municipalities when zoning pursuant to their police power. In short, zoning ordinances are valid so long as they bear a substantial relation to a police power objective of promoting the public health, safety, morals or general welfare. See Tr. of Union Coll. v. Members of the Schenectady City Council, 91 N.Y.2d 161, 667 N.Y.S.2d 978, 690 N.E.2d 862, 1997 WL 800676, *2 (1997); Vill. of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 394, 47 S. Ct. 114, 71 L. Ed. 303 (1926) (zoning ordinance subject to constitutional challenge only if "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare"); Matter of Troy Sand & Gravel Co., Inc v. Town of Sand Lake, 128 N.Y.S.3d 677, 185 A.D.3d 1306, 1309 (3d Dep't. 2020) ("[z]oning ordinances are susceptible to constitutional challenge only if clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare"). Zoning decisions are "entitled to a strong presumption of validity" and "one who challenges such a determination

bears a heavy burden of demonstrating, beyond a reasonable doubt, that the determination was arbitrary and unreasonable or otherwise unlawful". Troy Sand & Gravel, 185 A.D.3d at 1309, 128 N.Y.S.3d at 683.

While the power to zone is "formidable" it is not absolute - even when exercised by the State pursuant to its police power. Tr. of Union Coll., 91 N.Y.2d at 165, 667 N.Y.S.2d at 980, 690 N.E.2d at 864. Where, as here, local zoning is asserted to have been void as ultra vires, the court must determine whether the challenged legislation is consistent with narrower local power. This is because local governments like Defendants do not possess inherent zoning powers that are broadly consistent with the police power of the State. Instead, their authority to regulate land must be traced to the more limited grant of power by the State legislature. Jurisdictions like Defendants must trace their zoning authority to the delegation of power pursuant to, for example, Town and Village laws. Such laws may grant the power to zone in accord with the general welfare. See, e.g., Town Law Section Art. 16 Section 261 (conferring authority on Town Boards to enact ordinances imposing certain restrictions on building "[f]or the purpose of promoting the health, safety, morals or the general welfare of the community ..."); Village Law 7-700 (counterpart to Section 261 of Town Law). When determining the validity of general welfare zoning, courts must remember that legislating in accord with a grant of furthering the "general welfare" is not synonymous with the broad exercise of the State's police powers. Desena v. Gulde, 24 A.D.2d 165, 169, 265 N.Y.S.2d 239 (2d Dep't. 1965)

Additionally, where a comprehensive plan is adopted, the exercise of zoning jurisdiction must accord with that plan. Restuccio v. City of Oswego, 114 A.D.3d 1191, 1191-92, (4th Dep't. 2014); BLF Assocs. LLC. v. Town of Hempstead, 59 A.D.3d 51, 56, 870 N.Y.S.2d 422, 426 (2d Dep't. 2008); see Town Law 272-a (allowing for adoption of a plan). The definition of a "plan"

is not set forth in any enabling legislation. Instead a "comprehensive plan is a compilation of land use policies that may be found in any number of ordinances, resolutions, and policy statements of the town." BLF, 59 A.D.3d at 54, 870 N.Y.S.2d at 425. There must be "comprehensiveness of planning, rather than special interest, irrational ad hocery . . . not slavish servitude to any particular comprehensive plans." Infinity Consulting Grp. v. Town of Huntington, 49 A.D.3d 813, 814 (2d Dep't. 2008). For zoning to survive an ultra vires attack, it must "accord with" but not "define" a well-considered plan for the community. BLF, 59 A.D.3d at 55-56, 870 N.Y.S.2d at 425 (citing Gernatt Asphalt Prods. v. Town of Sardinia, 87 N.Y.2d 668, 685, 642 N.Y.S.2d 164, 664 N.E.2d 1226); Desena v. Gulde, 24 A.D.2d 165, 169, 265 N.Y.S.2d 239 (2d Dep't. 1965) (zoning decisions must be consistent with plan).

