UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WG WOODMERE LLC; SG BARICK LLC; and LH
BARICK LLC,

                       *Plaintiffs*,

   -against-

TOWN OF HEMPSTEAD; THE INCORPORATED
VILLAGE OF WOODSBURGH; and THE
INCORPORATED VILLAGE OF LAWRENCE,

                       *Defendants*.

20-CV-03903 (ARR) (AYS)

**OPINION & ORDER**

ROSS, United States District Judge:

In this action alleging violations of federal and state law in connection with the rezoning of a property located in Woodmere, New York, I have before me a report and recommendation ("R&R") from the Honorable Anne Y. Shields, United States Magistrate Judge, recommending that I grant in part and deny in part defendants' motion to dismiss plaintiffs' complaint. R&R 3, ECF No. 49. Defendants, Town of Hempstead ("Hempstead"), the Incorporated Village of Woodsburgh ("Woodsburgh"), and the Incorporated Village of Lawrence ("Lawrence") (collectively, the "municipalities"), timely objected in two separate filings. Defs.' Hempstead's & Woodsburgh's Objs. to R&R ("HW Objs."), ECF No. 53; Def. Lawrence's Objs. to R&R ("Lawrence Objs."), ECF No. 54. Defendants principally argue that plaintiffs lack standing to sue and fail to state a claim, and that Judge Shields erred in finding otherwise. Plaintiffs, WG Woodmere LLC, SG Barick LLC, and LH Barick LLC, respond that I should overrule defendants' objections and adopt the R&R in its entirety. Pls.' Resp. to Defs.' Objs. to R&R ("Pls.' Resp."), ECF No. 56.

Having reviewed the portions of the R&R to which proper objections were made *de novo*, I adopt the recommendation in part and reject it in part. Specifically, I reject the recommendation that I deny defendants' motion to dismiss plaintiffs' first six causes of action. Plaintiffs do not object to the recommendation that I grant the motion to dismiss plaintiffs' state constitutional claims and the seventh cause of action. Having reviewed that portion of the R&R for clear error, I adopt the recommendation as to the state constitutional claims and the seventh cause of action. Finally, given the dismissal of all the federal law claims, I decline to exercise supplemental jurisdiction over any remaining state law claims. Thus, defendants' motion to dismiss is granted in its entirety and plaintiffs' complaint is dismissed without prejudice. All other pending motions are denied as moot.

## BACKGROUND

### Factual Background

The facts underlying plaintiff's complaint are fully detailed in Judge Shields's comprehensive R&R, familiarity with which is assumed. The following facts, which are particularly relevant to the present motion, are drawn from plaintiffs' complaint and presumed to be true. *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013)

In 2017, plaintiffs acquired a 118-acre parcel of land, located at 99 Meadow Drive, in Woodmere, New York. Compl. ¶¶ 85, 87, ECF No. 1. The property, known as the "Woodmere Club," operated for decades as a private country club offering golf, tennis, swimming, and other amenities. *Id.* The Woodmere Club property is partially located in each of the three municipalities: approximately 55 acres are in Hempstead, 40.5 acres are in Woodsburgh, and 22.9 acres are in Lawrence. *Id.* ¶ 89. Because of the property's location, it is subject to the planning authority of the municipalities as well as the Nassau County Planning Commission ("NCPC"). *Id.* ¶ 90. Under

New York state and county law, the NCPC has primary jurisdiction over subdivision review of the Woodmere Club property. *Id.* ¶¶ 36, 53–57. At the time plaintiffs purchased the property, the then-applicable zoning regulations allowed for development of a subdivision plan consisting of 284 single-family residential lots, with 248 in Hempstead, 24 in Woodsburgh, and 12 in Lawrence. *Id.* ¶ 100. In December 2018, plaintiffs filed an application with the NCPC for approval to subdivide the property into 284 single family residential lots in compliance with the zoning regulations of the municipalities. *Id.* ¶¶ 167–68. The NCPC approval process included a review under New York's State Environmental Quality Review Act ("SEQRA"). *Id.* ¶¶ 17, 58, 171. The NCPC is the "Lead Agency" for purposes of the SEQRA review process, and the Woodmere Club property is subject to "the most detailed and extensive form of environmental review provided by law." *Id.* ¶ 172. Plaintiffs have expended approximately $2.2 million in fees and expenses associated with the NCPC application. *Id.* ¶¶ 186–87.