Ultimately, a court considering the validity of land use regulation considers whether it goes beyond the principles discussed above. Zoning exceeding such the State's delegation of power is ultra vires and therefore void. BLF, 59 A.D.3d at 54, 870 N.Y.S.2d at 425.

ii.    Plaintiffs State Plausible Claims for *Ultra Vires* Exercise of Power

In light of clear precedent Plaintiffs must concede that the zoning power is broad. Therefore, while their Complaint and briefing allege broadly that the CCD Zoning exceeds the police power, their argument in support of the fifth cause of action is nuanced in its reliance on cases holding that a local government must be careful not to exceed their specific delegated powers. Thus, in particular, Plaintiffs rely heavily on Golden v. Planning Bd. Of Town of Ramapo, 30 N.Y.2d 359 (1972), see Compl. ¶ 367, and BLF Assocs. LLC v. Town of Hempstead, 59 A.D.3d 51, 870 N.Y.S.2d 422 (2d Dep't. 2008). These cases support the law described above noting the distinction between the power to zone and the power to plan - with the latter constituting an ultra vires acts that falls outside of local delegated zoning power.

Plaintiffs argue, inter alia, that the CCD Zoning exceeds the zoning power because it was not made pursuant to "a well-considered comprehensive plan and [Defendants] have improperly adopted and implemented planning power through a zoning ordinance." Compl. ¶ 368. Defendants argue that there is no question but that the CCD Zoning is a valid exercise of their powers, and cannot therefore be deemed ultra vires. However, the issue of whether a particular zoning mechanism is valid or ultra vires is a factually sensitive matter that must be considered and weighed before a court reaches a decision as to whether particular acts have been made in accord with a municipalities' zoning power. That is unquestionably the case here. The facts pleaded raise a plausible claim that Defendants exceeded their powers. In view of the broad discretion inherent in the zoning power delegated by the State, Plaintiffs certainly face an uphill battle. However, based upon the plausible facts pleaded, that is a battle they are entitled to pursue.

Accordingly, the Court recommends denial of the motion to dismiss the Fifth Cause of Action.

2. _Ultra Vires_ Exercise of Zoning Power by Landmarking (6th Cause of Action)

Plaintiffs' sixth cause of action alleges that Defendants have improperly granted landmark status to the former golf club and its amenities. Plaintiffs' allegation is well supported by the description of the CCD Zoning's "Clubhouse-Hospitality Sub-District." That description states clearly that the subdistrict is "designed to preserve the existing clubhouse of the former Woodmere Club and its associated hospitality services." Motion to Dismiss for Failure to State a Claim by The Incorporated Village of Woodsburgh, Town of Hempstead ("Jnt. Mtd."), Ex. G1, DE [35-9]. At oral argument Plaintiffs' counsel confirmed that Plaintiffs are claiming illegal landmarking by creation of the subdistrict. Plaintiffs acknowledge that there is a proper

procedure for creation of landmark status, but allege that any such procedure was not followed when Defendants acted to confer landmark status on the former golf club building and its amenities. <u>See</u> Arg. Tr. 99:20-106:5.

The State of New York encourages localities to act to preserve and "manage the historic and cultural properties under their jurisdiction in a spirit of stewardship and trusteeship for future generations and to authorize local governments to conduct their activities, plans and programs in a manner consistent with the preservation and enhancement of historic . . . properties." Gen. Mun. L.119-aa. Indeed, "preservation of structures and areas with special historic, architectural or cultural significance is surely an important governmental objective." <u>Trustees of Union Coll</u>., 91 N.Y.2d 161, 166. Municipalities like Hempstead are empowered to provide for regulations that, <u>inter alia</u>, protect, enhance and perpetuate structures that have special cultural or aesthetic interest or character. <u>Id.</u> Pursuant to such direction, for example, the Town of Hempstead has established a Landmarks Preservation Commission which defines the concept of a landmark and considers applications to apply landmark status to a building. Such applications are thereafter referred for consideration to the Town Board. After holding hearings, the Town Board then has the power to act on such applications and render an ultimate determination that any particular structure is entitled to protection as a landmark. <u>See</u> <u>generally</u> Town Code Ch. 76.