Defendants have long resisted plaintiffs' development plans. In late 2016, before plaintiffs bought the property, the Hempstead Town Board imposed a temporary moratorium on residential development of golf course properties located within 500 feet of an incorporated village. Compl. ¶ 102. Hempstead proceeded to extend the moratorium six times. *Id.* ¶ 113. Following plaintiffs' purchase of the property, Woodsburgh imposed its own moratorium on subdivision approval. *Id.* ¶¶ 116–17. Plaintiffs challenged both moratoriums in state court; after the New York Supreme Court invalidated Hempstead's moratorium as an unconstitutional taking, Woodsburgh agreed to let its moratorium expire. *Id.* ¶¶ 122–23. Following the demise of its moratorium, Hempstead considered a new zoning proposal in 2018—the "GC Golf Course Coastal Residence District." *Id.* ¶ 124. This proposed zone, which would have also applied to two other waterfront golf courses, would have tripled the required minimum lot size and reduced the number of developable lots by

two-thirds. *Id.* ¶¶ 128, 131. Hempstead ultimately abandoned the proposal in the face of public opposition. *Id.* ¶¶ 146–48. The town then considered an alternative plan to use eminent domain to turn the property into a town-owned park, but abandoned that idea when residents indicated they did not support raising taxes to fund the project. *Id.* ¶ 151, 163.

Finally, in late 2019 and early 2020, as plaintiffs were moving through the SEQRA process before the NCPC, defendants entered an Intermunicipal Cooperation Agreement ("IMA") to rezone the Woodmere Club property. Compl. ¶¶ 188–89. Under the IMA, the municipalities agreed to adopt zoning ordinances that, when combined, would impose a single zoning scheme on the property. *Id.* ¶¶ 190–91. In May 2020, defendants introduced the zoning scheme, called the "Coastal Conservation District – Woodmere Club" ("CCD"). *Id.* ¶ 198. The CCD went further than the GC Golf Course Coastal Residence District, restricting residential development in areas of the property that were developable under the earlier plan. *See id.* ¶ 130. Defendants' stated purpose for enacting the Coastal Conservation District – Woodmere Club ("CCD") was:

> [T]o regulate development in the environmentally sensitive coastal areas that span the municipal boundaries of the Town and the contiguous Villages of Lawrence and Woodsburgh, including the area occupied by the former Woodmere Club – allowing for the enhanced preservation and protection of the Town's and neighboring Villages' environmental, coastal, open space and cultural resources and the preservation of the residential neighborhoods.

*Id.* ¶ 203.

The CCD creates three "subdistricts" covering the Woodmere Club property: the Open Space/Recreation Subdistrict ("Open Space District"), the Single-Family Residential Subdistrict ("Residential District"), and the "Clubhouse/Hospitality Subdistrict" ("Clubhouse District") *Id.* ¶ 208. The Open Space District covers 83.3 acres and limits permitted uses to a private or semi-private golf course or passive parkland. *Id.* ¶¶ 217–18; Ex. F to Compl. 14, ECF No. 1-6. The CCD requires plaintiffs to install and maintain active flood management equipment in the Open Space

District to mitigate flood risk to neighboring properties. Compl. ¶¶ 223–24. The Residential District covers approximately 29.4 acres of the property, almost all of which lies within a flood zone. *Id.* ¶¶ 231, 236. The Residential District significantly reduces the number of lots plaintiffs can develop compared to the prior zoning regulations, from 284 to 59 total, and more specifically from 12 to zero in Lawrence, from 24 to 18 in Woodsburgh, and from 248 to 41 in Hempstead. *Id.* ¶¶ 209–15. Finally, the Clubhouse District covers 5.7 acres of the property and encompasses the Woodmere Club clubhouse building and its tennis courts, swimming pool, and parking lot, and allows for the development of one building substantially identical to the existing clubhouse building in order to "preserve and enhance the existing clubhouse of the Woodmere Club." *Id.* ¶¶ 247–51.