The act of designating a piece of property as a landmark is not the same as a legislative act of zoning. While certain "spot-zoning" decisions may be impermissible, landmarking a single piece of property might not. The difference between impermissible zoning and permissible landmarking lies in the reasons for singling out a particular parcel for individual treatment. Generally, permissible landmarking, unlike discriminatory spot zoning, may properly apply to

only a particular property based upon its cultural architectural historical or social significance. See Penn Central, 438 U.S. at 128-35, 98 S. Ct. 2661-65.

In support of their motion to dismiss the sixth cause of action, Defendants broadly assert that the power to act to protect structures like the former golf club is well within their powers. When asked for clarity regarding their position and, in addition, to discuss whether the particular structures preserved by the subdistrict were being landmarked, Defendants where somewhat unclear. For example, when asked whether the amenities contained within the subdistrict were landmarked and intended to be preserved, counsel indicated that there were tennis courts on the Property at one time, but his response was otherwise unclear. See Arg. Tr. 95:8-98:24. Whatever the coverage and reasons for creation of the subdistrict, including preservation of the allegedly culturally significant original clubhouse, Defendants take the firm position that creation of the subdistrict, like all aspects of the CCD Zoning, was well within their power to zone.

Creation of the subdistrict (that all seem to agree confers landmark status on, at least, the clubhouse building) may or may not be a valid exercise of Defendants' powers to zone or landmark. When reaching a decision the court must consider whether procedures for landmarking exist, whether they were followed, and whether any landmarking decisions and the scope thereof were appropriate. Like issues regarding the legality of Defendants' exercise of their zoning powers, questions regarding the propriety of establishing a district aimed at preserving a particular building and its amenities are questions that cannot be answered in the context of this motion to dismiss. Accordingly, the Court recommends denial of the motion to dismiss the Sixth Cause of Action.

E.    SEQRA Claim (7th Cause of Action)

Plaintiffs' final claim alleges the "adoption of local laws inconsistent with

SEQRA."  Defendants seek dismissal of this claim primarily on the ground that localities like

Defendants may properly enact environmental legislation in accord with SEQRA. Before turning

to the merits of this branch of the motion the Court describes in greater detail than above, the

current status of the SEQRA process with respect to the Property.

At oral argument, counsel discussed the fact that there are currently two SEQRA

proceedings before the NCPC with respect to the Property. First, there is the proceeding

discussed above that Plaintiffs commenced to obtain approval to develop the Property in accord

with existing zoning (the "Initial SEQRA Proceeding"). Plaintiffs allege that instead of

participating in the Initial SEQRA Proceeding, Defendants bypassed that process by enacting the

CCD Zoning. See Arg. Tr. 25:3-25. Plaintiffs, as described above, characterize this as a tactic

aimed at halting the Initial SEQRA Proceeding, placing it in limbo. Arg. Tr. 25:24-25, 26:5-14.

When asked at oral argument what the next steps were with respect to the Initial SEQRA

Proceeding, Plaintiffs stated that there were no steps in the future because of Defendants'

enactment of the CCD Zoning. Id. Plaintiffs further stated that in response to Defendants' alleged

tactic of passing the CCD Zoning, they were forced to commence a second SEQRA proceeding

(the "Second SEQRA Proceeding"). Arg. Tr. 26:18-27:4. The Second SEQRA Proceeding is not

referred to in the Complaint, but was discussed, without opposition, at oral argument. In the

context of the Second SEQRA Proceeding, Plaintiffs challenge the CCD Zoning. That

proceeding has not been concluded, and no party alleges that it is, like the Initial SEQRA

Proceeding, in limbo.