***Procedural Background***

On August 24, 2020, plaintiffs sued defendants, alleging in their complaint seven claims seeking redress for violations of the U.S. Constitution, the New York Constitution, and New York law. *See* Compl. 55–66. Specifically, the complaint alleges: (1) denial of equal protection under the federal and state constitutions; (2) violation of the takings clause of the federal and state constitutions; (3) the imposition of unconstitutional conditions/exaction under the federal constitution; (4) violation of the due process clause of the federal and state constitutions; (5) unlawful and *ultra vires* exercise of zoning power; (6) unlawful and *ultra vires* action in connection with the Clubhouse District; and (7) the adoption of local laws inconsistent with SEQRA. *Id.* The federal constitutional claims are brought pursuant to 42 U.S.C. § 1983. *Id.* 55–63.

On February 16, 2021, defendants moved to dismiss, and the motion was referred to Judge Shields. Dkt. Order (Feb. 16, 2021). The case was subsequently reassigned to me. Dkt. Order (June

14, 2021). Judge Shields heard oral argument and, on August 23, 2021, issued the R&R. In the R&R, Judge Shields recommends that I grant in part and deny in part defendants' motion to dismiss. Specifically, Judge Shields would grant the motion to dismiss plaintiffs' seventh cause of action and deny the motion as to all other counts. After defendants timely filed their objections, plaintiffs filed a response, Pls.' Resp., defendants filed two replies, Defs.' Hempstead's & Woodsburgh's Reply in Supp. of Obj. to R&R ("HW Objs. Reply"), ECF No. 59-6; Def. Lawrence's Reply in Further Supp. of Defs.' Objs. to R&R ("Lawrence Objs. Reply"), ECF No. 60, plaintiffs filed a response to the replies, Suppl. Mem. of Law, ECF No. 63, and, finally, defendants filed two sur-replies to plaintiffs' response, Defs.' Hempstead's & Woodsburgh's Sur-Reply Mem., ECF No. 64-3; Def. Lawrence's Sur-Reply in Further Supp. of Defs.' Objs., ECF No. 65.

A reasonable observer might assume that the delay in deciding this motion is principally due to the length of defendants' 1,954-page motion to dismiss, the considerable briefing generated in response to the R&R, and/or the subsequent motion for discovery, motion to stay, and motion for a temporary restraining order. That assumption would only be half true. Most of the delay is in fact due to the parties' settlement negotiations, which were ongoing for many months. During that time, the parties asked me to place the present motion to dismiss on hold. I turn to the long-pending motion now because, on August 30, 2022, the parties represented that those negotiations reached an impasse.

## LEGAL STANDARD

The standard of review for a dispositive order of a magistrate judge that has been properly objected to is *de novo*. *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022); Fed. R. Civ. P. 72(b)(3). However, any part of a dispositive order that is not objected to, and any part

subject to "conclusory or general objections" or objections that "simply reiterate[]" arguments already made, is reviewed for clear error. *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (internal quotation marks omitted). Plaintiffs argue that I should review the R&R for clear error because defendants' objections to the R&R merely restate the arguments made in their motions to dismiss. Though there is significant overlap between the arguments made by defendants in their motion to dismiss and their objections, defendants generally identify specific legal conclusions in the R&R and provide justifications for the objections. As a result, I review the portions of the R&R to which defendants object *de novo*.

## DISCUSSION

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). The principal difference between the 12(b)(1) and 12(b)(6) analysis is the extent I can look beyond the pleadings. In reviewing a complaint for lack of subject matter jurisdiction under Rule 12(b)(1), I must "accept[] as true all material [factual] allegations of the complaint" and "draw[] all reasonable inferences in favor of the plaintiff," but I also may consider evidence outside the pleadings submitted by either party. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (citation omitted). In deciding a motion to dismiss under Rule 12(b)(6), on the other hand, I must also accept all factual allegations as true and must draw all reasonable inferences in plaintiffs' favor, *Lundy*, 711 F.3d at 113, but may only "consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## I.   Ripeness.