Plaintiffs' SEQRA cause of action, as pleaded in paragraphs 383 and 384 of the Complaint states that Defendants "were required to address any and all of their purported environmental concerns solely through the SEQRA process," and passage of the CCD Zoning pulled "the rug out from under the NCPC on the very eve of the closing of public comment on Plaintiffs' DEIS." Compl. ¶ 384. This is alleged to have been an act exceeding Defendants' authority and an unlawful preemption of the SEQRA process, requiring invalidation of the CCD Zoning in its entirety. Compl. ¶ 385.

Upon review of the allegations of the Complaint, the Court holds that Plaintiffs allege no plausible claim for violation of SEQRA. While allegations regarding Defendants' alleged bypass of the SEQRA process may state a plausible procedural due process claim (as discussed above) those allegations do not support a plausible claim for violation of SEQRA. Plaintiffs' SEQRA claim, even when interpreted broadly, asserts only that Defendants have failed to act in accord with SEQRA procedures, and, at best, that passage of environmental legislation is barred because the NCPC is the lead SEQRA agency, and Defendant localities may not enact environmental legislation.

The latter branch of such a broadly construed cause of action states no plausible claim because it is undeniable that localities may enact environmental legislation in accord with SEQRA - no party makes any argument to the contrary. The former cause of action - based upon the argument that SEQRA was violated by mere passage of the CCD Zoning - cannot be accepted because it is based upon the broad notion that the passage of local environmental legislation while any SEQRA proceeding is pending violates SEQRA. This argument requires acceptance of the untenable position that any local environmental legislation enacted during an ongoing SEQRA process is unlawful. This cannot be the law.

To be clear, to the extent that Plaintiffs claim that Defendants have put the Initial SEQRA Proceeding in limbo, this allegation properly supports (as discussed above) Plaintiffs' plausibly alleged procedural due process claim. The Seventh Cause of Action is not, however, Constitutionally based - it alleges that SEQRA itself was violated by the passage of local legislation which may or may not be in accord with SEQRA. Thus, it is a state law claim alleging that Defendants have violated SEQRA by passing the CCD Zoning.

To the extent that the Seventh Cause of Action alleges any more particular claim of preemption, i.e., that a final SEQRA decision preempts inconsistent local legislation, any such claim is presently implausible. There is no question but that SEQRA proceedings are ongoing. The NCPC and members of the community continue to be engaged in the SEQRA process. The parties are presumably engaged in the Second SEQRA Proceeding which is addressing the environmental impact of the CCD Zoning. The NCPC has reached no final SEQRA decision with respect to either the Initial or the Second SEQRA proceedings. In fact, at this time, no one can say whether the CCD Zoning is in accord with or exceeds any final SEQRA determination. It would therefore be nothing more than conjecture to determine whether or not the CCD Zoning is preempted by any SEQRA requirements. In view of this fact, Plaintiffs currently state no plausible claim that Defendants have acted in contravention of SEQRA.

Accordingly, the Court holds that Plaintiffs fail to plead a plausible claim for SEQRA preemption and recommends that the motion to dismiss the Seventh Cause of Action be dismissed. Such dismissal is recommended to be without prejudice to replead at the conclusion of the SEQRA process.

IV.    Disposition of the Instant Motion

As discussed above, Plaintiffs' pleading, in the main, is not subject to dismissal pursuant to Rule 12(b)(6). The Court observes what must be obvious to the parties - survival of the motion to dismiss most of Plaintiffs' claims does not translate, by any means, into a holding that all of Defendants' zoning decisions are unlawful. What it does translate into is a triggering of discovery over all of the claims plausibly alleged, along with the time and expense associated therewith.

CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendants' motions to dismiss appearing as Docket Entry No. 35 and 38 herein, be granted in part and denied in part. Specifically, the Court recommends that the motions to dismiss the SEQRA claims be granted without prejudice to replead at the conclusion of the SEQRA process, but that the motions be denied with respect to all other claims and that such claims be allowed to proceed to discovery.

OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure

to object timely to a magistrate's report operates as a waiver of any further judicial review of the

magistrate's decision").


Dated: Central Islip, New York
        August 23, 2021

                                              /s/ Anne Y. Shields
                                              Anne Y. Shields
                                              United States Magistrate Judge