Analyzing defendants' motion under the Rule 12(b)(6) standard, Judge Shields recommends a finding that plaintiffs' claims are ripe for adjudication. The R&R explains that while plaintiffs have not filed an application or variance with any of the municipalities, defendants' position as to plaintiff's property is clear because "the CCD zoning applies only to Plaintiff's property." R&R 26.

As a threshold matter, defendants insist that Judge Shields erred in not applying the Rule 12(b)(1) standard because "'ripeness' is a *jurisdictional* inquiry." HW Objs. 3. Along these lines, defendants argue that because plaintiffs' claim is not ripe, plaintiffs lack standing and I lack jurisdiction over their claims. Ripeness implicates standing because standing requires plaintiff to have suffered an "injury in fact," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), and a party bringing an unripe claim has often not yet been injured, *see Congressional Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83, 110 (2d Cir. 2019). However, the Supreme Court has suggested, and the Second Circuit explicitly stated, that the specific ripeness requirements applicable to land use disputes are not jurisdictional. *Horne v. Dep't of Agriculture*, 569 U.S. 513, 526 n.6 (2013) ("A 'Case' or 'Controversy' exists once the government has taken private property without paying for it."); *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014) ("Because *Williamson County* is a prudential rather than a jurisdictional rule, we may determine that in some instances, the rule should not apply and we still have the power to decide the case." (quoting *Sansotta v. Town of Nags Head*, 724 F.3d 533, 545 (4th Cir. 2013)); *see also Williamson Cnty. Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172

(1985), *overruled in part by Knick v. Township of Scott, Penn.*, 139 S. Ct. 2162 (2019). Given these precedents, I will analyze defendants' motion to dismiss under the Rule 12(b)(6) standard. When considering only the facts alleged in the complaint, exhibits to the complaint, and documents incorporated by reference in the complaint, I find that plaintiffs' takings and equal protection claims are not ripe for adjudication.

Under the Supreme Court's *Williamson County* decision, a constitutional land use regulation claim is ripe when the plaintiff can "show that [] the state regulatory entity has rendered a 'final decision' on the matter." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). The *Williamson County* ripeness prerequisite has been interpreted as conditioning "federal review on a property owner submitting at least one meaningful application for a variance." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005) (citing *Williamson County*, 473 U.S. at 190). Throughout their motion practice, defendants have argued that plaintiffs' complaint must be dismissed because they have not submitted a land use application to any of the defendant municipalities, much less filed a meaningful application for a variance. *E.g.*, Defs.' Hempstead's & Woodsburgh's Mot. to Dismiss 5, ECF No. 35-44. In response, plaintiffs principally argue that Judge Shields was correct in finding that defendants reached a final decision on their land use application because the CCD plan applies only to the Woodmere Club property, demonstrating that defendants' position on the property is clear. Pls.' Resp. 12–13. Plaintiffs add that defendants' conduct shows that any application for a variance would be futile. *Id.* at 12.

The Second Circuit has cautioned against a mechanical application of the finality requirement in land use disputes, *see Murphy*, 402 F.3d at 349, an approach undoubtedly supported by the Supreme Court's recent decision in *Pakdel v. City & County of San Francisco*, 141 S. Ct.

2226 (2021). In *Pakdel*, the Court explained that "[t]he finality requirement is relatively modest. All a plaintiff must show is that 'there [is] no question . . . about how the regulations at issue apply to the particular land in question.'" *Pakdel*, 141 S. Ct. at 2230 (citation omitted). "Once the government is committed to a position," and it is clear how far a land use regulation goes, "potential ambiguities evaporate and the dispute is ripe for judicial resolution." *Id.* Though the *Pakdel* Court did not repudiate *Williamson County*'s so-called "prong-one ripeness" requirement, *Murphy*, 402 F.3d at 348 (citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 518 (6th Cir. 2004)), it offered a clarifying gloss on the *Williamson County* standard. After holding that the administrative exhaustion of state remedies cannot be required before a takings claim is filed in federal court, the Court explained:

> [A] plaintiff's failure to properly pursue administrative procedures may render a claim unripe *if* avenues still remain for the government to clarify or change its decision. *See, e.g.*, *Williamson County*, 473 U.S. at 192–194 ("The Commission's refusal to approve the preliminary plat . . . leaves open the possibility that [the plaintiff] may develop the subdivision according to the plat after obtaining the variances"); *Knick*, 139 S. Ct. at 2169 ("[T]he developer [in *Williamson County*] still had an opportunity to seek a variance from the appeals board"); *cf. Palazzolo v. Rhode Island*, 533 U.S. 606, 624–25 (2001) (dismissing accusations that the plaintiff was "employing a hide the ball strategy" when "submission of [a] proposal would not have clarified the extent of development permitted . . . , which is the inquiry required under our ripeness decisions").

*Pakdel*, 141 S. Ct. at 2231 (cleaned up). Importantly, *Pakdel* suggests that *Williamson County* does not impose a strict "one meaningful application" rule in every case. Instead, "nothing more than *de facto* finality is necessary." *Pakdel*, 141 S. Ct. at 2230. Therefore, where an opportunity to file a variance application exists, plaintiffs must avail themselves of that opportunity. In cases where no such opportunity exists, the "one meaningful application" requirement does not apply. Such a rule is consistent with the longstanding exceptions to the final decision rule based on futility and unfair or repetitive procedures. *See Palazzo*, 533 U.S. at 621 ("Government authorities, of course,

may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision."); *Murphy*, 402 F.3d at 349 ("A property owner . . . will be excused from obtaining a final decision if pursuing an appeal to a zoning board or seeking a variance would be futile.").

Plaintiffs argue, and Judge Shields found, that defendants made a final decision by changing the zoning rules applicable to the Woodmere Club property because "the CCD zoning applies only to Plaintiff's property. Thus, this is not a case where a general zoning requirement might be waived, or a variance granted as to the use of a particular parcel within a zoning scheme." R&R 26. Though the R&R's reasoning is persuasive, I am not convinced that plaintiffs have established *de facto* finality. Two primary rationales underlie the finality requirement: ensuring that the plaintiff has suffered an actual injury and, in a regulatory takings case, ensuring that the scope of the challenged regulation is clear. *Pakdel*, 141 S. Ct. at 2230. I conclude that both rationales support a finding that plaintiffs' takings claims are not yet ripe for adjudication.

My inquiry begins with an analysis of the injuries plaintiffs allegedly suffered. Plaintiffs' takings claim can be construed as either a per se taking of the approximately 75% of the land that plaintiffs allege must be set aside for parkland, Compl. ¶¶ 322, 329, or as a regulatory taking because the CCD zoning rules render a 59-lot development economically infeasible, *id.* ¶ 324. Plaintiffs also bring an exaction takings claim, alleging that the CCD zoning requires them to spend approximately $3 million to install flood mitigation improvements solely for the benefit of nearby residents. *Id.* ¶ 337. Crucially, plaintiffs are not arguing that the opportunity to develop the land pursuant to the old zoning rules was taken from them; rather, they are arguing that defendants' imposition of the new zoning rules amounts to an uncompensated governmental intrusion on their land. Thus, the alleged injury derives from imposition of the CCD zoning restrictions.

Framed this way, plaintiffs' case is essentially indistinguishable from myriad takings cases that have been found unripe in the absence of a final decision on a zoning application. Typically, when an owner challenges a land-use authority's denial of a substantial project, and there is doubt as to whether a more modest submission or a variance application would be accepted, the case is not ripe. *See MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 352–53 (1986); *Williamson County*, 473 U.S. at 182–94. Here, the municipalities effectively denied plaintiffs' 284-lot application by entering an IMA that would not allow such extensive development. But there remains the possibility that a more modest subdivision application will be approved. Indeed, as Judge Shields discusses in her R&R, plaintiffs have filed a new land use application with the NCPC for a 59-lot subdivision, and the application is undergoing SEQRA review.[1] R&R 51; July 28, 2021 Hr'g Tr. 27:2–3, ECF No. 48.

Unless and until a final decision on that application is made, it will be impossible to know whether the CCD zoning goes "too far" because we will not know how far the regulation goes. Perhaps plaintiffs will have to devote a large portion of the Woodmere Club to open parkland and the limits on development will cause a loss of all economically beneficial use of the land; or perhaps the zoning regulations and allowed variances will permit productive use of the property. One example of the unknown impact of the new zoning is the extent development will be allowed in the non-residential areas. Though plaintiffs allege that the Open Space District must be set aside as "parkland," the zoning regulations attached to the complaint explicitly allow for development

---

[1] Though plaintiffs' second subdivision application is not referred to in the complaint or any of its attachments or documents incorporated by reference, Judge Shields considered it because it was "discussed, without opposition, at oral argument." R&R 51. The existence of the second application is not dispositive of the ripeness issue, but I am permitted to take judicial notice of matters of public record, such as the application to the NCPC, in deciding a motion to dismiss under Rule 12(b)(6). *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

of a private or semi-private golf course. *See, e.g.*, Ex. E to Compl. 9, ECF No. 1-5. As to whether a private or semi-private golf course is an economically beneficial use of the property, the Complaint simply states: "It's not." Compl. ¶ 219. But the result of plaintiffs' subdivision application is unknown, and this conclusory allegation is no substitute for a final decision. The determination of when a regulation effectively appropriates a property "depends, in significant part, upon an analysis of the effect the . . . application of the zoning ordinance and subdivision regulations had on the value of respondent's property and investment-backed profit expectations," an effect that "cannot be measured until a final decision is made as to how the regulations will be applied to respondent's property." *Williamson County*, 473 U.S. at 199–200.

Plaintiffs emphasize the decision in *S. Grande View Dev. Co., Inc. v. City of Alabaster, Alabama*, 1 F.4th 1299, 1307 (11th Cir. 2021), a recent Eleventh Circuit case. In *S. Grande View*, a city rezoned a 142-acre portion of a 547-acre property that had been developed pursuant to a master plan approved by the city. *Id.* at 1302. Relying in part on binding circuit precedent, the court determined that the plaintiff's takings claim was ripe because "the zoning ordinance itself was [defendants'] final decision on the matter." *Id.* at 1307. The court explained that the targeted nature of the rezoning meant "there was no ambiguity as to how a general plan would be applied to a specific project." *Id.* But in the present case, unlike in *S. Grande View*, there is still ambiguity as to how the town and county land-use regulations will impact plaintiffs' project because plaintiffs' subdivision plan has yet to be approved at the town or county level. Indeed, New York law gives the defendant municipalities broad discretion in approving or denying a subdivision application. *See* N.Y. Village Law 7–730; *Deepwells Ests. Inc. v. Inc. Vill. of Head of Harbor*, 973 F. Supp. 338, 349 (E.D.N.Y. 1997) (explaining that New York village "planning boards are vested with the authority to weigh evidence and exercise their discretion in approving or denying approval

of a subdivision plat"). Here, such discretionary review power is vested with the NCPC. Compl. ¶ 57. Thus, there remains significant ambiguity regarding how the zoning regulations will actually apply to the Woodmere Club property, not least because one of the NCPC's duties is to conduct an environmental review under SEQRA, "an exhaustive review process that must be completed before the NCPC can make [a] final determination on the subdivision application." Compl. ¶¶ 58, 171.

I am sympathetic to plaintiffs' arguments, as they expended significant resources to develop the property under now-obsolete zoning rules. But plaintiffs' application under the old rules is essentially irrelevant to the constitutional takings claims, because a cognizable takings injury would derive from the impact of the CCD zoning scheme on plaintiffs' use of their property. For that reason, I reject plaintiffs' argument that a variance application would be futile because the municipalities' respective zoning boards are unable or unlikely to grant variances such that plaintiffs can develop the Woodmere Club consistent with their original subdivision plan. Pls.' Resp. 13. The crucial question is not whether plaintiffs can develop their original subdivision plan, but whether the new restrictions imposed on the land amount to a per se taking, a regulatory taking, or an exaction. It will be impossible to answer these questions until a final decision is made on plaintiffs' second application. As a result, until plaintiffs receive a final decision regarding the application of the CCD zoning and Nassau County subdivision regulations to its property, "it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed." *MacDonald*, 477 U.S. at 349 (citation omitted). For the foregoing reasons, I reject the R&R's recommendation regarding ripeness. I therefore dismiss plaintiffs' takings claims.[2]

_____

[2] Facial takings claims are not subject to the *Williamson County* finality rule, and plaintiffs claim

The *Williamson County* finality requirement also applies to equal protection claims and due process claims.[3] *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88–89 (2d Cir. 2002) (collecting cases). Judge Shields concluded that the complaint adequately alleges two distinct theories of an equal protection violation: that of a "facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect" ("selective treatment") and that of a "facially neutral law that is enforced in a discriminatory manner" ("selective enforcement"). *Tartikov*, 945 F.3d at 110–11; *see* R&R 31–32. Because the CCD zoning rules have not yet been applied to or enforced against plaintiffs, the equal protection claim is not ripe. And though a facial equal protection claim would avoid the ripeness requirement, plaintiffs do not allege one. *See* Compl. ¶¶ 308–17.

Even if plaintiffs' equal protection claim were ripe, I would dismiss it for failure to state a claim. Under either of plaintiffs' equal protection theories, they must allege differential treatment from "similarly situated" individuals. *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013). "While a plaintiff is not required to proffer evidence of similarly situated individuals at the motion to dismiss stage, the court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Id.* at 434 (internal quotation marks and citation omitted). Ultimately, plaintiffs fail to "show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d

---

that their challenge is "both facial and as applied." Resp. to Objs. 11. But the bar to pleading a facial takings challenge is a high one that is not met in this case. I find that plaintiffs have failed to plausibly allege that "no set of circumstances exists under which the [challenged ordinance] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[3] For the reasons discussed below, I dismiss plaintiffs' due process claims on different grounds.

Cir. 2006). Most significantly, plaintiffs have not alleged that any of the proffered comparators—the Rockaway Hunting Club, Inwood Country Club, Seawane Golf and Country Club, the Golf Club at Middle Bay, and the Lawrence Yacht & Country Club—are, like the Woodmere Club, no longer operational. *See* Compl. ¶¶ 274–76. Though those comparators are apparently within flood zones like the Woodmere Club, the requisite "high degree of similarity" does not exist because a rational person could regard the circumstances of an inactive country club and an active one to differ to a degree that would justify differential treatment by a municipality's zoning board. *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010). For the foregoing reasons, plaintiffs' equal protection claim is dismissed.

## II.    Due Process.

Plaintiffs' complaint alleges procedural and substantive due process violations. Though the *Williamson County* finality requirement applies to due process claims, unlike plaintiffs' other constitutional claims I find that the *Williamson County* ripeness requirement is satisfied as to due process. Whereas the injury that forms the basis of the takings and equal protection claims is the imposition of the CCD zoning scheme on plaintiffs' property (with an as-yet undetermined effect), the procedural and substantive due process claims do not derive from the imposition of the *new* zoning regulations. Rather, the due process claims are premised on a cognizable property interest in the *old* zoning regulations. *See Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) ("[A] property interest can sometimes exist in what is *sought*—in addition to the property interest that exists in what is *owned*—provided there is a 'legitimate claim of entitlement' to the benefit in question." (citation omitted)). Because defendants have clearly made a final decision as to the old zoning regulations by getting rid of them, I find that plaintiffs' due process claims are ripe for adjudication.

However, the due process claims are unsuccessful due to the discretionary nature of the subdivision approval process. To state a substantive or procedural due process claim in a land use regulation case, "a party must first establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit." *Zahra*, 48 F.3d at 680 (substantive due process); *Mehta v. Surles*, 905 F.2d 595, 598 (2d Cir. 1990) (procedural due process). The Second Circuit applies a "strict entitlement" test to determine whether a party has a property interest in a land-use regulation, which asks whether there is a "legitimate claim of entitlement" to the benefit conferred by the regulation in question. *Zahra*, 48 F.3d at 680. A party has an entitlement to the approval of a land use plan where there is a "certainty or a very strong likelihood of issuance" based "on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case." *RRI Realty Corp. v. Incorporated Village of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989) (internal quotation marks omitted). To satisfy the strict entitlement test, the discretion of the relevant agency must be "so narrowly circumscribed that approval of a proper application is virtually assured." *Id.*

Plaintiffs have not alleged that the discretion of the NCPC and the defendant municipalities is so narrowly circumscribed that approval of their first subdivision application would have been virtually assured. As discussed above, New York law allows municipalities to exercise discretion in approving or denying subdivision applications. *Deepwells Ests. Inc.*, 973 F. Supp. at 349. In the present case, that authority rests with the NCPC, which may also restrict or reject the proposed plan on SEQRA grounds after conducting the requisite environmental review. The R&R erred in focusing solely on whether "existing rules or understandings that stem from an independent source such as state law-rules or understanding"—in this case New York law—define a property interest

17

in the original zoning rules. *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 58 (2d Cir. 1985) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (internal quotation marks omitted)). Judge Shields conducted New York's "vested" rights analysis, but that test applies where subdivision plats have already been approved. *See Ellington Const. Corp. v. Zoning Bd. of Appeals of Inc. Vill. of New Hempstead*, 77 N.Y.2d 114, 122, 564 N.Y.S.2d 1001, 1005 (1990). Plaintiffs cite no case in which a right in zoning rules vested during the subdivision approval process. Here, where there has not been initial subdivision approval—and where approval may not be guaranteed—plaintiffs have failed to plausibly allege a legitimate claim of entitlement to approval of their plan under the original zoning rules. Moreover, the "special facts" exception is inapplicable. The special facts exception applies where a plaintiff's land use application is denied due to a change in the applicable regulations where the plaintiff was "entitled to the permit as a matter of right by full compliance with the requirements at the time of the application" and where the municipality used dilatory tactics to avoid granting the application while it worked to change the law. *Pokoik v. Silsdorf*, 40 N.Y.2d 769, 773, 390 N.Y.S.2d 49, 51 (1976); *Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 335 (E.D.N.Y. 2010). Plaintiffs have not alleged that the NCPC unfairly delayed approval of its subdivision plan to give defendants an opportunity to change the applicable zoning law. Indeed, when defendants enacted the CCD zoning, plaintiffs had not yet submitted land use applications to the defendant municipalities and the NCPC was still conducting its SEQRA review—and village and SEQRA approval are both prerequisites for NCPC approval. So while plaintiffs' due process claims are ripe, plaintiffs fail to plausibly state claims for relief on due process grounds, and the due process claims are therefore dismissed.

III.   **State Law Claims.**

Plaintiffs brought several state law claims, some concurrent with the federal constitutional claims, and others independent of them. I adopt the R&R's recommendations regarding plaintiffs' state constitutional claims and count seven of the complaint. Judge Shields found that the state constitutional claims are either barred by the availability of a federal remedy or subject to the same legal standards as the federal constitutional claims. R&R 28–29. As to count seven of plaintiffs' complaint, which alleges defendants adopted local laws inconsistent with SEQRA, Judge Shields found that plaintiffs failed to plausibly allege that defendants violated SEQRA. R&R 52. Plaintiffs do not object to these recommendations, and I see no clear error in them. That leaves claims five and six, which allege defendants acted in an *ultra vires* and unlawful manner in adopting the CCD zoning. Assuming that those claims are adequately pleaded, an issue I do not decide, I decline to exercise supplemental jurisdiction over them because the federal claims have been dismissed and this case is only at the pleadings stage. 28 U.S.C. § 1367(c)(3); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) ("A district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage." (citation omitted)).

## CONCLUSION

For the foregoing reasons, I adopt the R&R in part and reject it in part. Defendants' motion to dismiss is granted, and plaintiffs' complaint is dismissed without prejudice. All other pending motions are denied as moot.

SO ORDERED.


                                                        _____/s/_____
                                                        Allyne R. Ross
                                                        United States District Judge


Dated:          December 1, 2022
                Brooklyn, New York